Firm I.D. No. 38100

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JUDGE MAROVICH

THE TRAVELERS INDEMNITY CO. OF )
ILLINOIS n/k/a TRAVELERS PROPERTY )
CASUALTY CO. OF AMERICA, )

      Plaintiff, )

vs. )

CARRAMERICA REALTY, LP )

      Defendant. )

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

**05C 5724**

Case No.: **FILED**

OCT - 4 2005

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES the Plaintiff, THE TRAVELERS INDEMNITY COMPANY OF
ILLINOIS n/k/a TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA
(hereinafter "Travelers"), by and through its attorneys, KARBAL, COHEN, ECONOMOU, SILK &
DUNNE, LLC, and for its Complaint for Declaratory Judgment against the Defendant
CARRAMERICA REALTY, LP (hereinafter "CarrAmerica"), and RICHARD WALLACE
(hereinafter "Wallace" or "Underlying Plaintiff"), states and alleges as follows:

### NATURE OF ACTION

1. This Complaint is an action for declaratory judgment pursuant to 735 ILCS 5/2-
701, wherein Travelers seeks a declaration that an insurance policy issued to Swedish Beverages,
Inc. ("Swedish Beverages") does not afford a duty to defend or indemnify CarrAmerica for the
underlying lawsuit entitled *Richard Wallace v. CarrAmerica Realty Corporation a/k/a
CarrAmerica Realty Services, Inc. a/k/a CarrAmerica Realty, L.P., a/k/a CarrAmerica Realty*

*GP Holdings, Inc.*, No. 03 L 010011 (hereinafter the "Underlying Lawsuit") filed in the Circuit Court of Cook County, Illinois.

2.     Plaintiff, Travelers, is a Connecticut Corporation with its principal place of business in Hartford, Connecticut.

3.     Defendant, CarrAmerica, is a Delaware limited partnership doing business in the State of Illinois.

4.     Defendant Wallace is an individual domiciled in the State of Illinois.

5.     Defendant Wallace is named as a defendant herein only to the extent that he is a necessary party in the instant declaratory judgment action.

## JURISDICTION

6.     This Court has jurisdiction over this cause by virtue of 28 USC §1332, in that there is complete diversity of citizenship between St. Paul, on the one hand and all Defendants, on the other hand, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## VENUE

7.     Venue is proper in this District, pursuant to 28 USC §1339(a)(2), because a substantial part of the events or omissions giving rise to St. Paul's claims for declaratory judgment occurred in this District.

## BACKGROUND

8. This coverage dispute arises from an accident that allegedly occurred on March 21, 2003 involving Wallace.

9. On information and belief, on March 21, 2003, Wallace stepped into a large hole located along the U-shaped driveway in the common area of the property commonly known as Bannockburn Lake Office Plaza One located at 2333 Waukegan Road in the City of Bannockburn, State of Illinois (hereinafter the "Property").

10. On information and belief, Wallace was an employee of Swedish Beverages at the time of the aforementioned accident.

11. On information and belief, CarrAmerica leased a certain portion of the Property, specifically, Suite S160, (hereinafter "Premises") to Swedish Beverage pursuant to a lease agreement dated May 13, 2002 (hereinafter "Lease"). A copy of the Lease is attached hereto as **Exhibit "A"**.

12. On information and belief, CarrAmerica owned and managed the Property.

13. The Lease contains the following relevant provisions:

    8. <u>WAIVER OF CLAIMS; INDEMNIFICATION; INSURANCE.</u>

    B.   <u>Indemnification.</u>

> Tenant shall indemnify, defend and hold harmless Landlord . . . against any claim by any third party for injury to any person . . . and arising from the use of the Premises or from any other act or omission or negligence of Tenant or any of Tenant's employees or agents.
> <div align="center">***</div>
>
> Landlord shall indemnify, defend and hold harmless Tenant . . . against any claim by any third party for damage to person or Premises or from any other act or omission or negligence of Landlord or any of Landlord's employees or agents.
> <div align="center">***</div>

3

E.    Landlord's Insurance.    Landlord shall maintain "All-Risk" property insurance . . . and Commercial General Liability insurance policies coverage the common areas of the Building.

Pursuant to the Lease, "Premises" is defined as "that part of the Project leased to Tenant described in the Schedule and outlined in Appendix A. "Project" means the Building known as Bannockburn Lake Office Plaza I and the land located at 2333 Waukegan Road, Bannockburn, Illinois.

14.    On August 19, 2003, Wallace filed a complaint in the Underlying Lawsuit (hereinafter "Underlying Complaint") alleging negligence against CarrAmerica for failure to maintain the Property in a safe and non-hazardous condition.   A copy of the Underlying Complaint is attached hereto as **Exhibit "B"**.

15.    On December 9, 2004, Wallace filed an amended complaint in the Underlying Lawsuit (hereinafter "Amended Complaint").   A copy of the Amended Complaint is attached hereto as **Exhibit "C"**.

16.    Count I of the Amended Complaint alleges negligence against CarrAmerica for failure to maintain the Property, specifically in a safe and non-hazardous condition.

17.    Count II of the Amended Complaint is on behalf of Wallace's wife for loss of consortium.

18.    The Amended Complaint alleges that CarrAmerica owned, operated, maintained, managed, controlled and/or leased the Property.

19.    The Amended Complaint alleges that there was a large hole in the curb of the common area U-shaped driveway in the front entrance of the Property, which CarrAmerica was aware of, or should have been aware of.

4

20.     The Amended Complaint alleges that on March 21, 2003, Wallace pulled his car up to the U-shaped driveway, exited his car and accidentally stepped into the large hole on the Property, causing Wallace to trip and fall.

21.     On or about October 18, 2004, CarrAmerica wrote to Travelers, notifying Travelers of the Underlying Lawsuit and requesting both indemnity and defense with respect to the Underlying Lawsuit. A copy of the letter is attached hereto as **Exhibit "D"**.

22.     On or about **April 25, 2005,** Travelers wrote to CarrAmerica, disclaiming coverage and formally declining to defend or indemnify CarrAmerica with respect to the Underlying Lawsuit. A copy of the letter is attached hereto as **Exhibit "E"**.

## The Travelers Policy

23.     Travelers issued a commercial insurance policy, under policy number I-660-870X561A-TIL-02 to Swedish Beverage, the named insured, with a policy period of May 17, 2002 to May 17, 2003 (hereinafter the "Travelers Policy").

24.     The Travelers Policy is subject to all of its respective terms, conditions, limitations and exclusions. A certified copy of the Travelers Policy is attached hereto as **Exhibit "F"** and incorporated by reference as if fully set forth herein.

25.     The Travelers Policy contains a commercial general liability coverage part with the following relevant limits:

| General Aggregate Limit (other than Products-Completed Operations) | $2,000,000 |
|---|---|
| Products-Completed Operations Aggregate Limit | $2,000,000 |
| Each Occurrence Limit | $1,000,000 |

5

26.     The Travelers Policy contains a Commercial General Liability Coverage Form

with the following relevant provisions:

> Various provisions in this policy restrict coverage. Read the entire
> policy carefully to determine rights, duties and what is and is not
> covered.
>
> Throughout this policy the words "you" and "your" refer to the Named
> Insured shown in the Declarations, and any other person or organization
> qualifying as a Named Insured under this policy. The words "we," "us"
> and "our" refer to the Company providing this insurance.

***

SECTION I –COVERAGES

COVERAGE A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.     Insurance Agreement.

    a.     We will pay those sums that the insured becomes legally
      obligated to pay as damages because of "bodily injury"
      or "property damage" to which this insurance applies.
      We will have the right and duty to defend the insured
      against any "suit" seeking those damages.

* * *

2.     Exclusions.

    This insurance does not apply to:

    a.     Expected or Intended Injury

      "Bodily injury" or "property damage" expected or
      intended from the standpoint of the insured.

27.     The Travelers Policy contains the following notice condition for coverage:

2.     **Duties In The Event Of Occurrence, Offense, Claim Or Suit . . .**

    b.     If a claim is made or "suit" is brought against any
      insured, you must:

      (1)     Immediately record the specifics of the claim or
        "suit" and the date received; and

6

(2)     Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.     You and any other involved insured must:

(1)     Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2)     Authorize us to obtain records and other information;

(3)     Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4)     Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d.     No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

28.    The Travelers Policy contains the following "other insurance" clause:

4.     **Other Insurance.**

b.     Excess Insurance

This insurance is excess over any of the other insurance; whether primary, excess, contingent or on any other basis:

(4)     That is valid and collectible insurance available to you if you are added as an additional insured under any other policy.

29. The Travelers Policy contains an endorsement titled "Additional Insured—Managers or Lessors of Premises" and states in relevant part:

## SCHEDULE

1. Designation of Premises (Part Leased to You):

   2333 Waukegan Road
   Bannockburn IL 60015

2. Name of Person or Organization (Additional Insured):

   CARRAMERICA REALTY LLP
   2333 Waukegan Road, Ste 240
   Bannockburn IL 60015

"WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule..."

## COUNT I
## DECLARATORY RELIEF

30. Travelers realleges the allegations of Paragraphs 1 through 29 above as if fully set forth herein.

31. CarrAmerica is not an insured under the Travelers Policy with respect to the Underlying Lawsuit.

32. The Underlying Lawsuit does not arise out of the ownership, maintenance or use of the Premises leased by Travelers' named insured, Swedish Beverages.

33. Wallace was injured on the common area of the Property and not on or in the Premises.

34. The Travelers Policy excludes coverage for the Underlying Lawsuit to the extent CarrAmerica knew or should have known of the hole giving rise to the injury to Wallace.

8

35. Because CarrAmerica did not provide notice for more than a year after the date of the Underlying Lawsuit, coverage is barred by the terms and conditions of the Travelers Policy.

36. If the Travelers Policy is deemed to provide coverage to CarrAmerica with respect to the Underlying Lawsuit, that coverage is excess.

37. Because the Underlying Lawsuit is not covered under the terms, definitions and conditions of the Travelers Policy, Plaintiff requests that the Court determine and declare that Travelers currently has no obligation under the Travelers Policy, or otherwise, to CarrAmerica, or any other alleged insured under the Travelers Policy, in connection with the Underlying Lawsuit.

38. Based on the foregoing, there is an actual and justiciable controversy between the parties, which may be determined by a judgment or order of this Court. Pursuant to the terms of 28 USC §§2201 and 2202, this Court has the power to declare and adjudicate the rights and liabilities of the parties hereto under the terms and provisions of the policies of insurance referred to herein, and to adjudicate the final rights of all parties and to give such other and further relief as may be necessary to enforce same.

WHEREFORE, Travelers prays for judgment as follows:

(a) Declaring that Travelers has no obligation to defend or indemnify CarrAmerica with respect to the Complaint and Amended Complaint filed in the Underlying Lawsuit; and

(b) Awarding Travelers such other and further relief that the Court may deem just and proper.

Dated: October 4, 2005

Respectfully submitted,

THE TRAVELERS INDEMNITY COMPANY OF
ILLINOIS n/k/a TRAVELERS PROPERTY
CASUALTY COMPANY OF AMERICA

By: _____

One of Its Attorneys

Rory T. Dunne
Suverna Patel
KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC
200 South Michigan Avenue, 20th Floor
Chicago, Illinois 60604
Tel:    (312) 431-3700
Fax:    (312) 431-3670
Firm ID No. 38100
203565_1

10

* * * * * * * * * * * * * * * * * * *

Lease

## BANNOCKBURN LAKE OFFICE PLAZA I

* * * * * * * * * * * * * * * * * * *

Between

## SWEDISH BEVERAGES, INC.
(Tenant)

and

## CARRAMERICA REALTY, L.P.
(Landlord)

lee1REVISED1
052302-1:50PM

# LEASE

THIS LEASE (the "Lease") is dated as of May 13, 2002 between CarrAmerica Realty, L.P., a Delaware limited partnership (the "Landlord") and the Tenant as named in the Schedule below. The term "Project" means the building (the "Building") known as "Bannockburn Lake Office Plaza I" and the land (the "Land") located at 2333 Waukegan Road, Bannockburn, Illinois. "Premises" means that part of the Project leased to Tenant described in the Schedule and outlined on Appendix A.

The following schedule (the "Schedule") is an integral part of this Lease. Terms defined in this Schedule shall have the same meaning throughout the Lease.

## SCHEDULE

1. Tenant: Swedish Beverages, Inc., a Illinois corporation
2. Premises: Suite S160
3. Rentable Square Feet of the Premises: 2,308
4. Tenant's Proportionate Share: 2.24% (based upon a total of 103,221 rentable square feet in the Building)
5. Security Deposit: $9,374.33
6. Tenant's Real Estate Broker for this Lease: Dan Graham of CB Richard Ellis
7. Landlord's Real Estate Broker for this Lease: Sean D. Kropke of CB Richard Ellis
8. Tenant Improvements, if any: See the Tenant Improvement Agreement attached hereto as Appendix C.
9. Commencement Date: May 27, 2002, but if the Premises are subject to new construction pursuant to Appendix C, then the Completion Date, as defined therein, if it is later; Landlord and Tenant shall execute a Commencement Date Confirmation substantially in the form of Appendix E promptly following the Commencement Date.
10. Termination Date/Term: May 31, 2007, five (5) years after the Commencement Date, or if the Commencement Date is not the first day of a month, then after the first day of the following month.
11. Guarantor: N/A

lse1REVISED1
052302-1:50PM

1

12.    **Base Rent:**

| Period | Annual Base Rent | Monthly Base Rent |
| --- | --- | --- |
| Lease Year 1 | $36,928.00 | $3,077.33* |
| Lease Year 2 | $38,082.00 | $3,173.50 |
| Lease Year 3 | $39,236.00 | $3,269.67 |
| Lease Year 4 | $40,390.00 | $3,365.83 |
| Lease Year 5 | $41,544.00 | $3,462.00 |

* Base Rent as well as Operating Cost Share Rent and Tax Share Rent shall be abated for the first ninety (90) days of the Term only.

1.    **LEASE AGREEMENT.** On the terms stated in this Lease, Landlord leases the Premises to Tenant, and Tenant leases the Premises from Landlord, for the Term beginning on the Commencement Date and ending on the Termination Date unless extended or sooner terminated pursuant to this Lease.

2.    **RENT.**

A.    **Types of Rent.** Tenant shall pay the following Rent in the form of a check to Landlord at the following address:

CarrAmerica Realty, L.P., Chicago .
t/a Bannockburn
P.O. Box 642829
Pittsburgh, PA 15264-2829

or by wire transfer as follows:

PNC Bank
ABA Number 043000096
Account Number 1004339225

or in such other manner as Landlord may notify Tenant:

(1)    **Base Rent** in monthly installments in advance, the first monthly installment payable concurrently with the execution of this Lease and thereafter on or before the first day of each month of the Term in the amount set forth on the Schedule.

(2)    **Operating Cost Share Rent** in an amount equal to the Tenant's Proportionate Share of the Operating Costs for the applicable fiscal year of the Lease,

lee1REVISED1
052302-1:50PM

2

paid monthly in advance in an estimated amount. Definitions of Operating Costs and Tenant's Proportionate Share, and the method for billing and payment of Operating Cost Share Rent are set forth in Sections 2B, 2C and 2D.

(3)     Tax Share Rent in an amount equal to the Tenant's Proportionate Share of the Taxes for the applicable fiscal year of this Lease, paid monthly in advance in an estimated amount. A definition of Taxes and the method for billing and payment of Tax Share Rent are set forth in Sections 2B, 2C and 2D.

(4)     Additional Rent in the amount of all costs, expenses, liabilities, and amounts which Tenant is required to pay under this Lease, excluding Base Rent, Operating Cost Share Rent, and Tax Share Rent, but including any interest for late payment of any item of Rent.

(5)     Rent as used in this Lease means Base Rent, Operating Cost Share Rent, Tax Share Rent and Additional Rent. Tenant's agreement to pay Rent is an independent covenant, with no right of setoff, deduction or counterclaim of any kind.

B.      Payment of Operating Cost Share Rent and Tax Share Rent.

(1)     Payment of Estimated Operating Cost Share Rent and Tax Share Rent. Landlord shall estimate the Operating Costs and Taxes of the Project by April 1 of each fiscal year, or as soon as reasonably possible thereafter. Landlord may revise these estimates whenever it obtains more accurate information, such as the final real estate tax assessment or tax rate for the Project.

Within ten (10) days after receiving the original or revised estimate from Landlord, Tenant shall pay Landlord one-twelfth (1/12th) of Tenant's Proportionate Share of this estimate, multiplied by the number of months that have elapsed in the applicable fiscal year to the date of such payment including the current month, minus payments previously made by Tenant for the months elapsed. On the first day of each month thereafter, Tenant shall pay Landlord one-twelfth (1/12th) of Tenant's Proportionate Share of this estimate, until a new estimate becomes applicable.

(2)     Correction of Operating Cost Share Rent. Landlord shall deliver to Tenant a report for the previous fiscal year (the "Operating Cost Report") by May 15 of each year, or as soon as reasonably possible thereafter, setting forth (a) the actual Operating Costs incurred, (b) the amount of Operating Cost Share Rent due from Tenant, and (c) the amount of Operating Cost Share Rent paid by Tenant. Within twenty (20) days after such delivery, Tenant shall pay to Landlord the amount due minus the amount paid. If the amount paid exceeds the amount due, Landlord shall apply the excess to Tenant's payments of Operating Cost Share Rent next coming due. In the last Lease Year, Landlord shall deliver to Tenant the report for the previous fiscal year within 120 days after the end of the last fiscal year.

(3)    Correction of Tax Share Rent.  Landlord shall deliver to Tenant a report for the previous fiscal year (the "Tax Report") by May 15 of each year, or as soon as reasonably possible thereafter, setting forth (a) the actual Taxes, (b) the amount of Tax Share Rent due from Tenant, and (c) the amount of Tax Share Rent paid by Tenant. Within twenty (20) days after such delivery, Tenant shall pay to Landlord the amount due from Tenant minus the amount paid by Tenant.  If the amount paid exceeds the amount due, Landlord shall apply the excess to Tenant's payments of Tax Share Rent next coming due. In the last Lease Year, Landlord shall deliver to Tenant the report for the previous fiscal year within 120 days after the end of the last fiscal year.

C.    Definitions.

(1)    Included Operating Costs. "Operating Costs" means any expenses, costs and disbursements of any kind other than Taxes, paid or incurred by Landlord in connection with the management, maintenance, operation, insurance, repair and other related activities in connection with any part of the Project and of the personal property, fixtures, machinery, equipment, systems and apparatus used in connection therewith, including the cost of providing those services required to be furnished by Landlord under this Lease.  Operating Costs shall also include the costs of any capital improvements which are intended to reduce Operating Costs or improve safety, (except those made to comply with existing government requirements) and those made to keep the Project in compliance with governmental requirements applicable from time to time (collectively, "Included Capital Items"); provided, that the costs of any Included Capital Item shall be amortized by Landlord, together with an amount equal to interest at ten percent (10%) per annum, over the estimated useful life of such item and such amortized costs are only included in Operating Costs for that portion of the useful life of the Included Capital Item which falls within the Term.

If the Project is not fully occupied during any portion of any fiscal year, Landlord may adjust (an "Equitable Adjustment") Operating Costs to equal what would have been incurred by Landlord had the Project been fully occupied.  This Equitable Adjustment shall apply only to Operating Costs which are variable and therefore increase as occupancy of the Project increases.  Landlord may incorporate the Equitable Adjustment in its estimates of Operating Costs.

If Landlord does not furnish any particular service whose cost would have constituted an Operating Cost to a tenant other than Tenant who has undertaken to perform such service itself, Operating Costs shall be increased by the amount which Landlord would have incurred if it had furnished the service to such tenant.

(2)    Excluded Operating Costs.  Operating Costs shall not include:

lse1REVISED1
052302-1:50PM

4

(a)   costs of alterations of tenant premises;

(b)   costs of capital improvements other than included Capital Items;

(c)   interest and principal payments on mortgages or any other debt costs, or rental payments on any ground lease of the Project;

(d)   real estate brokers' leasing commissions;

(e)   legal fees, space planner fees and advertising expenses incurred with regard to leasing the Building or portions thereof;

(f)   any cost or expenditure for which Landlord is reimbursed, by insurance proceeds or otherwise, except by Operating Cost Share Rent;

(g)   the cost of any service furnished to any office tenant of the Project which Landlord does not make available to Tenant;

(h)   depreciation (except on any Included Capital Items);

(i)   franchise or income taxes imposed upon Landlord, except to the extent imposed in lieu of all or any part of Taxes;

(j)   costs of correcting defects in construction of the Building (as opposed to the cost of normal repair, maintenance and replacement expected with the construction materials and equipment installed in the Building in light of their specifications);

(k)   legal and auditing fees which are for the benefit of Landlord such as collecting delinquent rents, preparing tax returns and other financial statements, and audits other than those incurred in connection with the preparation of reports required pursuant to Section 2B above;

(l)   the wages of any employee for services not related directly to the management, maintenance, operation and repair of the Building; and

(m)   fines, penalties and interest.

(3)   Taxes.  "Taxes" means any and all taxes, assessments and charges of any kind, general or special, ordinary or extraordinary, levied against the Project, which Landlord shall pay or become obligated to pay in connection with the ownership, leasing, renting, management, use, occupancy, control or operation of the Project or of the personal property, fixtures, machinery, equipment, systems and apparatus used in connection therewith.  Taxes shall include real estate taxes, personal property taxes,

lse1REVISED1
052302-1:50PM

5

sewer rents, water rents, special or general assessments, transit taxes, ad valorem taxes, and any tax levied on the rents hereunder or the interest of Landlord under this Lease (the "Rent Tax"). Taxes shall also include all fees and other costs and expenses paid by Landlord in reviewing any tax and in seeking a refund or reduction of any Taxes, whether or not the Landlord is ultimately successful.

For the purpose of determining Taxes for any given year, the amount to be included for such year (a) for special taxes or assessments payable in installments, shall be the amount of the installments (and any interest) due and payable during such year, and (b) for all other Taxes, shall, at Landlord's election, be the amount accrued, assessed or otherwise imposed for such year without regard to when any such Taxes are payable.

Taxes shall not include any net income (except Rent Tax), capital, stock, succession, transfer, franchise, gift, estate or inheritance tax, except to the extent that such tax shall be imposed in lieu of any portion of Taxes.

(4)    Lease Year.  "Lease Year" means each consecutive twelve-month period beginning with the Commencement Date, except that if the Commencement Date is not the first day of a calendar month, then the first Lease Year shall be the period from the Commencement Date through the final day of the twelve months after the first day of the following month, and each subsequent Lease Year shall be the twelve months following the prior Lease Year.

(5)    Fiscal Year.  "Fiscal Year" means the calendar year, except that the first fiscal year and the last fiscal year of the Term may be a partial calendar year.

D.    Computation of Base Rent and Rent Adjustments.

(1)    Prorations.    If this Lease begins on a day other than the first day of a month, the Base Rent, Operating Cost Share Rent and Tax Share Rent shall be prorated for such partial month based on the actual number of days in such month. If this Lease begins on a day other than the first day, or ends on a day other than the last day, of the fiscal year, Operating Cost Share Rent and Tax Share Rent shall be prorated for the applicable fiscal year.

(2)    Default Interest.  Any sum due from Tenant to Landlord not paid when due shall bear interest from the date due until paid at eighteen percent (18%) per annum.

(3)    Rent Adjustments.  The square footage of the Premises and the Building set forth in the Schedule are conclusively deemed to be the actual square footage thereof, without regard to any subsequent remeasurement of the Premises or the Building. If any Operating Cost paid in one fiscal year relates to more than one fiscal

lse1REVISED1
052302-1:50PM

6

year, Landlord may proportionately allocate such Operating Cost among the related fiscal years.

(4)    Books and Records.  Landlord shall maintain books and records reflecting the Operating Costs and Taxes in accordance with sound accounting and management practices.  Tenant and its certified public accountant shall have the right to inspect Landlord's records at Landlord's office upon at least seventy-two (72) hours' prior notice during normal business hours during the ninety (90) days following the respective delivery of the Operating Cost Report or the Tax Report.  The results of any such inspection shall be kept strictly confidential by Tenant and its agents, and Tenant and its certified public accountant must agree, in their contract for such services, to such confidentiality restrictions and shall specifically agree that the results shall not be made available to any other tenant of the Building.  Unless Tenant sends to Landlord any written exception to either such report within said ninety (90) day period, such report shall be deemed final and accepted by Tenant.  Tenant shall pay the amount shown on both reports in the manner prescribed in this Lease, whether or not Tenant takes any such written exception, without any prejudice to such exception.  If Tenant makes a timely exception, Landlord shall cause its independent certified public accountant to issue a final and conclusive resolution of Tenant's exception.  Tenant shall pay the cost of such certification unless Landlord's original determination of annual Operating Costs or Taxes overstated the amounts thereof by more than five percent (5%).

(5)    Miscellaneous.  So long as Tenant is in default of any obligation under this Lease, Tenant shall not be entitled to any refund of any amount from Landlord.  If this Lease is terminated for any reason prior to the annual determination of Operating Cost Share Rent or Tax Share Rent, either party shall pay the full amount due to the other within fifteen (15) days after Landlord's notice to Tenant of the amount when it is determined.  Landlord may commingle any payments made with respect to Operating Cost Share Rent or Tax Share Rent, without payment of interest.

3.    PREPARATION AND CONDITION OF PREMISES; POSSESSION AND SURRENDER OF PREMISES.

A.    Condition of Premises.  Except to the extent of the Tenant Improvements item on the Schedule, Landlord is leasing the Premises to Tenant "as is", without any obligation to alter, remodel, improve, repair or decorate any part of the Premises.

B.    Tenant's Possession.  Tenant's taking possession of any portion of the Premises shall be conclusive evidence that the Premises was in good order, repair and condition.  If Landlord authorizes Tenant to take possession of any part of the Premises prior to the Commencement Date for purposes of doing business, all terms of this Lease shall apply to such pre-Term possession, including Base Rent at the rate set forth for the First Lease Year in the Schedule prorated for any partial month.

lse1REVISED1
052302-1:50PM

7

C.   Maintenance. Throughout the Term, Tenant shall maintain the Premises in their condition as of the Completion Date, loss or damage caused by the elements, ordinary wear, and fire and other casualty excepted, and at the termination of this Lease, or Tenant's right to possession, Tenant shall return the Premises to Landlord in broom-clean condition. To the extent Tenant fails to perform either obligation, Landlord may, but need not, restore the Premises to such condition and Tenant shall pay the cost thereof.

## 4.   PROJECT SERVICES.

Landlord shall furnish services as follows:

A.   Heating and Air Conditioning. During the normal business hours of 8:00 a.m. to 6:00 p.m., Monday through Friday, and 8:00 a.m. to 1:00 p.m. on Saturday, Landlord shall furnish heating and air conditioning to provide a comfortable temperature, in Landlord's judgment, for normal business operations, except to the extent Tenant installs equipment which adversely affects the temperature maintained by the air conditioning system.   If Tenant installs such equipment, Landlord may install supplementary air conditioning units in the Premises, and Tenant shall pay to Landlord upon demand as Additional Rent the cost of installation, operation and maintenance thereof.

Landlord shall furnish heating and air conditioning after business hours if Tenant provides Landlord reasonable prior notice, and pays Landlord all then current charges for such additional heating or air conditioning.

B.   Elevators.   Landlord shall provide passenger elevator service during normal business hours to Tenant in common with Landlord and all other tenants. Landlord shall provide limited passenger service at other times, except in case of an emergency.

C.   Electricity. All electricity used in the Premises shall be supplied by the electricity company through a separate meter and shall be paid for by Tenant.  Tenant shall pay for the installation of any submeter required on any floor of its Premises. Tenant shall not install or operate in the Premises any electrically operated equipment or other machinery, other than business machines and equipment normally employed for general office use which do not require high electricity consumption for operation, without obtaining the prior written consent of Landlord.

D.   Water. Landlord shall furnish hot and cold tap water for drinking and toilet purposes.  Tenant shall pay Landlord for water furnished for any other purpose as Additional Rent at rates fixed by Landlord. Tenant shall not permit water to be wasted.

E.   Janitorial Service.   Landlord shall furnish janitorial service as generally provided to other tenants in the Building.

F.   Interruption of Services.   If any of the Building equipment or machinery

ceases to function properly for any cause Landlord shall use reasonable diligence to repair the same promptly. Landlord's inability to furnish, to any extent, the Project services set forth in this Section 4, or any cessation thereof resulting from any causes, including without limitation any entry for repairs pursuant to this Lease, and any renovation, redecoration or rehabilitation of any area of the Building shall not render Landlord liable for damages to either person or property or for interruption or loss to Tenant's business, nor be construed as an eviction of Tenant, nor work an abatement of any portion of Rent, nor relieve Tenant from fulfillment of any covenant or agreement hereof. However, in the event that an interruption of the Project services set forth in this Section 4 is within Landlord's reasonable control and such interruption causes the Premises to be untenantable for a period of at least ten (10) consecutive business days, monthly Rent shall thereafter be abated proportionately.

## 5.   ALTERATIONS AND REPAIRS.

### A.   Landlord's Consent and Conditions.

Tenant shall not make any improvements or alterations to the Premises (the "Work") without in each instance submitting plans and specifications for the Work to Landlord and obtaining Landlord's prior written consent.   Tenant shall pay Landlord's standard charge for review of the plans and all other items submitted by Tenant.   Landlord will be deemed to be acting reasonably in withholding its consent for any Work which (a) impacts the base structural components or systems of the Building, (b) impacts any other tenant's premises, or (c) is visible from outside the Premises.

Tenant shall reimburse Landlord for actual costs incurred for review of the plans and all other items submitted by Tenant.   Tenant shall pay for the cost of all Work.   All Work shall become the property of Landlord upon its installation, except for Tenant's trade fixtures and for items which Landlord requires Tenant to remove at Tenant's cost at the termination of the Lease pursuant to Section 5E.

The following requirements shall apply to all Work:

(1)   Prior to commencement, Tenant shall furnish to Landlord building permits, certificates of insurance satisfactory to Landlord, and, at Landlord's request, security for payment of all costs.

(2)   Tenant shall perform all Work so as to maintain peace and harmony among other contractors serving the Project and shall avoid interference with other work to be performed or services to be rendered in the Project.

(3)   The Work shall be performed in a good and workmanlike manner, meeting the standard for construction and quality of materials in the Building, and shall comply with all insurance requirements and all applicable governmental laws,

lse1REVISED1
052302-1:50PM

9

ordinances and regulations ("Governmental Requirements").

(4) Tenant shall perform all Work so as to minimize or prevent disruption to other tenants, and Tenant shall comply with all reasonable requests of Landlord in response to complaints from other tenants.

(5) Tenant shall perform all Work in compliance with Landlord's "Policies, Rules and Procedures for Construction Projects" in effect at the time the Work is performed.

(6) Tenant shall permit Landlord to supervise all Work. Landlord may charge a supervisory fee not to exceed fifteen percent (15%) of labor, material, and all other costs of the Work.

(7) Upon completion, Tenant shall furnish Landlord with contractor's affidavits and full and final statutory waivers of liens, as-built plans and specifications, and receipted bills covering all labor and materials, and all other close-out documentation required in Landlord's "Policies, Rules and Procedures for Construction Projects".

B.   Damage to Systems. If any part of the mechanical, electrical or other systems in the Premises shall be damaged, Tenant shall promptly notify Landlord, and Landlord shall repair such damage. Landlord may also at any reasonable time make any repairs or alterations which Landlord deems necessary for the safety or protection of the Project, or which Landlord is required to make by any court or pursuant to any Governmental Requirement. Tenant shall at its expense make all other repairs necessary to keep the Premises, and Tenant's fixtures and personal property, in good order, condition and repair; to the extent Tenant fails to do so, Landlord may make such repairs itself. The cost of any repairs made by Landlord on account of Tenant's default, or on account of the mis-use or neglect by Tenant or its invitees, contractors or agents anywhere in the Project, shall become Additional Rent payable by Tenant on demand.

C.   No Liens. Tenant has no authority to cause or permit any lien or encumbrance of any kind to affect Landlord's interest in the Project; any such lien or encumbrance shall attach to Tenant's interest only. If any mechanic's lien shall be filed or claim of lien made for work or materials furnished to Tenant, then Tenant shall at its expense within ten (10) days thereafter either discharge or contest the lien or claim. If Tenant contests the lien or claim, then Tenant shall (i) within such ten (10) day period, provide Landlord adequate security for the lien or claim, (ii) contest the lien or claim in good faith by appropriate proceedings that operate to stay its enforcement, and (iii) pay promptly any final adverse judgment entered in any such proceeding. If Tenant does not comply with these requirements, Landlord may discharge the lien or claim, and the amount paid, as well as attorney's fees and other expenses incurred by Landlord, shall become Additional Rent payable by Tenant on demand.

D.   Ownership of Improvements. All Work as defined in this Section 5, partitions, hardware, equipment, machinery and all other improvements and all fixtures except trade

lse1REVISED1
052302-1:50PM

fixtures, constructed in the Premises by either Landlord or Tenant, (i) shall become Landlord's property upon installation without compensation to Tenant, unless Landlord consents otherwise in writing, and (ii) shall at Landlord's option either (a) be surrendered to Landlord with the Premises at the termination of the Lease or of Tenant's right to possession, or (b) be removed in accordance with Subsection 5E below (unless Landlord at the time it gives its consent to the performance of such construction expressly waives in writing the right to require such removal).

E.     Removal at Termination.  Upon the termination of this Lease or Tenant's right of possession Tenant shall remove from the Project its trade fixtures, furniture, moveable equipment and other personal property, any improvements, except initial improvements outlined in Spaceplan dated May 9, 2002, which Landlord elects shall be removed by Tenant pursuant to Section 5D, and any improvements to any portion of the Project other than the Premises. Tenant shall repair all damage caused by the installation or removal of any of the foregoing items.  If Tenant does not timely remove such property, then Tenant shall be conclusively presumed to have, at Landlord's election (i) conveyed such property to Landlord without compensation or (ii) abandoned such property, and Landlord may dispose of or store any part thereof in any manner at Tenant's sole cost, without waiving Landlord's right to claim from Tenant all expenses arising out of Tenant's failure to remove the property, and without liability to Tenant or any other person.  Landlord shall have no duty to be a bailee of any such personal property.  If Landlord elects abandonment, Tenant shall pay to Landlord, upon demand, any expenses incurred for disposition.

6.     USE OF PREMISES.  Tenant shall use the Premises only for general office purposes.  Tenant shall not allow any use of the Premises which will negatively affect the cost of coverage of Landlord's insurance on the Project.  Tenant shall not allow any inflammable or explosive liquids or materials to be kept on the Premises.  Tenant shall not allow any use of the Premises which would cause the value or utility of any part of the Premises to diminish or would interfere with any other tenant or with the operation of the Project by Landlord.  Tenant shall not permit any nuisance or waste upon the Premises, or allow any offensive noise or odor in or around the Premises.

If any governmental authority shall deem the Premises to be a "place of public accommodation" under the Americans with Disabilities Act or any other comparable law as a result of Tenant's use, Tenant shall either modify its use to cause such authority to rescind its designation or be responsible for any alterations, structural or otherwise, required to be made to the Building or the Premises under such laws.

7.     GOVERNMENTAL REQUIREMENTS AND BUILDING RULES.  Tenant shall comply with all Governmental Requirements applying to its use of the Premises.  Tenant shall also comply with all reasonable rules established for the Project from time to time by Landlord. The present rules and regulations are contained in Appendix B.  Failure by another tenant to comply with the rules or failure by Landlord to enforce them shall not relieve Tenant of its obligation to comply with the rules or make Landlord responsible to Tenant in any way. Landlord shall use reasonable efforts to apply the rules and regulations uniformly with respect to

lse1REVISED1
052302-1:50PM

11

Tenant and tenants in the Building under leases containing rules and regulations similar to this Lease. In the event of alterations and repairs performed by Tenant, Tenant shall comply with the provisions of Section 5 of this Lease and also Landlord's "Policies, Rules and Procedures for Construction Projects".

## 8. WAIVER OF CLAIMS; INDEMNIFICATION; INSURANCE.

A. **Waiver of Claims.** To the extent permitted by law, Tenant waives any claims it may have against Landlord or its officers, directors, employees or agents for business interruption or damage to property sustained by Tenant as the result of any act or omission of Landlord.

To the extent permitted by law, Landlord waives any claims it may have against Tenant or its officers, directors, employees or agents for loss of rents (other than Rent) or damage to property sustained by Landlord as the result of any act or omission of Tenant.

B. **Indemnification.** Tenant shall indemnify, defend and hold harmless Landlord and its officers, directors, employees and agents against any claim by any third party for injury to any person or damage to or loss of any property occurring in the Project and arising from the use of the Premises or from any other act or omission or negligence of Tenant or any of Tenant's employees or agents. Tenant's obligations under this section shall survive the termination of this Lease.

Landlord shall indemnify, defend and hold harmless Tenant and its officers, directors, employees and agents against any claim by any third party for damage to person or Premises or from any other act or omission or negligence of Landlord or any of Landlord's employees or agents. Landlord's obligations under this section shall survive the termination of this Lease.

C. **Tenant's Insurance.** Tenant shall maintain insurance as follows, with such other terms, coverages and insurers, as Landlord shall reasonably require from time to time:

(1) Commercial General Liability Insurance, with (a) Contractual Liability including the indemnification provisions contained in this Lease, (b) a severability of interest endorsement, (c) limits of not less than Two Million Dollars ($2,000,000) combined single limit per occurrence and not less than Two Million Dollars ($2,000,000) in the aggregate for bodily injury, sickness or death, and property damage, and umbrella coverage of not less than Five Million Dollars ($5,000,000).

(2) Property Insurance against "All Risks" of physical loss covering the replacement cost of all improvements, fixtures and personal property. Tenant waives all rights of subrogation, and Tenant's property insurance shall include a waiver of subrogation in favor of Landlord.

lse1REVISED1
052302-1:50PM

(3)  Workers' compensation or similar insurance in form and amounts required by law, and Employer's Liability with not less than the following limits:

| Each Accident | $500,000 |
| Disease—Policy Limit | $500,000 |
| Disease—Each Employee | $500,000 |

Such insurance shall contain a waiver of subrogation provision in favor of Landlord and its agents.

Tenant's insurance shall be primary and not contributory to that carried by Landlord, its agents, or mortgagee. Landlord, and if any, Landlord's building manager or agent and ground lessor shall be named as additional insureds as respects to insurance required of the Tenant in Section 8C(1). The company or companies writing any insurance which Tenant is required to maintain under this Lease, as well as the form of such insurance, shall at all times be subject to Landlord's approval, and any such company shall be licensed to do business in the state in which the Building is located. Such insurance companies shall have a A.M. Best rating of A VI or better.

Tenant shall cause any contractor of Tenant performing work on the Premises to maintain insurance as follows, with such other terms, coverages and insurers, as Landlord shall reasonably require from time to time:

(1)  Commercial General Liability Insurance, including contractor's liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement, and contractor's protective liability coverage, to afford protection with limits, for each occurrence, of not less than One Million Dollars ($1,000,000) with respect to personal injury, death or property damage.

(2)  Workers' compensation or similar insurance in form and amounts required by law, and Employer's Liability with not less than the following limits:

| Each Accident | $500,000 |
| Disease—Policy Limit | $500,000 |
| Disease—Each Employee | $500,000 |

Such insurance shall contain a waiver of subrogation provision in favor of Landlord and its agents.

Tenant's contractor's insurance shall be primary and not contributory to that carried by Tenant, Landlord, their agents or mortgagees. Tenant and Landlord, and if any, Landlord's building manager or agent, mortgagee or ground lessor shall be named as additional insured on Tenant's contractor's insurance policies.

lse1REVISED1
052302-1:50PM

13

D.     <u>Insurance Certificates.</u> Tenant shall deliver to Landlord certificates evidencing all required insurance no later than five (5) days prior to the Commencement Date and each renewal date. Each certificate will provide for thirty (30) days prior written notice of cancellation to Landlord and Tenant.

E.     <u>Landlord's Insurance.</u> Landlord shall maintain "All-Risk" property insurance at replacement cost, including loss of rents, on the Building, and Commercial General Liability insurance policies covering the common areas of the Building, each with such terms, coverages and conditions as are normally carried by reasonably prudent owners of properties similar to the Project" With respect to property insurance, Landlord and Tenant mutually waive all rights of subrogation, and the respective "All-Risk" coverage property insurance policies carried by Landlord and Tenant shall contain enforceable waiver of subrogation endorsements.

## 9.     <u>FIRE AND OTHER CASUALTY.</u>

A.     <u>Termination.</u> If a fire or other casualty causes substantial damage to the Building or the Premises, Landlord shall engage a registered architect to certify within one (1) month of the casualty to both Landlord and Tenant the amount of time needed to restore the Building and the Premises to tenantability, using standard working methods. If the time needed exceeds twelve (12) months from the beginning of the restoration, or two (2) months therefrom if the restoration would begin during the last twelve (12) months of the Lease, then in the case of the Premises, either Landlord or Tenant may terminate this Lease, and in the case of the Building, Landlord may terminate this Lease, by notice to the other party within ten (10) days after the notifying party's receipt of the architect's certificate. The termination shall be effective thirty (30) days from the date of the notice and Rent shall be paid by Tenant to that date, with an abatement for any portion of the Premises which has been untenantable after the casualty.

B.     <u>Restoration.</u> If a casualty causes damage to the Building or the Premises but this Lease is not terminated for any reason, then subject to the rights of any mortgagees or ground lessors, Landlord shall obtain the applicable insurance proceeds and diligently restore the Building and the Premises subject to current Governmental Requirements. Tenant shall replace its damaged improvements, personal property and fixtures. Rent shall be abated on a per diem basis during the restoration for any portion of the Premises which is untenantable, except to the extent that Tenant's negligence caused the casualty.

10.     <u>EMINENT DOMAIN.</u> If a part of the Project is taken by eminent domain or deed in lieu thereof which is so substantial that the Premises cannot reasonably be used by Tenant for the operation of its business, then either party may terminate this Lease effective as of the date of the taking. If any substantial portion of the Project is taken without affecting the Premises, then Landlord may terminate this Lease as of the date of such taking. Rent shall abate from the date of the taking in proportion to any part of the Premises taken. The entire award for a taking of any kind shall be paid to Landlord, and Tenant shall have no right to share in the award. All obligations accrued to the date of the taking shall be performed by the party liable to perform said obligations, as set forth herein.

lse1REVISED1
052302-1:50PM

## 11. RIGHTS RESERVED TO LANDLORD.

Landlord may exercise at any time any of the following rights respecting the operation of the Project without liability to the Tenant of any kind:

A.    Name.  To change the name or street address of the Building or the suite number(s) of the Premises.

B.    Signs.  To install and maintain any signs on the exterior and in the interior of the Building, and to approve at its sole discretion, prior to installation, any of Tenant's signs in the Premises visible from the common areas or the exterior of the Building.

C.    Window Treatments.  To approve, at its discretion, prior to installation, any shades, blinds, ventilators or window treatments of any kind, as well as any lighting within the Premises that may be visible from the exterior of the Building or any interior common area.

D.    Keys.  To retain and use at any time passkeys to enter the Premises or any door within the Premises.  Tenant shall not alter or add any lock or bolt.

E.    Access.  To have access to inspect the Premises, and to perform its obligations, or make repairs, alterations, additions or improvements, as permitted by this Lease.

F.    Preparation for Reoccupancy.  To decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy at any time after Tenant abandons the Premises, without relieving Tenant of any obligation to pay Rent.

G.    Heavy Articles.  To approve the weight, size, placement and time and manner of movement within the Building of any safe, central filing system or other heavy article of Tenant's property.  Tenant shall move its property entirely at its own risk.

H.    Show Premises.  To show the Premises to prospective purchasers, tenants, brokers, lenders, investors, rating agencies or others at any reasonable time, provided that Landlord gives prior notice to Tenant and does not materially interfere with Tenant's use of the Premises.

I.    Relocation of Tenant.  To relocate the Tenant, upon ninety days' prior written notice, from all or part of the Premises (the "Old Premises") to another area in the Project (the "new premises"), provided that:

    (1)    the size of the new premises is at least equal to the size of the Old Premises;

    (2)    the configuration of the new premises is essentially the same as the Old Premises and allows for the same continuity of work flow;

    (3)    the new premises have an equal number of window offices that offer a

Ise1REVISED1
052302-1:50PM

15

view comparable to the Old Premises views;

    (4)    Landlord pays the cost of moving the Tenant and improving the new premises to the standard of the Old Premises. Cost shall include the normal physical moving costs of the physical move, replacement stationary, preparation and mailing of customer and vendor announcements, change of address fees, recabling of computer and communication systems. The move shall take place over a weekend. Tenant shall cooperate with Landlord in all reasonable ways to facilitate the move, including supervising the movement of files or fragile equipment, designating new locations for furniture, equipment and new telephone and electrical outlets, and determining the color of paint and wallpaper in the new premises.

    (5)    The Landlord may move the tenant only once during the lease term, and then only to expand the space of an adjoining tenant or to lease a much larger space (at least 5,000 square feet) to a new or existing tenant.

J.    Use of Lockbox. To designate a lockbox collection agent for collections of amounts due Landlord. In that case, the date of payment of Rent or other sums shall be the date of the agent's receipt of such payment or the date of actual collection if payment is made in the form of a negotiable instrument thereafter dishonored upon presentment. However, Landlord may reject any payment for all purposes as of the date of receipt or actual collection by mailing to Tenant within 21 days after such receipt or collection a check equal to the amount sent by Tenant.

K.    Repairs and Alterations. To make repairs or alterations to the Project and in doing so transport any required material through the Premises, to close entrances, doors, corridors, elevators and other facilities in the Project, to open any ceiling in the Premises, or to temporarily suspend services or use of common areas in the Building. Landlord may perform any such repairs or alterations during ordinary business hours, except that Tenant may require any Work in the Premises to be done after business hours if Tenant pays Landlord for overtime and any other expenses incurred. Landlord may do or permit any work on any nearby building, land, street, alley or way.

L.    Landlord's Agents. If Tenant is in default under this Lease, possession of Tenant's funds or negotiation of Tenant's negotiable instrument by any of Landlord's agents shall not waive any breach by Tenant or any remedies of Landlord under this Lease.

M.    Building Services. To install, use and maintain through the Premises, pipes, conduits, wires and ducts serving the Building, provided that such installation, use and maintenance does not unreasonably interfere with Tenant's use of the Premises.

N.    Other Actions. To take any other action which Landlord deems reasonable in connection with the operation, maintenance or preservation of the Building.

lse1REVISED1
052302-1:50PM

## 12. TENANT'S DEFAULT.

Any of the following shall constitute a default by Tenant:

A.    Rent Default. Tenant fails to pay any Rent when due;

B.    Assignment/Sublease or Hazardous Substances Default. Tenant defaults in its obligations under Section 17 Assignment and Sublease or Section 28 Hazardous Substances;

C.    Other Performance Default. Tenant fails to perform any other obligation to Landlord under this Lease, and, in the case of only the first two (2) such failures during the Term of this Lease, this failure continues for ten (10) days after written notice from Landlord, except that if Tenant begins to cure its failure within the ten (10) day period but cannot reasonably complete its cure within such period, then, so long as Tenant continues to diligently attempt to cure its failure, the ten (10) day period shall be extended to sixty (60) days, or such lesser period as is reasonably necessary to complete the cure;

D.    Credit Default. One of the following credit defaults occurs:

(1)    Tenant commences any proceeding under any law relating to bankruptcy, insolvency, reorganization or relief of debts, or seeks appointment of a receiver, trustee, custodian or other similar official for the Tenant or for any substantial part of its property, or any such proceeding is commenced against Tenant and either remains undismissed for a period of thirty days or results in the entry of an order for relief against Tenant which is not fully stayed within seven days after entry;

(2)    Tenant becomes insolvent or bankrupt, does not generally pay its debts as they become due, or admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors;

(3)    Any third party obtains a levy or attachment under process of law against Tenant's leasehold interest.

E.    Vacation or Abandonment Default. Tenant vacates or abandons the Premises.

## 13. LANDLORD REMEDIES.

A.    Termination of Lease or Possession. If Tenant defaults, Landlord may elect by notice to Tenant either to terminate this Lease or to terminate Tenant's possession of the Premises without terminating this Lease. In either case, Tenant shall immediately vacate the Premises and deliver possession to Landlord, and Landlord may repossess the Premises and may, at Tenant's sole cost, remove any of Tenant's signs and any of its other property, without relinquishing its right to receive Rent or any other right against Tenant.

lse1REVISED1
052302-1:50PM

B.     Lease Termination Damages. If Landlord terminates the Lease, Tenant shall pay to Landlord all Rent due on or before the date of termination, plus Landlord's reasonable estimate of the aggregate Rent that would have been payable from the date of termination through the Termination Date, reduced by the rental value of the Premises calculated as of the date of termination for the same period, taking into account anticipated vacancy prior to reletting, reletting expenses and market concessions, discounted to present value at the rate of five percent (5%) per annum. If Landlord shall relet any part of the Premises for any part of such period before such present value amount shall have been paid by Tenant or finally determined by a court, then the amount of Rent payable pursuant to such reletting (taking into account vacancy prior to reletting and any reletting expenses or concessions) shall be deemed to be the reasonable rental value for that portion of the Premises relet during the period of the reletting.

C.     Possession Termination Damages. If Landlord terminates Tenant's right to possession without terminating the Lease and Landlord takes possession of the Premises itself, Landlord may relet any part of the Premises for such Rent, for such time, and upon such terms as Landlord in its sole discretion shall determine, without any obligation to do so prior to renting other vacant areas in the Building. Any proceeds from reletting the Premises shall first be applied to the expenses of reletting, including redecoration, repair, alteration, advertising, brokerage, legal, and other reasonably necessary expenses. If the reletting proceeds after payment of expenses are insufficient to pay the full amount of Rent under this Lease, Tenant shall pay such deficiency to Landlord monthly upon demand as it becomes due. Any excess proceeds shall be retained by Landlord.

D.     Landlord's Remedies Cumulative. All of Landlord's remedies under this Lease shall be in addition to all other remedies Landlord may have at law or in equity. Waiver by Landlord of any breach of any obligation by Tenant shall be effective only if it is in writing, and shall not be deemed a waiver of any other breach, or any subsequent breach of the same obligation. Landlord's acceptance of payment by Tenant shall not constitute a waiver of any breach by Tenant, and if the acceptance occurs after Landlord's notice to Tenant, or termination of the Lease or of Tenant's right to possession, the acceptance shall not affect such notice or termination. Acceptance of payment by Landlord after commencement of a legal proceeding or final judgment shall not affect such proceeding or judgment. Landlord may advance such monies and take such other actions for Tenant's account as reasonably may be required to cure or mitigate any default by Tenant. Tenant shall immediately reimburse Landlord for any such advance, and such sums shall bear interest at the default interest rate until paid.

E.     WAIVER OF TRIAL BY JURY. EACH PARTY WAIVES TRIAL BY JURY IN THE EVENT OF ANY LEGAL PROCEEDING BROUGHT BY THE OTHER IN CONNECTION WITH THIS LEASE. EACH PARTY SHALL BRING ANY ACTION AGAINST THE OTHER IN CONNECTION WITH THIS LEASE IN A FEDERAL OR STATE COURT LOCATED IN ILLINOIS, CONSENTS TO THE JURISDICTION OF SUCH COURTS, AND WAIVES ANY RIGHT TO HAVE ANY PROCEEDING TRANSFERRED FROM SUCH COURTS ON THE

lse1REVISED1
052302-1:50PM

**GROUND OF IMPROPER VENUE OR INCONVENIENT FORUM.**

F.    Litigation Costs.   Tenant shall pay Landlord's reasonable attorneys' fees and other costs in enforcing this Lease, whether or not suit is filed.

14.    SURRENDER.   Upon termination of this Lease or Tenant's right to possession, Tenant shall return the Premises to Landlord in good order and condition, ordinary wear and casualty damage excepted.  If Landlord requires Tenant to remove any alterations, then Tenant shall remove the alterations in a good and workmanlike manner and restore the Premises to its condition prior to their installation.

15.    HOLDOVER.   Tenant shall have no right to holdover possession of the Premises after the expiration or termination of this Lease without Landlord's prior written consent, which Landlord may withhold in its sole and absolute discretion.  If Tenant retains possession of any part of the Premises after the Term, Tenant shall become a month-to-month tenant for the entire Premises upon all of the terms of this Lease as might be applicable to such month-to-month tenancy, except that Tenant shall pay all of Base Rent, Operating Cost Share Rent and Tax Share Rent at double the rate in effect immediately prior to such holdover, computed on a monthly basis for each full or partial month Tenant remains in possession.  Tenant shall also pay Landlord all of Landlord's direct and consequential damages resulting from Tenant's holdover.  No acceptance of Rent or other payments by Landlord under these holdover provisions shall operate as a waiver of Landlord's right to regain possession or any other of Landlord's remedies.

16.    SUBORDINATION TO GROUND LEASES AND MORTGAGES.

A.    Subordination.   This Lease shall be subordinate to any present or future ground lease or mortgage respecting the Project, and any amendments to such ground lease or mortgage, at the election of the ground lessor or mortgagee as the case may be, effected by notice to Tenant in the manner provided in this Lease.  The subordination shall be effective upon such notice, but at the request of Landlord or ground lessor or mortgagee, Tenant shall within ten (10) days of the request, execute and deliver to the requesting party any reasonable documents provided to evidence the subordination.  Any mortgagee has the right, at its option, to subordinate its mortgage to the terms of this Lease, without notice to, nor the consent of, Tenant.

B.    Termination of Ground Lease or Foreclosure of Mortgage.   If any ground lease is terminated or mortgage foreclosed or deed in lieu of foreclosure given and the ground lessor, mortgagee, or purchaser at a foreclosure sale shall thereby become the owner of the Project, Tenant shall attorn to such ground lessor or mortgagee or purchaser without any deduction or setoff by Tenant, and this Lease shall continue in effect as a direct lease between Tenant and such ground lessor, mortgagee or purchaser.  The ground lessor or mortgagee or purchaser shall be liable as Landlord only during the time such ground lessor or mortgagee or purchaser is the owner of the Project.  At the request of Landlord, ground lessor or mortgagee, Tenant shall

lse1REVISED1
052302-1:50PM

execute and deliver within ten (10) days of the request any document furnished by the requesting party to evidence Tenant's agreement to attorn.

   C.   Security Deposit.  Any ground lessor or mortgagee shall be responsible for the return of any security deposit by Tenant only to the extent the security deposit is received by such ground lessor or mortgagee.

   D.   Notice and Right to Cure.  The Project is subject to any ground lease and mortgage identified with name and address of ground lessor or mortgagee in Appendix D to this Lease (as the same may be amended from time to time by written notice to Tenant).  Tenant agrees to send by registered or certified mail to any ground lessor or mortgagee identified either in such Appendix or in any later notice from Landlord to Tenant a copy of any notice of default sent by Tenant to Landlord.  If Landlord fails to cure such default within the required time period under this Lease, but ground lessor or mortgagee begins to cure within ten (10) days after such period and proceeds diligently to complete such cure, then ground lessor or mortgagee shall have such additional time as is necessary to complete such cure, including any time necessary to obtain possession if possession is necessary to cure, and Tenant shall not begin to enforce its remedies so long as the cure is being diligently pursued.

   E.   Definitions.  As used in this Section 16, "mortgage" shall include "deed of trust" and/or "trust deed" and "mortgagee" shall include "beneficiary" and/or "trustee", "mortgagee" shall include the mortgagee of any ground lessee, and "ground lessor", "mortgagee", and "purchaser at a foreclosure sale" shall include, in each case, all of its successors and assigns, however remote.

## 17.   ASSIGNMENT AND SUBLEASE.

   A.   In General.  Tenant shall not, without the prior consent of Landlord in each case, (i) make or allow any assignment or transfer, by operation of law or otherwise, of any part of Tenant's interest in this Lease, (ii) grant or allow any lien or encumbrance, by operation of law or otherwise, upon any part of Tenant's interest in this Lease, (iii) sublet any part of the Premises, or (iv) permit anyone other than Tenant and its employees to occupy any part of the Premises.  Tenant shall remain primarily liable for all of its obligations under this Lease, notwithstanding any assignment or transfer.  No consent granted by Landlord shall be deemed to be a consent to any subsequent assignment or transfer, lien or encumbrance, sublease or occupancy.  Tenant shall pay all of Landlord's attorneys' fees and other expenses incurred in connection with any consent requested by Tenant or in reviewing any proposed assignment or subletting.  Any assignment or transfer, grant of lien or encumbrance, or sublease or occupancy without Landlord's prior written consent shall be void.  If Tenant shall assign this Lease or sublet the Premises in its entirety any rights of Tenant to renew this Lease, extend the Term or to lease additional space in the Project shall be extinguished thereby and will not be transferred to the assignee or subtenant, all such rights being personal to the Tenant named herein.

   B.   Landlord's Consent.  Landlord will not unreasonably withhold its consent to any

lse1REVISED1
052302-1:50PM

proposed assignment or subletting. It shall be reasonable for Landlord to withhold its consent to any assignment or sublease if (i) Tenant is in default under this Lease, (ii) the proposed assignee or sublessee is a tenant in the Project or an affiliate or subtenant of such a tenant or a party that Landlord has identified as a prospective tenant in the Project, (iii) the financial responsibility, nature of business, and character of the proposed assignee or subtenant are not all reasonably satisfactory to Landlord, (iv) in the reasonable judgment of Landlord the purpose for which the assignee or subtenant intends to use the Premises (or a portion thereof) is not in keeping with Landlord's standards for the Building or are in violation of the terms of this Lease or any other leases in the Project, (v) the proposed assignee or subtenant is a government entity, or (vi) the proposed assignment is for less than the entire Premises or for less than the remaining Term of the Lease. The foregoing shall not exclude any other reasonable basis for Landlord to withhold its consent.

C. _Procedure._ Tenant shall notify Landlord of any proposed assignment or sublease at least thirty (30) days prior to its proposed effective date. The notice shall include the name and address of the proposed assignee or subtenant, its corporate affiliates in the case of a corporation and its partners in a case of a partnership, an execution copy of the proposed assignment or sublease, and sufficient information to permit Landlord to determine the financial responsibility and character of the proposed assignee or subtenant. As a condition to any effective assignment of this Lease, the assignee shall execute and deliver in form satisfactory to Landlord at least fifteen (15) days prior to the effective date of the assignment, an assumption of all of the obligations of Tenant under this Lease. As a condition to any effective sublease, subtenant shall execute and deliver in form satisfactory to Landlord at least fifteen (15) days prior to the effective date of the sublease, an agreement to comply with all of Tenant's obligations under this Lease, and at Landlord's option, an agreement (except for the economic obligations which subtenant will undertake directly to Tenant) to attorn to Landlord under the terms of the sublease in the event this Lease terminates before the sublease expires.

D. _Change of Management or Ownership._ Any transfer of the direct or indirect power to affect the management or policies of Tenant or direct or indirect change in 50% or more of the ownership interest in Tenant shall constitute an assignment of this Lease.

E. _Excess Payments._ If Tenant shall assign this Lease or sublet any part of the Premises for consideration in excess of the pro-rata portion of Rent applicable to the space subject to the assignment or sublet, then Tenant shall pay to Landlord as Additional Rent 50% of any such excess immediately upon receipt.

F. _Recapture._ Landlord may, by giving written notice to Tenant within thirty (30) days after receipt of Tenant's notice of assignment or subletting, terminate this Lease with respect to the space described in Tenant's notice, as of the effective date of the proposed assignment or sublease and all obligations under this Lease as to such space shall expire except as to any obligations that expressly survive any termination of this Lease.

18. **CONVEYANCE BY LANDLORD.** If Landlord shall at any time transfer its

lse1REVISED1
052302-1:50PM

21

interest in the Project or this Lease, Landlord shall be released of any obligations occurring after such transfer, except the obligation to return to Tenant any security deposit not delivered to its transferee, and Tenant shall look solely to Landlord's successors for performance of such obligations. This Lease shall not be affected by any such transfer.

19. **ESTOPPEL CERTIFICATE.** Each party shall, within ten (10) days of receiving a request from the other party, execute, acknowledge in recordable form, and deliver to the other party or its designee a certificate stating, subject to a specific statement of any applicable exceptions, that the Lease as amended to date is in full force and effect, that the Tenant is paying Rent and other charges on a current basis, and that to the best of the knowledge of the certifying party, the other party has committed no uncured defaults and has no offsets or claims. The certifying party may also be required to state the date of commencement of payment of Rent, the Commencement Date, the Termination Date, the Base Rent, the current Operating Cost Share Rent and Tax Share Rent estimates, the status of any improvements required to be completed by Landlord, the amount of any security deposit, and such other matters as may be reasonably requested. Failure to deliver such statement within the time required shall be conclusive evidence against the non-certifying party that this Lease, with any amendments identified by the requesting party, is in full force and effect, that there are no uncured defaults by the requesting party, that not more than one month's Rent has been paid in advance, that the non-certifying party has not paid any security deposit, and that the non-certifying party has no claims or offsets against the requesting party.

20. **SECURITY DEPOSIT.** Tenant shall deposit with Landlord on the date of this Lease, security for the performance of all of its obligations in the amount set forth on the Schedule. If Tenant defaults under this Lease, Landlord may use any part of the Security Deposit to make any defaulted payment, to pay for Landlord's cure of any defaulted obligation, or to compensate Landlord for any loss or damage resulting from any default. To the extent any portion of the deposit is used, Tenant shall within five (5) days after demand from Landlord restore the deposit to its full amount. Landlord may keep the Security Deposit in its general funds and shall not be required to pay interest to Tenant on the deposit amount. If Tenant shall perform all of its obligations under this Lease and return the Premises to Landlord at the end of the Term, Landlord shall return all of the remaining Security Deposit to Tenant within thirty (30) days after the end of the Term. The Security Deposit shall not serve as an advance payment of Rent or a measure of Landlord's damages for any default under this Lease.

If Landlord transfers its interest in the Project or this Lease, Landlord may transfer the Security Deposit to its transferee. Upon such transfer, Landlord shall have no further obligation to return the Security Deposit to Tenant, and Tenant's right to the return of the Security Deposit shall apply solely against Landlord's transferee.

21. **FORCE MAJEURE.** Landlord shall not be in default under this Lease to the extent Landlord is unable to perform any of its obligations on account of any strike or labor problem, energy shortage, governmental pre-emption or prescription, national emergency, or any other cause of any kind beyond the reasonable control of Landlord ("Force Majeure").

lse1REVISED1
052302-1:50PM

22.    **TENANT'S    PERSONAL    PROPERTY    AND    FIXTURES.**
INTENTIONALLY DELETED.

23.    **NOTICES.** All notices, consents, approvals and similar communications to be given by one party to the other under this Lease, shall be given in writing, mailed or personally delivered as follows:

A.    **Landlord.** To Landlord as follows:

CarrAmerica Realty Corporation
2333 Waukegan Road
Suite E-110
Bannockburn, IL 60015
Attn:    Property Manager

with a copy to each of:

CarrAmerica Realty Corporation
1850 K Street, N.W.
Suite 500
Washington, D.C. 20006
Attn:    Lease Administration

and:

CarrAmerica Realty Corporation
1850 K Street, N.W.
Suite 500
Washington, D.C. 20006
Attn:    General Counsel

and:

Mason, Silver, Wenk & Mishkin, L.L.C.
10 South LaSalle Street
Suite 2650
Chicago, IL 60603
Attn:    Keith J. Wenk, Esq.

or to such other person at such other address as Landlord may designate by notice to Tenant.

lse1REVISED1
052302~1:50PM

B.     **Tenant.** To Tenant as follows:

Swedish Beverages, Inc.
2333 Waukegan Road
Suite S160
Bannockburn, IL 60015
Attn: Tony Fliko

or to such other person at such other address as Tenant may designate by notice to Landlord.

Mailed notices shall be sent by United States certified or registered mail, or by a reputable national overnight courier service, postage prepaid. Mailed notices shall be deemed to have been given on the earlier of actual delivery or three (3) business days after posting in the United States mail in the case of registered or certified mail, and one business day in the case of overnight courier.

24.     **QUIET POSSESSION.** So long as Tenant shall perform all of its obligations under this Lease, Tenant shall enjoy peaceful and quiet possession of the Premises against any party claiming through the Landlord.

25.     **REAL ESTATE BROKER.** Tenant represents to Landlord that Tenant has not dealt with any real estate broker with respect to this Lease except for any broker(s) listed in the Schedule, and no other broker is in any way entitled to any broker's fee or other payment in connection with this Lease. Tenant shall indemnify and defend Landlord against any claims by any other broker or third party for any payment of any kind in connection with this Lease.

26.     **MISCELLANEOUS.**

A.     **Successors and Assigns.**     Subject to the limits on Tenant's assignment contained in Section 17, the provisions of this Lease shall be binding upon and inure to the benefit of all successors and assigns of Landlord and Tenant.

B.     **Date Payments Are Due.** Except for payments to be made by Tenant under this Lease which are due upon demand or are due in advance (such as Base Rent), Tenant shall pay to Landlord any amount for which Landlord renders a statement of account within ten days of Tenant's receipt of Landlord's statement.

C.     **Meaning of "Landlord", "Re-Entry", "Including" and "Affiliate".** The term "Landlord" means only the owner of the Project and the lessor's interest in this Lease from time to time. The words "re-entry" and "re-enter" are not restricted to their technical legal meaning. The words "including" and similar words shall mean "without limitation." The word "affiliate" shall mean a person or entity controlling, controlled by or under common control with the applicable entity. "Control" shall mean the power directly or indirectly, by contract or otherwise, to direct the management and policies of the applicable entity.

lse1REVISED1
052302-1:50PM

D.    **Time of the Essence.** Time is of the essence of each provision of this Lease.

E.    **No Option.** This document shall not be effective for any purpose until it has been executed and delivered by both parties; execution and delivery by one party shall not create any option or other right in the other party.

F.    **Severability.** The unenforceability of any provision of this Lease shall not affect any other provision.

G.    **Governing Law.** This Lease shall be governed in all respects by the laws of the state in which the Project is located, without regard to the principles of conflicts of laws.

H.    **Lease Modification.** Tenant agrees to modify this Lease in any way requested by a mortgagee which does not cause increased expense to Tenant or otherwise materially adversely affect Tenant's interests under this Lease.

I.    **No Oral Modification.** No modification of this Lease shall be effective unless it is a written modification signed by both parties.

J.    **Landlord's Right to Cure.** If Landlord breaches any of its obligations under this Lease, Tenant shall notify Landlord in writing and shall take no action respecting such breach so long as Landlord promptly begins to cure the breach and diligently pursues such cure to its completion. Landlord may cure any default by Tenant; any expenses incurred shall become Additional Rent due from Tenant on demand by Landlord.

K.    **Captions.** The captions used in this Lease shall have no effect on the construction of this Lease.

L.    **Authority.** Landlord and Tenant each represents to the other that it has full power and authority to execute and perform this Lease.

M.    **Landlord's Enforcement of Remedies.** Landlord may enforce any of its remedies under this Lease either in its own name or through an agent.

N.    **Entire Agreement.** This Lease, together with all Appendices, constitutes the entire agreement between the parties. No representations or agreements of any kind have been made by either party which are not contained in this Lease.

O.    **Landlord's Title.** Landlord's title shall always be paramount to the interest of the Tenant, and nothing in this Lease shall empower Tenant to do anything which might in any way impair Landlord's title.

P.    **Light and Air Rights.** Landlord does not grant in this Lease any rights to light and

lse1REVISED1
052302-1:50PM

air in connection with Project. Landlord reserves to itself, the Land, the Building below the improved floor of each floor of the Premises, the Building above the ceiling of each floor of the Premises, the exterior of the Premises and the areas on the same floor outside the Premises, along with the areas within the Premises required for the installation and repair of utility lines and other items required to serve other tenants of the Building.

Q.   Singular and Plural. Wherever appropriate in this Lease, a singular term shall be construed to mean the plural where necessary, and a plural term the singular. For example, if at any time two parties shall constitute Landlord or Tenant, then the relevant term shall refer to both parties together.

R.   No Recording by Tenant. Tenant shall not record in any public records any memorandum or any portion of this Lease.

S.   Exclusivity. Landlord does not grant to Tenant in this Lease any exclusive right except the right to occupy its Premises.

T.   No Construction Against Drafting Party. The rule of construction that ambiguities are resolved against the drafting party shall not apply to this Lease.

U.   Survival. All obligations of Landlord and Tenant under this Lease shall survive the termination of this Lease.

V.   Rent Not Based on Income. No rent or other payment in respect of the Premises shall be based in any way upon net income or profits from the Premises. Tenant may not enter into or permit any sublease or license or other agreement in connection with the Premises which provides for a rental or other payment based on net income or profit.

W.   Building Manager and Service Providers. Landlord may perform any of its obligations under this Lease through its employees or third parties hired by the Landlord.

X.   Late Charge and Interest on Late Payments. Without limiting the provisions of Section 12A, if Tenant fails twice within a twelve (12) month period to pay any installment of Rent or other charge to be paid by Tenant pursuant to this Lease within ten (10) business days after the same becomes due and payable, then Tenant shall pay a late charge equal to five percent (5%) of the amount of such payment. In addition, interest shall be paid by Tenant to Landlord on any late payments of Rent from the date due until paid at the rate provided in Section 2D(2). Such late charge and interest shall constitute Additional Rent due and payable by Tenant to Landlord upon the date of payment of the delinquent payment referenced above.

Y.   Tenant's Financial Statements. Upon request from Landlord, Tenant shall provide Landlord with current audited annual and quarterly financial statements (income and balance sheet).

lse1REVISED1
052302-1:50PM

27. **UNRELATED BUSINESS INCOME.** If Landlord is advised by its counsel at any time that any part of the payments by Tenant to Landlord under this Lease may be characterized as unrelated business income under the United States Internal Revenue Code and its regulations, then Tenant shall enter into any amendment proposed by Landlord to avoid such income, so long as the amendment does not require Tenant to make more payments or accept fewer services from Landlord, than this Lease provides.

28. **HAZARDOUS SUBSTANCES.** Tenant shall not cause or permit any Hazardous Substances to be brought upon, produced, stored, used, discharged or disposed of in or near the Project unless Landlord has consented to such storage or use in its sole discretion. "Hazardous Substances" include those hazardous substances described in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 et seq., the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq., any other applicable federal, state or local law, and the regulations adopted under these laws. If any lender or governmental agency shall require testing for Hazardous Substances in the Premises, Tenant shall pay for such testing.

29. **EXCULPATION.** Landlord shall have no personal liability under this Lease; its liability shall be limited to its interest in the Project, and shall not extend to any other property or assets of the Landlord. In no event shall any officer, director, employee, agent, shareholder, partner, member or beneficiary of Landlord be personally liable for any of Landlord's obligations hereunder.

30. **EXISTING TENANT.** This Lease, and the terms and conditions set forth herein, are subject to Landlord's receipt, on or before May 15, 2002, of an executed Amendment from the exiting tenant of the Premises, Allscripts, Inc., which Amendment shall provide for the surrender of the Premises by Allscripts, Inc. on or before May 15, 2002, and shall otherwise be in a form acceptable to Landlord. In the event Landlord does not receive said Amendment for any reason whatsoever on or before May 15, 2002, Landlord shall, within 5-business days after May 15, 2002, provide notice to Tenant terminating this Lease, in which event this Lease shall be null and void and neither party hereunder shall have any further rights or remedies.

31. **TEMPORARY SPACE.** Commencing May 13, 2002, Landlord will provide Tenant with temporary space in the Conference Center, rent free at 2333 Waukegan Road, Suite 245, Bannockburn, Illinois. Tenant shall vacate the temporary space on or before the Commencement Date.

[no further text on this page - signature page to follow]

lsa1REVISED1
052302-1:50PM

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease.

LANDLORD:

**CARRAMERICA REALTY, L.P.,**
a Delaware limited partnership

By:    CarrAmerica Realty GP Holdings, Inc., a Delaware
       corporation, its general partner

By: _Gerald J. O'Malley_

Print Name:___ Gerald O'Malley

Print Title:__ Regional Managing Director

Date:__ May 24, 2002

TENANT:

**SWEDISH BEVERAGES, INC.,** a _Illinois corporation_

corporation

By: _A J Filko_
Print Name: _Anthony J. Filko_
Print Title: _COO, CFO_

Date:__ May 24, 2002

lee1REVISED1
052302-1:50PM

# APPENDIX A

## PLAN OF THE PREMISES



**APPENDIX B**

**RULES AND REGULATIONS**

1.      Tenant shall not place anything, or allow anything to be placed near the glass of any window, door, partition or wall which may, in Landlord's judgment, appear unsightly from outside of the Premises.

2.      The Project directory shall be available to Tenant solely to display names and their location in the Project, which display shall be as directed by Landlord.

3.      The sidewalks, halls, passages, exits, entrances, elevators and stairways shall not be obstructed by Tenant or used by Tenant for any purposes other than for ingress to and egress from the Premises. Tenant shall lend its full cooperation to keep such areas free from all obstruction and in a clean and sightly condition and shall move all supplies, furniture and equipment as soon as received directly to the Premises and move all such items and waste being taken from the Premises (other than waste customarily removed by employees of the Building) directly to the shipping platform at or about the time arranged for removal therefrom. The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public and Landlord shall, in all cases, retain the right to control and prevent access thereto by all persons whose presence in the judgment of Landlord, reasonably exercised, shall be prejudicial to the safety, character, reputation and interests of the Project. Neither Tenant nor any employee or invitee of Tenant shall go upon the roof of the Project.

4.      The toilet rooms, urinals, wash bowls and other apparatuses shall not be used for any purposes other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein, and to the extent caused by Tenant or its employees or invitees, the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by Tenant.

5.      Tenant shall not cause any unnecessary janitorial labor or services by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness.

6.      Tenant shall not install or operate any refrigerating, heating or air conditioning apparatus, or carry on any mechanical business without the prior written consent of Landlord; use the Premises for housing, lodging or sleeping purposes; or permit preparation or warming of food in the Premises (warming of coffee and individual meals with employees and guests excepted). Tenant shall not occupy or use the Premises or permit the Premises to be occupied or used for any purpose, act or thing which is in violation of any Governmental Requirement or which may be dangerous to persons or property.

7.      Tenant shall not bring upon, use or keep in the Premises or the Project any kerosene, gasoline or inflammable or combustible fluid or material, or any other articles deemed

lee1REVISED1
052302-1:50PM

hazardous to persons or property, or use any method of heating or air conditioning other than that supplied by Landlord.

     8.     Landlord shall have sole power to direct electricians as to where and how telephone and other wires are to be introduced. No boring or cutting for wires is to be allowed without the consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord.

9.  No additional locks shall be placed upon any doors, windows or transoms in or to the Premises. Tenant shall not change existing locks or the mechanism thereof. Upon termination of the lease, Tenant shall deliver to Landlord all keys and passes for offices, rooms, parking lot and toilet rooms which shall have been furnished Tenant.

In the event of the loss of keys so furnished, Tenant shall pay Landlord therefor. Tenant shall not make, or cause to be made, any such keys and shall order all such keys solely from Landlord and shall pay Landlord for any keys in addition to the two sets of keys originally furnished by Landlord for each lock.

10.  Tenant shall not install linoleum, tile, carpet or other floor covering so that the same shall be affixed to the floor of the Premises in any manner except as approved by Landlord.

11.  No furniture, packages, supplies, equipment or merchandise will be received in the Project or carried up or down in the freight elevator, except between such hours and in such freight elevator as shall be designated by Landlord. Tenant shall not take or permit to be taken in or out of other entrances of the Building, or take or permit on other elevators, any item normally taken in or out through the trucking concourse or service doors or in or on freight elevators.

12.  Tenant shall cause all doors to the Premises to be closed and securely locked and shall turn off all utilities, lights and machines before leaving the Project at the end of the day.

13.  Without the prior written consent of Landlord, Tenant shall not use the name of the Project or any picture of the Project in connection with, or in promoting or advertising the business of, Tenant, except Tenant may use the address of the Project as the address of its business.

14.  Tenant shall cooperate fully with Landlord to assure the most effective operation of the Premises' or the Project's heating and air conditioning, and shall refrain from attempting to adjust any controls, other than room thermostats installed for Tenant's use. Tenant shall keep corridor doors closed.

15.  Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage, which may arise from a cause other than Landlord's negligence, which includes keeping doors locked and other means of entry to the Premises closed and secured.

16.  Peddlers, solicitors and beggars shall be reported to the office of the Project or as Landlord otherwise requests.

lse1REVISED1
052302-1:50PM

17.     Tenant shall not advertise the business, profession or activities of Tenant conducted in the Project in any manner which violates the letter or spirit of any code of ethics adopted by any recognized association or organization pertaining to such business, profession or activities.

18.     No bicycle or other vehicle and no animals or pets shall be allowed in the Premises, halls, freight docks, or any other parts of the Building except that blind persons may be accompanied by "seeing eye" dogs. Tenant shall not make or permit any noise, vibration or odor to emanate from the Premises, or do anything therein tending to create, or maintain, a nuisance, or do any act tending to injure the reputation of the Building.

19.     Tenant acknowledges that Building security problems may occur which may require the employment of extreme security measures in the day-to-day operation of the Project.

Accordingly:

(a)     Landlord may, at any time, or from time to time, or for regularly scheduled time periods, as deemed advisable by Landlord and/or its agents, in their sole discretion, require that persons entering or leaving the Project or the Property identify themselves to watchmen or other employees designated by Landlord, by registration, identification or otherwise.

(b)     Tenant agrees that it and its employees will cooperate fully with Project employees in the implementation of any and all security procedures.

(c)     Such security measures shall be the sole responsibility of Landlord, and Tenant shall have no liability for any action taken by Landlord in connection therewith, it being understood that Landlord is not required to provide any security procedures and shall have no liability for such security procedures or the lack thereof.

20.     Tenant shall not do or permit the manufacture, sale, purchase, use or gift of any fermented, intoxicating or alcoholic beverages without obtaining written consent of Landlord.

21.     Tenant shall not disturb the quiet enjoyment of any other tenant.

22.     Tenant shall not provide any janitorial services or cleaning without Landlord's written consent and then only subject to supervision of Landlord and at Tenant's sole responsibility and by janitor or cleaning contractor or employees at all times satisfactory to Landlord.

23.     Landlord may retain a pass key to the Premises and be allowed admittance thereto at all times to enable its representatives to examine the Premises from time to time and to exhibit the same and Landlord may place and keep on the windows and doors of the Premises at any time signs advertising the Premises for Rent.

lse1REVISED1
052302-1:50PM

24. No equipment, mechanical ventilators, awnings, special shades or other forms of window covering shall be permitted either inside or outside the windows of the Premises without the prior written consent of Landlord, and then only at the expense and risk of Tenant, and they shall be of such shape, color, material, quality, design and make as may be approved by Landlord.

25. Tenant shall not during the term of this Lease canvas or solicit other tenants of the Building for any purpose.

26. Tenant shall not install or operate any phonograph, musical or sound- producing instrument or device, radio receiver or transmitter, TV receiver or transmitter, or similar device in the Building, nor install or operate any antenna, aerial, wires or other equipment inside or outside the Building, nor operate any electrical device from which may emanate electrical waves which may interfere with or impair radio or television broadcasting or reception from or in the Building or elsewhere, without in each instance the prior written approval of Landlord. The use thereof, if permitted, shall be subject to control by Landlord to the end that others shall not be disturbed.

27. Tenant shall promptly remove all rubbish and waste from the Premises.

28. Tenant shall not exhibit, sell or offer for sale, Rent or exchange in the Premises or at the Project any article, thing or service, except those ordinarily embraced within the use of the Premises specified in Section 6 of this Lease, without the prior written consent of Landlord.

29. Tenant shall list all furniture, equipment and similar articles Tenant desires to remove from the Premises or the Building and deliver a copy of such list to Landlord and procure a removal permit from the Office of the Building authorizing Building employees to permit such articles to be removed.

30. Tenant shall not overload any floors in the Premises or any public corridors or elevators in the Building.

31. Tenant shall not do any painting in the Premises, or mark, paint, cut or drill into, drive nails or screws into, or in any way deface any part of the Premises or the Building, outside or inside, without the prior written consent of Landlord.

32. Whenever Landlord's consent, approval or satisfaction is required under these Rules, then unless otherwise stated, any such consent, approval or satisfaction must be obtained in advance, such consent or approval may be granted or withheld in Landlord's sole discretion, and Landlord's satisfaction shall be determined in its sole judgment.

33. Tenant and its employees shall cooperate in all fire drills conducted by Landlord in the Building.

lse1REVISED1
052302-1:50PM

**APPENDIX C**

**TENANT IMPROVEMENT AGREEMENT**

1.    INITIAL IMPROVEMENTS. Landlord shall cause to be performed the improvements (the "Initial Improvements") in the Premises in accordance with the space plan prepared by Landlord dated May 9, 2002(the "Plans") on or before May 28, 2002. The Initial Improvements shall be performed at the Landlord's cost.

Landlord, with consultation of Tenant, shall select a contractor to perform the construction of the Initial Improvements. Landlord shall use commercially reasonable efforts to cause the Initial Improvements to be substantially completed, except for minor "Punch List" items, on or before the Commencement Date specified in the Schedule to the Lease, subject to Tenant Delay (as defined in Section 4 hereof) and Force Majeure.

Landlord, or an agent of Landlord, shall provide project management services in connection with the construction of the Initial Improvements and the Change Orders (hereinafter defined). Such project management services shall be performed, at Tenant's cost, for a fee of five percent (5%) of all costs related to the preparation of the Plans and the construction of the Initial Improvements and the Change Orders.

2.    CHANGE ORDERS. If, prior to the Commencement Date, Tenant shall require improvements or changes (individually or collectively, "Change Orders") to the Premises in addition to, revision of, or substitution for the Initial Improvements, Tenant shall deliver to Landlord for its approval plans and specifications for such Change Orders. If Landlord does not approve of the plans for Change Orders, Landlord shall advise Tenant of the revisions required. Tenant shall revise and redeliver the plans and specifications to Landlord within five (5) business days of Landlord's advice or Tenant shall be deemed to have abandoned its request for such Change Orders. Tenant shall pay for all preparations and revisions of plans and specifications, and the construction of all Change Orders.

3.             INTENTIONALLY OMITTED.

lse1REVISED1
052302-1:50PM

4.    COMMENCEMENT DATE DELAY. Commencement Date shall be delayed until the Initial Improvements have been substantially completed (the "Completion Date"), except to the extent that the delay shall be caused by any one or more of the following (a "Tenant Delay"):

(a)    Tenant's request for Change Orders whether or not any such Change Orders are actually performed; or

(b)    Contractor's performance of any Change Orders; or

(c)    Tenant's request for materials, finishes or installations requiring unusually long lead times; or

(d)    Tenant's delay in reviewing, revising or approving plans and specifications beyond the periods set forth herein; or

(e)    Tenant's delay in providing information critical to the normal progression of the project. Tenant shall provide such information as soon as reasonably possible, but in no event longer than one week after receipt of such request for information from the Landlord; or

(f)    Tenant's delay in making payments to Landlord for costs of the Change Orders; or

(g)    Any other act or omission by Tenant, its agents, contractors or persons employed by any of such persons.

If the Commencement Date is delayed for any reason, then Landlord shall cause Landlord's Architect to certify the date on which the Initial Improvements would have been completed but for such Tenant Delay, or were in fact completed without any Tenant Delay.

5.    ACCESS BY TENANT PRIOR TO COMMENCEMENT OF TERM. Landlord at its discretion may permit Tenant and its agents to enter the Premises prior to the Commencement Date to prepare the Premises for Tenant's use and occupancy. Any such permission shall constitute a license only, conditioned upon Tenant's:

(a)    working in harmony with Landlord and Landlord's agents, contractors, workmen, mechanics and suppliers and with other tenants and occupants of the Building;

(b)    obtaining in advance Landlord's approval of the contractors proposed to be used by Tenant and depositing with Landlord in advance of any work (i) security satisfactory to Landlord for the completion thereof, and (ii) the contractor's affidavit for the proposed work and the waivers of lien from the contractor and all subcontractors and suppliers of material; and

(c)    furnishing Landlord with such insurance as Landlord may require against liabilities which may arise out of such entry.

lse1REVISED1
052302-1:50PM

Landlord shall have the right to withdraw such license for any reason upon twenty-four (24) hours' written notice to Tenant. Landlord shall not be liable in any way for any injury, loss or damage which may occur to any of Tenant's property or installations in the Premises prior to the Commencement Date. Tenant shall protect, defend, indemnify and save harmless Landlord from all liabilities, costs, damages, fees and expenses arising out of the activities of Tenant or its agents, contractors, suppliers or workmen in the Premises or the Building. Any entry and occupation permitted under this Section shall be governed by Section 5 and all other terms of the Lease.

6.    MISCELLANEOUS.

Terms used in this Appendix C shall have the meanings assigned to them in the Lease. The terms of this Appendix C are subject to the terms of the Lease.

## APPENDIX D

## MORTGAGES CURRENTLY AFFECTING THE PROJECT

Instrument                              Name and Address of Holder

None                                    N/A

Ise1REVISED1
052302-1:50PM

**APPENDIX E**

**COMMENCEMENT DATE CONFIRMATION**

Landlord:          CarrAmerica Realty. L.P., a Delaware limited partnership

Tenant:            Swedish Beverages, Inc., a _____ corporation

This Commencement Date Confirmation is made by Landlord and Tenant pursuant to that certain Lease dated as of _____, 20__ (the "Lease") for certain premises known as Suite _____ in the building commonly known as Bannockburn Lake Office Plaza I (the "Premises"). This Confirmation is made pursuant to Item 9 of the Schedule to the Lease.

    1.    Lease Commencement Date, Termination Date. Landlord and Tenant hereby agree that the Commencement Date of the Lease is _____, 20__, and the Termination Date of the Lease is _____, _____.

    2.    Acceptance of Premises. Tenant has inspected the Premises and affirms that the Premises is acceptable in all respects in its current "as is" condition.

    3.    Incorporation. This Confirmation is incorporated into the Lease, and forms an integral part thereof. This Confirmation shall be construed and interpreted in accordance with the terms of the Lease for all purposes.

TENANT:

Swedish Beverages, Inc., a _____

By:_____

Name:_____

Title:_____

lse1REVISED1
052302-1:50PM

1

LANDLORD:

CarrAmerica Realty, L.P., a Delaware limited partnership

By:    CarrAmerica Realty GP Holdings, Inc., a Delaware corporation

By:_____
Name:_____
Title:_____

lse1REVISED1
052302-1:50PM

2



## Space Plan of Premises

Room 1

Room 2

Room 3

Room 4

Kitchen Area

Room 7

Room 6

Conference Area

Room 5



2 x 2 Plywood

**Tenant Improvements:**

1. Install a new Glass Customed Wood Frame Entry Door – Note: A temporary door will be installed until permanent door is received.
2. All non-wallpapered walls to be painted. Paint color shall be Benjamin Moore – Wedding Veil #2125–70
3. Steam clean all carpeting.
4. Refurbish Interior wood office doors.
5. Remove Shelving in Kitchen (Room 7) and reinstall in Room 5.
6. Install Plywood Board for telephone system in Room 5
7. Remove to 2 base cabinets in Conference area (Room 7) and install next to existing corner kitchen cabinets.
8. Install new countertop over entire corner kitchen area (Room7). Countertop shall be Nevamar-ET-1-IT.
9. Remove and reinstall ceiling projector screen from Room2 to Conference Area in Room 7.
10. Provide clean working blinds for 10 windows.
11. Remove door between two offices (Rooms 1 & 2), remove wallpaper and paint walls, as specified by Swedish Beverages.
12. Relocat door to Room 4.
13. Construct one Office (Room 4) approximately 15' x 12', with door and sidelight. Door to have a 2-way lock. Wall outlet to be replaced with a standard 4 –way outlet.
14. Construct one Storage Room, (Room 5) approximately 10' x 12', with door.
15. Replace baseboard trim in Room #1 with color specified by Swedish Beverages.

**Symbols:**

Duplex Outlet ⊕

Quad Outlet ✦

220 Outlet Ⓞ

Approved by: _____

1.   LEASE AGREEMENT                                                    2

2.   RENT                                                              2
     A.   Types of Rent                                                2
          (1)   Base Rent........................................  2
          (2)   Operating Cost Share Rent......................  2
          (3)   Tax Share Rent .................................  2
          (4)   Additional Rent ................................  2
          (5)   Rent............................................  3
     B.   Payment of Operating Cost Share Rent and
          Tax Share Rent                                              3
          (1)   Payment of Estimated Operating
                Cost Share Rent and Tax Share Rent.......  3
          (2)   Correction of Operating Cost Share Rent.  3
          (3)   Correction of Tax Share Rent...............  3
     C.   Definitions                                                 3
          (1)   Included Operating Costs..........................  3
          (2)   Excluded Operating Costs.......................  4
          (3)   Taxes...........................................  5
          (4)   Lease Year .....................................  5
          (5)   Fiscal Year.....................................  5
     D.   Computation of Base Rent and Rent Adjustments  5
          (1)   Prorations.......................................  5
          (2)   Default Interest. ...............................  6
          (3)   Rent Adjustments. ..............................  6
          (4)   Books and Records. ............................  6
          (5)   Miscellaneous. .................................  6
3.   PREPARATION AND CONDITION OF PREMISES; POSSESSION AND
     SURRENDER OF PREMISES                                            6
     A.   Condition of Premises. .....................................  6
     B.   Tenant's Possession. ......................................  7
     C.   Maintenance...............................................  7

4.   PROJECT SERVICES                                                 7
     A.   Heating and Air Conditioning..............................  7
     B.   Elevators .................................................  7
     C.   Electricity ...............................................  7
     D.   Water.....................................................  7
     E.   Janitorial Service.........................................  8
     F    Interruption of Services                                    8

lse1REVISED1
052302-1:50PM

| 5. | ALTERATIONS AND REPAIRS | 8 |
|---|---|---|
| | A. Landlord's Consent and Conditions. | 8 |
| | B. Damage to Systems. | 9 |
| | C. No Liens. | 9 |
| | D. Ownership of Improvements. | 9 |
| | E. Removal at Termination. | 10 |
| 6. | USE OF PREMISES | 10 |
| 7. | GOVERNMENTAL REQUIREMENTS AND BUILDING RULES. | 10 |
| 8. | WAIVER OF CLAIMS; INDEMNIFICATION; INSURANCE. | 11 |
| | A. Waiver of Claims. | 11 |
| | B. Indemnification. | 11 |
| | C. Tenant's Insurance. | 11 |
| | D. Insurance Certificates. | 12 |
| | E. Landlord's Insurance. | 12 |
| 9. | FIRE AND OTHER CASUALTY | 13 |
| | A. Termination. | 13 |
| | B. Restoration. | 13 |
| 10. | EMINENT DOMAIN. | 13 |
| 11. | RIGHTS RESERVED TO LANDLORD. | 13 |
| | A. Name. | 13 |
| | B. Signs. | 13 |
| | C. Window Treatments. | 13 |
| | D. Keys. | 13 |
| | E. Access. | 14 |
| | F. Preparation for Reoccupancy. | 14 |
| | G. Heavy Articles | 14 |
| | H. Show Premises | 14 |
| | I. Relocation of Tenant | 14 |
| | J. Use of Lockbox. | 14 |
| | K. Repairs and Alterations | 14 |
| | L. Landlord's Agents. | 15 |
| | M. Building Services. | 15 |
| | N. Other Actions. | 15 |

Ise1REVISED1
052302-1:50PM

| 12. | TENANT'S DEFAULT. | 15 |
| | A. Rent Default. | 15 |
| | B. Assignment/Sublease or Hazardous Substances Default | 15 |
| | C. Other Performance Default | 15 |
| | D. Credit Default. | 15 |
| | E. Vacation or Abandonment Default. | 15 |
| 13. | LANDLORD REMEDIES | 16 |
| | A. Termination of Lease or Possession. | 16 |
| | B. Lease Termination Damages. | 16 |
| | C. Possession Termination Damages. | 16 |
| | D. Landlord's Remedies Cumulative. | 16 |
| | E. WAIVER OF TRIAL BY JURY. | 16 |
| | F. Litigation Costs. | 17 |
| 14. | SURRENDER. | 17 |
| 15. | HOLDOVER. | 17 |
| 16. | SUBORDINATION TO GROUND LEASES AND MORTGAGES | 17 |
| | A. Subordination | 17 |
| | B. Termination of Ground Lease or Foreclosure of Mortgage | 17 |
| | C. Security Deposit | 18 |
| | D. Notice and Right to Cure | 18 |
| | E. Definitions. | 18 |
| 17. | ASSIGNMENT AND SUBLEASE. | 18 |
| | A. In General. | 18 |
| | B. Landlord's Consent. | 18 |
| | C. Procedure. | 19 |
| | D. Change of Management or Ownership. | 19 |
| | E. Excess Payments. | 19 |
| | F. Recapture. | 19 |
| 18. | CONVEYANCE BY LANDLORD | 19 |
| 19. | ESTOPPEL CERTIFICATE | 19 |
| 20. | SECURITY DEPOSIT | 21 |
| 21. | FORCE MAJEURE | 20 |
| 22. | TENANT'S PERSONAL PROPERTY AND FIXTURES | 20 |

lse1REVISED1
052302-1:50PM

30. Existing Tenant                                    26

31. TEMPORARY SPACE                                    26

APPENDIX A - PLAN OF THE PREMISES
APPENDIX B - RULES AND REGULATIONS
APPENDIX C - TENANT IMPROVEMENT AGREEMENT
APPENDIX D - MORTGAGES CURRENTLY AFFECTING THE PROJECT
APPENDIX E - COMMENCEMENT DATE CONFIRMATION
APPENDIX F - SPACE PLAN OF PREMISES

lse1REVISED1
052302-1:50PM



# JURY DEMAND

03 GG 051

ATTY ID NO: 35500

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

RICHARD WALLACE,                    )
                                    )
            Plaintiff,              )
                                    )          03L 010011
        vs.                         )   No.    CALENDAR C
                                    )          OTHER PERSONAL INJ
CARRAMERICA REALTY CORPORATION,     )
A/K/A CARRAMERICA REALTY SERVICES,  )
INC., A/K/A CARRAMERICA REALTY, L.P.,)
A/K/A CARRAMERICA REALTY GP         )
HOLDINGS, INC,                      )
                                    )
            Defendant.              )

## COMPLAINT AT LAW

NOW COMES the Plaintiff, Richard Wallace, by and through his attorneys, Guth Reinke & Farnan, Ltd., and complaining of the Defendant, CarrAmerica Realty Corporation, a/k/a CarrAmerica Realty Services, Inc., a/k/a CarrAmerica Realty, L.P., a/k/a CarrAmerica Realty GP Holdings, Inc, states as follows:

1. That on or about March 21, 2003, the Defendant, CarrAmerica Realty Corporation, was a corporation registered, licensed and qualified to do business in the State of Illinois, County of Cook by virtue of its corporate Registered Agent being domiciled at 208 S. LaSalle Street, in the County of Cook, State of Illinois.

2. That the defendant, CarrAmerica Realty Corporation, is also known as CarrAmerica Realty services, Inc., CarrAmerica Realty, L.P. and CarrAmerica Realty GP Holdings, Inc. Collectively, these Defendants are known as, for purposes herein, as "CarrAmerica".

3. That on or about March 21, 2003, and prior thereto, CarrAmerica owned, operated, maintained, managed, controlled, and/or leased the premises commonly known as Bannockburn

Lake Office Plaza One located at 2333 Waukegan Road in the City of Bannockburn, State of Illinois.

4. That on or about March 21, 2003, upon the said premises, there was a U-shaped driveway in front of the entrance. In the curb that ran along this U-shaped driveway was a large hole which the defendant and/or its employees were aware of, or in the exercise of ordinary and reasonable care should have been aware of.

5. That on or about March 21, 2003, the Plaintiff was unaware of the said hole in the curb that ran along the U-shaped driveway.

6. It was the duty of the Defendant, CarrAmerica, to own, operate, maintain, manage and control the said premises in a manner not to cause injury to persons lawfully then and there on the premises.

7. That on or about March 21, 2003, at 2:30 p.m. the Plaintiff, Richard Wallace, was then and there upon the aforementioned premises lawfully and legally as a tenant of the Defendant, CarrAmerica.

8. That at the aforementioned time and place, after pulling his car up to the U-shaped driveway, the Plaintiff exited his car and, not seeing the said hole due to the location of his car and the shadow from the building, stepped into the large hole, causing the Plaintiff to trip and fall.

9. That notwithstanding the aforesaid duty, the Defendant was guilty of one or more of the following negligent acts and/or omissions:

   a.  Carelessly and negligently failed to maintain the property in a reasonably safe condition so as not to cause injury to the plaintiff;

   b.  Carelessly and negligently failed to make a reasonable inspection of the said premises when the Defendant knew or should have known that an inspection was necessary to prevent injury to the Plaintiff;

   c.  Carelessly and negligently failed to maintain said premises for the purpose of ingress and egress in a reasonably safe manner so as not to cause injury to the plaintiff;

d.  Carelessly and negligently failed to keep the said premises free from any hazardous condition, even though the Defendant knew, or in the exercise of ordinary care should have known, such a hazardous condition existed;

e.  Carelessly and negligently failed to warn the Plaintiff of the dangerous condition of the curb, when the Defendant knew, or in the exercise of ordinary care should have known, that a warning would be necessary to prevent injury;

f.  Carelessly and negligently allowed and permitted a large hole in the curb that ran along the U-shaped driveway to remain and exist on the said premises when the Defendant knew or in the exercise of ordinary care should have known that the hole created a dangerous condition;

g.  Carelessly and negligently failed to properly fill, repair and fix the hole in the curb that ran along the U-shaped driveway on the said premises when the Defendant knew, or should have known that filling, repairing and fixing the hole was necessary to prevent injury to the Plaintiff;

h.  Carelessly and negligently failed to properly barricade the large hole in the curb of the U-shaped driveway when the Defendant knew or in the exercise of ordinary care should have known, that the hole created a dangerous condition;

i.  Otherwise carelessly and negligently operated, maintained, managed and controlled said premises.

10.  That as a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of the Defendant, the Plaintiff was caused to trip and fall on the aforementioned premises, and as a result, the Plaintiff sustained injuries, both internally and externally and of a permanent and lasting nature and was caused to endure and will in the future endure pain and suffering in body and mind. In an endeavor to be cured of his injuries, the plaintiff was caused to and will be in the future caused to spend money for medical care, thereby causing losses of considerable sums of money. Furthermore, the plaintiff was unable to and will in the future be unable to attend to normal affairs and work duties, thus suffering loss of past and future income.

WHEREFORE, the Plaintiff, Richard Wallace, prays for judgement against the Defendant CarrAmerica Realty Corporation, a/k/a CarrAmerica Realty Services, Inc., a/k/a CarrAmerica

Realty, L.P., a/k/a CarrAmerica Realty GP Holdings, Inc, for a sum in excess of $50,000 plus costs of this suit.

Respectfully submitted,

RICHARD WALLACE

By: _____
Guth, Reinke & Farnan, Ltd.
His Attorneys

GUTH, REINKE & FARNAN, LTD.
161 N. Clark, Suite 2900
Chicago, IL 60601
(312) 855-0840
Attorney No. 35500

03 GG 051

ATTY ID NO: 35500

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

RICHARD WALLACE and ANIA WALLACE,  )
                          )
       Plaintiffs,           )
                          )
   vs.                    )   No. 03 L 010011
                          )
CARRAMERICA REALTY CORPORATION,  )
A/K/A CARRAMERICA REALTY SERVICES,  )
INC., A/K/A CARRAMERICA REALTY, L.P.,  )
A/K/A CARRAMERICA REALTY GP  )
HOLDINGS, INC,  )
                          )
       Defendant.         )
                          )

## FIRST AMENDED COMPLAINT AT LAW

### COUNT I

NOW COMES the Plaintiff, Richard Wallace, by and through his attorneys, Guth Reinke & Farnan, Ltd., and complaining of the Defendant, CarrAmerica Realty Corporation, a/k/a CarrAmerica Realty Services, Inc., a/k/a CarrAmerica Realty, L.P., a/k/a CarrAmerica Realty GP Holdings, Inc, state as follows:

1. That on or about March 21, 2003, the Defendant, CarrAmerica Realty Corporation, was a corporation registered, licensed and qualified to do business in the State of Illinois, County of Cook by virtue of its corporate Registered Agent being domiciled at 208 S. LaSalle Street, in the County of Cook, State of Illinois.

2. That the defendant, CarrAmerica Realty Corporation, is also known as CarrAmerica Realty services, Inc., CarrAmerica Realty, L.P. and CarrAmerica Realty GP Holdings, Inc. Collectively, these Defendants are known as, for purposes herein, as "CarrAmerica".

3. That on or about March 21, 2003, and prior thereto, CarrAmerica owned, operated, maintained, managed, controlled, and/or leased the premises commonly known as Bannockburn

Lake Office Plaza One located at 2333 Waukegan Road in the City of Bannockburn, State of Illinois.

4. That on or about March 21, 2003, upon the said premises, there was a U-shaped driveway in front of the entrance. In the curb that ran along this U-shaped driveway was a large hole which the defendant and/or its employees were aware of, or in the exercise of ordinary and reasonable care should have been aware of.

5. That on or about March 21, 2003, the Plaintiff was unaware of the said hole in the curb that ran along the U-shaped driveway.

6. It was the duty of the Defendant, CarrAmerica, to own, operate, maintain, manage and control the said premises in a manner not to cause injury to persons lawfully then and there on the premises.

7. That on or about March 21, 2003, at 2:30 p.m. the Plaintiff, Richard Wallace, was then and there upon the aforementioned premises lawfully and legally as a tenant of the Defendant, CarrAmerica.

8. That at the aforementioned time and place, after pulling his car up to the U-shaped driveway, the Plaintiff exited his car and, not seeing the said hole due to the location of his car and the shadow from the building, stepped into the large hole, causing the Plaintiff to trip and fall.

9. That notwithstanding the aforesaid duty, the Defendant was guilty of one or more of the following negligent acts and/or omissions:

a. Carelessly and negligently failed to maintain the property in a reasonably safe condition so as not to cause injury to the plaintiff;

b. Carelessly and negligently failed to make a reasonable inspection of the said premises when the Defendant knew or should have known that an inspection was necessary to prevent injury to the Plaintiff;

c. Carelessly and negligently failed to maintain said premises for the purpose of ingress and egress in a reasonably safe manner so as not to cause injury to the plaintiff;

d. Carelessly and negligently failed to keep the said premises free from any hazardous condition, even though the Defendant knew, or in the exercise of ordinary care should have known, such a hazardous condition existed;

e. Carelessly and negligently failed to warn the Plaintiff of the dangerous condition of the curb, when the Defendant knew, or in the exercise of ordinary care should have known, that a warning would be necessary to prevent injury;

f. Carelessly and negligently allowed and permitted a large hole in the curb that ran along the U-shaped driveway to remain and exist on the said premises when the Defendant knew or in the exercise of ordinary care should have known that the hole created a dangerous condition;

g. Carelessly and negligently failed to properly fill, repair and fix the hole in the curb that ran along the U-shaped driveway on the said premises when the Defendant knew, or should have known that filling, repairing and fixing the hole was necessary to prevent injury to the Plaintiff;

h. Carelessly and negligently failed to properly barricade the large hole in the curb of the U-shaped driveway when the Defendant knew or in the exercise of ordinary care should have known, that the hole created a dangerous condition;

i. Otherwise carelessly and negligently operated, maintained, managed and controlled said premises.

10. That as a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of the Defendant, the Plaintiff was caused to trip and fall on the aforementioned premises, and as a result, the Plaintiff sustained injuries, both internally and externally and of a permanent and lasting nature and was caused to endure and will in the future endure pain and suffering in body and mind. In an endeavor to be cured of his injuries, the plaintiff was caused to and will be in the future caused to spend money for medical care, thereby causing losses of considerable sums of money. Furthermore, the plaintiff was unable to and will in the future be unable to attend to normal affairs and work duties, thus suffering loss of past and future income.

WHEREFORE, the Plaintiff, Richard Wallace, prays for judgment against the Defendant CarrAmerica Realty Corporation, a/k/a CarrAmerica Realty Services, Inc., a/k/a CarrAmerica Realty, L.P., a/k/a CarrAmerica Realty GP Holdings, Inc, for a sum in excess of $50,000 plus costs of this suit.

## COUNT II

Now comes the Plaintiff, Ania Wallace, by and through her attorneys, Guth, Reinke & Farnan, Ltd., and complaining of the Defendant CarrAmerica Realty Corporation, a/k/a CarrAmerica Realty Services, Inc., a/k/a CarrAmerica Realty, L.P., a/k/a CarrAmerica Realty GP Holdings, Inc, states as follows:

1-9. Plaintiff restates, realleges, reaffirms and repleads paragraphs one (1) through nine (9) inclusive, of Count I as fully stated herein.

10. That as a direct and proximate result of the negligence of the Defendant, the Plaintiff, Richard Wallace, became severely and permanently injured, both internally and externally, and as a result thereof, the Plaintiff Ania Wallace, has been and will in the future continue to be deprived of the services, society, affection and consortium of and from Richard Wallace.

WHEREFORE, the Plaintiff Ania Wallace demands judgment in her favor and against the Defendant CarrAmerica Realty Corporation, a/k/a CarrAmerica Realty Services, Inc., a/k/a CarrAmerica Realty, L.P., a/k/a CarrAmerica Realty GP Holdings, Inc, in an amount in excess of $50,000.00 plus costs incurred in bringing this suit, costs of judgment collection and interest from the date of judgment and for other just and equitable relief as this Court deems just and proper.

Respectfully submitted,

RICHARD WALLACE & ANIA
WALLACE

By: _____

Guth, Reinke & Farnan, Ltd.
Their Attorneys

GUTH, REINKE & FARNAN, LTD.
161 N. Clark, Suite 2900
Chicago, IL 60601
(312) 855-0840
ATTY ID NO: 35500



**FORAN GLENNON PALANDECH & PONZI** PC
Attorneys At Law

150 South Wacker Drive, 11th Floor
Chicago, Illinois 60606
tel: 312.863.5000
fax: 312.863.5099
www.fgpp.com

11400 Wilshire Boulevard
15th Floor
Los Angeles, California 90025
tel: 310.826.1810
fax: 310.826.1821

George D. Pilja
Attorney at Law
Direct: 312.863.5010
gpilja@fgpp.com

October 18, 2004

Dwight F. Miller
Travelers Indemnity of Illinois
215 Shuman Blvd
Naperville, IL 60563

|  |  |  |
|---|---|---|
| Re: | Our Insured: | CarrAmerica Realty, L.P. |
|  | Claimant: | Richard Wallace |
|  | Our Claim No.: | 9240064198-001 |
|  | D/L: | 03/21/03 |
|  | Our File No.: | 07120 |

Dear Mr. Miller:

We represent CarrAmerica Realty, LP in a lawsuit involving a personal injury allegedly sustained by Plaintiff Richard Wallace on March 21, 2003. CarrAmerica Realty, L.P. has been named as a defendant in the above-captioned lawsuit, which is currently pending in the Circuit Court of Cook County, Illinois.

The lawsuit arises out of an accident that allegedly occurred at the Bannockburn Lake Office Plaza I located at 2333 Waukegan Road, Bannockburn, Illinois, which arose from the Plaintiff's use of the premises. At the time of the alleged accident, the Plaintiff had been an employee of your insured, Swedish Beverages, Inc., acting within the scope of his employment. Swedish Beverages, Inc. leased space at the foregoing pursuant to a written lease agreement with CarrAmerica. CarrAmerica was named as an additional insured with respect to this incident pursuant to that lease agreement under a policy issued by Travelers Indemnity of Illinois to its insured, Swedish Beverages, Inc.

A copy of the certificate of insurance naming CarrAmerica as an additional insured is enclosed herewith. Additionally, a copy of your insured Swedish Beverages, Inc.'s written lease agreement with CarrAmerica is also enclosed herewith. The agreement contains tenant insurance requirements which make CarrAmerica an additional insured as to this incident under your insured Swedish Beverages, Inc.'s policy with Travelers Indemnity of Illinois. The agreement also contains an indemnification provisions which requires Travelers Indemnity of Illinois to indemnify, defend and hold harmless CarrAmerica in connection with this lawsuit.

Based on the foregoing, we hereby tender this matter to Travelers Indemnity of Illinois to defend and indemnify CarrAmerica Realty, LP pursuant to the dictates of *John Burns Construction Co. v. Indiana Ins. Co.*, 189 Ill. 2d 570 (Ill. 2000) and *Richard Marker Associates*

*v. Pekin Ins. Co.*, 318 Ill. App. 3d 1137 (2nd Dist. 2001). As such, we demand that Travelers Indemnity of Illinois exclusively handle the defense and indemnity of CarrAmerica Realty, LP with regard to this lawsuit.

We look forward to hearing from you very soon.

Very truly yours,

Foran Glennon Palandech & Ponzi PC

By:

George D. Pilja

GDP:gp

Enclosure

cc:   T.J. Adams Group, LLC (w/encl.)
Ms. Caroline Fountain (w/out encl.)
Ms. Sandra Shoffner (w/out encl.)
Mr. Robert T. Boylan (w/out encl.)

# ACORD CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
02/28/2003

| PRODUCER  (630)324-2500 | FAX  (630)324-2501 |
|---|---|
| T.J. Adams Group, LLC<br>333 E. Butterfield Road<br>Ste. 500<br>Lombard, IL 60148 | |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURED Swedish Beverages Inc.<br>2333 Waukegan Road<br>Suite S170<br>Bannockburn, IL 60015 | |

| | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURER A | Travelers Indemnity of IL | |
| INSURER B | Travelers Ind. Co. of Connect. | |
| INSURER C | | |
| INSURER D | | |
| INSURER E | | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY**<br>[X] COMMERCIAL GENERAL LIABILITY<br>[ ] CLAIMS MADE [X] OCCUR<br>[X] Vendors Coverage | I660-870X561A-02 | 05/17/2002 | 05/17/2003 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 50,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>[ ] POLICY [ ] PRO-JECT [ ] LOC | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | **AUTOMOBILE LIABILITY**<br>[ ] ANY AUTO<br>[ ] ALL OWNED AUTOS<br>[ ] SCHEDULED AUTOS<br>[ ] HIRED AUTOS<br>[ ] NON-OWNED AUTOS | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>[ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC<br>AUTO ONLY:  AGG | $<br>$ |
| A | | **EXCESS/UMBRELLA LIABILITY**<br>[X] OCCUR [ ] CLAIMS MADE<br>[ ] DEDUCTIBLE<br>[ ] RETENTION  $ | CUP4260W260 | 05/17/2002 | 05/17/2003 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| B | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE<br>OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | UB-2889A659 | 05/17/2002 | 05/17/2003 | [X] WC STATU- TORY LIMITS [ ] OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| A | | **OTHER**<br>Property - All Risk | I-660-870X561A-TIL-02 | 05/17/2002 | 05/17/2003 | All Risk coverage for Improvements and Betterments | |

Handwritten on certificate: 924-64198 / DROP TO KELLI BELPEDIO

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

Subject to policy terms and conditions, CarrAmerica Realty, CarrAmerica Realty LP T/A Bannockburn Lake Office Plaza is an additional insured on the GL w/r/t work done by the Insured on the above job.  A Waiver of Subrogation applies in favor of the additional insureds.

This certificate revises and replaces certificate dated 6/11/02.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CarrAmerica Realty LP<br>2333 Waukegan Road<br>Suite 240<br>Bannockburn, IL 60015 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL  30  DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE<br>Richard Miller/MMW |

ACORD 25 (2001/08)  FAX:  (847)948-9778                    ©ACORD CORPORATION 198

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Lease

# BANNOCKBURN LAKE OFFICE PLAZA I

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Between

## SWEDISH BEVERAGES, INC.
(Tenant)

and

## CARRAMERICA REALTY, L.P.
(Landlord)

lse1REVISED1
052302-1:50PM

# LEASE

THIS LEASE (the "Lease") is dated as of May 13, 2002 between CarrAmerica Realty, L.P., a Delaware limited partnership (the "Landlord") and the Tenant as named in the Schedule below. The term "Project" means the building (the "Building") known as "Bannockburn Lake Office Plaza I" and the land (the "Land") located at 2333 Waukegan Road, Bannockburn, Illinois. "Premises" means that part of the Project leased to Tenant described in the Schedule and outlined on Appendix A.

The following schedule (the "Schedule") is an integral part of this Lease. Terms defined in this Schedule shall have the same meaning throughout the Lease.

## SCHEDULE

1. **Tenant:** Swedish Beverages, Inc., a Illinois corporation
2. **Premises:** Suite S160
3. **Rentable Square Feet of the Premises:** 2,308
4. **Tenant's Proportionate Share:** 2.24% (based upon a total of 103,221 rentable square feet in the Building)
5. **Security Deposit:** $9,374.33
6. **Tenant's Real Estate Broker for this Lease:** Dan Graham of CB Richard Ellis
7. **Landlord's Real Estate Broker for this Lease:** Sean D. Kropke of CB Richard Ellis
8. **Tenant Improvements, if any:** See the Tenant Improvement Agreement attached hereto as Appendix C.
9. **Commencement Date:** May 27, 2002, but if the Premises are subject to new construction pursuant to Appendix C, then the Completion Date, as defined therein, if it is later; Landlord and Tenant shall execute a Commencement Date Confirmation substantially in the form of Appendix E promptly following the Commencement Date.
10. **Termination Date/Term:** May 31, 2007, five (5) years after the Commencement Date, or if the Commencement Date is not the first day of a month, then after the first day of the following month.
11. **Guarantor:** N/A

lse1REVISED1
052302-1:50PM

1

12. **Base Rent:**

| Period | Annual Base Rent | Monthly ___ Base Rent |
|--------|------------------|------------------------|
| Lease Year 1 | $36,928.00 | $3,077.33* |
| Lease Year 2 | $38,082.00 | $3,173.50 |
| Lease Year 3 | $39,236.00 | $3,269.67 |
| Lease Year 4 | $40,390.00 | $3,365.83 |
| Lease Year 5 | $41,544.00 | $3,462.00 |

\* Base Rent as well as Operating Cost Share Rent and Tax Share Rent shall be abated for the first ninety (90) days of the Term only.

1. **LEASE AGREEMENT.** On the terms stated in this Lease, Landlord leases the Premises to Tenant, and Tenant leases the Premises from Landlord, for the Term beginning on the Commencement Date and ending on the Termination Date unless extended or sooner terminated pursuant to this Lease.

2. **RENT.**

A. Types of Rent. Tenant shall pay the following Rent in the form of a check to Landlord at the following address:

CarrAmerica Realty, L.P., Chicago
t/a Bannockburn
P.O. Box 642829
Pittsburgh, PA 15264-2829

or by wire transfer as follows:

PNC Bank
ABA Number 043000096
Account Number 1004339225

or in such other manner as Landlord may notify Tenant:

(1) Base Rent in monthly installments in advance, the first monthly installment payable concurrently with the execution of this Lease and thereafter on or before the first day of each month of the Term in the amount set forth on the Schedule.

(2) Operating Cost Share Rent in an amount equal to the Tenant's Proportionate Share of the Operating Costs for the applicable fiscal year of the Lease,

lse1REVISED1
052302-1:50PM

2

paid monthly in advance in an estimated amount. Definitions of Operating Costs and Tenant's Proportionate Share, and the method for billing and payment of Operating Cost Share Rent are set forth in Sections 2B, 2C and 2D.

(3)     Tax Share Rent in an amount equal to the Tenant's Proportionate Share of the Taxes for the applicable fiscal year of this Lease, paid monthly in advance in an estimated amount. A definition of Taxes and the method for billing and payment of Tax Share Rent are set forth in Sections 2B, 2C and 2D.

(4)     Additional Rent in the amount of all costs, expenses, liabilities, and amounts which Tenant is required to pay under this Lease, excluding Base Rent, Operating Cost Share Rent, and Tax Share Rent, but including any interest for late payment of any item of Rent.

(5)     Rent as used in this Lease means Base Rent, Operating Cost Share Rent, Tax Share Rent and Additional Rent. Tenant's agreement to pay Rent is an independent covenant, with no right of setoff, deduction or counterclaim of any kind.

B.     Payment of Operating Cost Share Rent and Tax Share Rent.

(1)     Payment of Estimated Operating Cost Share Rent and Tax Share Rent. Landlord shall estimate the Operating Costs and Taxes of the Project by April 1 of each fiscal year, or as soon as reasonably possible thereafter. Landlord may revise these estimates whenever it obtains more accurate information, such as the final real estate tax assessment or tax rate for the Project.

Within ten (10) days after receiving the original or revised estimate from Landlord, Tenant shall pay Landlord one-twelfth (1/12th) of Tenant's Proportionate Share of this estimate, multiplied by the number of months that have elapsed in the applicable fiscal year to the date of such payment including the current month, minus payments previously made by Tenant for the months elapsed. On the first day of each month thereafter, Tenant shall pay Landlord one-twelfth (1/12th) of Tenant's Proportionate Share of this estimate, until a new estimate becomes applicable.

(2)     Correction of Operating Cost Share Rent. Landlord shall deliver to Tenant a report for the previous fiscal year (the "Operating Cost Report") by May 15 of each year, or as soon as reasonably possible thereafter, setting forth (a) the actual Operating Costs incurred, (b) the amount of Operating Cost Share Rent due from Tenant, and (c) the amount of Operating Cost Share Rent paid by Tenant. Within twenty (20) days after such delivery, Tenant shall pay to Landlord the amount due minus the amount paid. If the amount paid exceeds the amount due, Landlord shall apply the excess to Tenant's payments of Operating Cost Share Rent next coming due. In the last Lease Year, Landlord shall deliver to Tenant the report for the previous fiscal year within 120 days after the end of the last fiscal year.

lse1REVISED1
052302-1:50PM

3

(3)     Correction of Tax Share Rent. Landlord shall deliver to Tenant a report for the previous fiscal year (the "Tax Report") by May 15 of each year, or as soon as reasonably possible thereafter, setting forth (a) the actual Taxes, (b) the amount of Tax Share Rent due from Tenant, and (c) the amount of Tax Share Rent paid by Tenant. Within twenty (20) days after such delivery, Tenant shall pay to Landlord the amount due from Tenant minus the amount paid by Tenant. If the amount paid exceeds the amount due, Landlord shall apply the excess to Tenant's payments of Tax Share Rent next coming due. In the last Lease Year, Landlord shall deliver to Tenant the report for the previous fiscal year within 120 days after the end of the last fiscal year.

## C.     Definitions.

(1)     Included Operating Costs. "Operating Costs" means any expenses, costs and disbursements of any kind other than Taxes, paid or incurred by Landlord in connection with the management, maintenance, operation, insurance, repair and other related activities in connection with any part of the Project and of the personal property, fixtures, machinery, equipment, systems and apparatus used in connection therewith, including the cost of providing those services required to be furnished by Landlord under this Lease. Operating Costs shall also include the costs of any capital improvements which are intended to reduce Operating Costs or improve safety, (except those made to comply with existing government requirements) and those made to keep the Project in compliance with governmental requirements applicable from time to time (collectively, "Included Capital Items"); provided, that the costs of any Included Capital Item shall be amortized by Landlord, together with an amount equal to interest at ten percent (10%) per annum, over the estimated useful life of such item and such amortized costs are only included in Operating Costs for that portion of the useful life of the Included Capital Item which falls within the Term.

If the Project is not fully occupied during any portion of any fiscal year, Landlord may adjust (an "Equitable Adjustment") Operating Costs to equal what would have been incurred by Landlord had the Project been fully occupied. This Equitable Adjustment shall apply only to Operating Costs which are variable and therefore increase as occupancy of the Project increases. Landlord may incorporate the Equitable Adjustment in its estimates of Operating Costs.

If Landlord does not furnish any particular service whose cost would have constituted an Operating Cost to a tenant other than Tenant who has undertaken to perform such service itself, Operating Costs shall be increased by the amount which Landlord would have incurred if it had furnished the service to such tenant.

(2)     Excluded Operating Costs. Operating Costs shall not include:

lse1REVISED1
052302-1:50PM

4

(a) costs of alterations of tenant premises;

(b) costs of capital improvements other than included Capital Items;

(c) interest and principal payments on mortgages or any other debt costs, or rental payments on any ground lease of the Project;

(d) real estate brokers' leasing commissions;

(e) legal fees, space planner fees and advertising expenses incurred with regard to leasing the Building or portions thereof;

(f) any cost or expenditure for which Landlord is reimbursed, by insurance proceeds or otherwise, except by Operating Cost Share Rent;

(g) the cost of any service furnished to any office tenant of the Project which Landlord does not make available to Tenant;

(h) depreciation (except on any Included Capital Items);

(i) franchise or income taxes imposed upon Landlord, except to the extent imposed in lieu of all or any part of Taxes;

(j) costs of correcting defects in construction of the Building (as opposed to the cost of normal repair, maintenance and replacement expected with the construction materials and equipment installed in the Building in light of their specifications);

(k) legal and auditing fees which are for the benefit of Landlord such as collecting delinquent rents, preparing tax returns and other financial statements, and audits other than those incurred in connection with the preparation of reports required pursuant to Section 2B above;

(l) the wages of any employee for services not related directly to the management, maintenance, operation and repair of the Building; and

(m) fines, penalties and interest.

(3)  Taxes. "Taxes" means any and all taxes, assessments and charges of any kind, general or special, ordinary or extraordinary, levied against the Project, which Landlord shall pay or become obligated to pay in connection with the ownership, leasing, renting, management, use, occupancy, control or operation of the Project or of the personal property, fixtures, machinery, equipment, systems and apparatus used in connection therewith. Taxes shall include real estate taxes, personal property taxes,

lsa1REVISED1
052302-1:50PM

5

sewer rents, water rents, special or general assessments, transit taxes, ad valorem taxes, and any tax levied on the rents hereunder or the interest of Landlord under this Lease (the "Rent Tax"). Taxes shall also include all fees and other costs and expenses paid by Landlord in reviewing any tax and in seeking a refund or reduction of any Taxes, whether or not the Landlord is ultimately successful.

For the purpose of determining Taxes for any given year, the amount to be included for such year (a) for special taxes or assessments payable in installments, shall be the amount of the installments (and any interest) due and payable during such year, and (b) for all other Taxes, shall, at Landlord's election, be the amount accrued, assessed or otherwise imposed for such year without regard to when any such Taxes are payable.

Taxes shall not include any net income (except Rent Tax), capital, stock, succession, transfer, franchise, gift, estate or inheritance tax, except to the extent that such tax shall be imposed in lieu of any portion of Taxes.

(4)     Lease Year.  "Lease Year" means each consecutive twelve-month period beginning with the Commencement Date, except that if the Commencement Date is not the first day of a calendar month, then the first Lease Year shall be the period from the Commencement Date through the final day of the twelve months after the first day of the following month, and each subsequent Lease Year shall be the twelve months following the prior Lease Year.

(5)     Fiscal Year.  "Fiscal Year" means the calendar year, except that the first fiscal year and the last fiscal year of the Term may be a partial calendar year.

D.     Computation of Base Rent and Rent Adjustments.

(1)     Prorations.  If this Lease begins on a day other than the first day of a month, the Base Rent, Operating Cost Share Rent and Tax Share Rent shall be prorated for such partial month based on the actual number of days in such month. If this Lease begins on a day other than the first day, or ends on a day other than the last day, of the fiscal year, Operating Cost Share Rent and Tax Share Rent shall be prorated for the applicable fiscal year.

(2)     Default Interest.  Any sum due from Tenant to Landlord not paid when due shall bear interest from the date due until paid at eighteen percent (18%) per annum.

(3)     Rent Adjustments.  The square footage of the Premises and the Building set forth in the Schedule are conclusively deemed to be the actual square footage thereof, without regard to any subsequent remeasurement of the Premises or the Building. If any Operating Cost paid in one fiscal year relates to more than one fiscal

lse1REVISED1
052302-1:50PM

6

year, Landlord may proportionately allocate such Operating Cost among the related fiscal years.

(4)     Books and Records.  Landlord shall maintain books and records reflecting the Operating Costs and Taxes in accordance with sound accounting and management practices.  Tenant and its certified public accountant shall have the right to inspect Landlord's records at Landlord's office upon at least seventy-two (72) hours' prior notice during normal business hours during the ninety (90) days following the respective delivery of the Operating Cost Report or the Tax Report.  The results of any such inspection shall be kept strictly confidential by Tenant and its agents, and Tenant and its certified public accountant must agree, in their contract for such services, to such confidentiality restrictions and shall specifically agree that the results shall not be made available to any other tenant of the Building.  Unless Tenant sends to Landlord any written exception to either such report within said ninety (90) day period, such report shall be deemed final and accepted by Tenant.  Tenant shall pay the amount shown on both reports in the manner prescribed in this Lease, whether or not Tenant takes any such written exception, without any prejudice to such exception.  If Tenant makes a timely exception, Landlord shall cause its independent certified public accountant to issue a final and conclusive resolution of Tenant's exception.  Tenant shall pay the cost of such certification unless Landlord's original determination of annual Operating Costs or Taxes overstated the amounts thereof by more than five percent (5%).

(5)     Miscellaneous.  So long as Tenant is in default of any obligation under this Lease, Tenant shall not be entitled to any refund of any amount from Landlord.  If this Lease is terminated for any reason prior to the annual determination of Operating Cost Share Rent or Tax Share Rent, either party shall pay the full amount due to the other within fifteen (15) days after Landlord's notice to Tenant of the amount when it is determined.  Landlord may commingle any payments made with respect to Operating Cost Share Rent or Tax Share Rent, without payment of interest.

3.     PREPARATION AND CONDITION OF PREMISES; POSSESSION AND SURRENDER OF PREMISES.

A.     Condition of Premises.  Except to the extent of the Tenant Improvements item on the Schedule, Landlord is leasing the Premises to Tenant "as is", without any obligation to alter, remodel, improve, repair or decorate any part of the Premises.

B.     Tenant's Possession.  Tenant's taking possession of any portion of the Premises shall be conclusive evidence that the Premises was in good order, repair and condition.  If Landlord authorizes Tenant to take possession of any part of the Premises prior to the Commencement Date for purposes of doing business, all terms of this Lease shall apply to such pre-Term possession, including Base Rent at the rate set forth for the First Lease Year in the Schedule prorated for any partial month.

lse1REVISED1
052302-1:50PM

7

C.    Maintenance.  Throughout the Term, Tenant shall maintain the Premises in their condition as of the Completion Date, loss or damage caused by the elements, ordinary wear, and fire and other casualty excepted, and at the termination of this Lease, or Tenant's right to possession, Tenant shall return the Premises to Landlord in broom-clean condition.  To the extent Tenant fails to perform either obligation, Landlord may, but need not, restore the Premises to such condition and Tenant shall pay the cost thereof.

## 4.    PROJECT SERVICES.

Landlord shall furnish services as follows:

A.    Heating and Air Conditioning.  During the normal business hours of 8:00 a.m. to 6:00 p.m., Monday through Friday, and 8:00 a.m. to 1:00 p.m. on Saturday, Landlord shall furnish heating and air conditioning to provide a comfortable temperature, in Landlord's judgment, for normal business operations, except to the extent Tenant installs equipment which adversely affects the temperature maintained by the air conditioning system.  If Tenant installs such equipment, Landlord may install supplementary air conditioning units in the Premises, and Tenant shall pay to Landlord upon demand as Additional Rent the cost of installation, operation and maintenance thereof.

Landlord shall furnish heating and air conditioning after business hours if Tenant provides Landlord reasonable prior notice, and pays Landlord all then current charges for such additional heating or air conditioning.

B.    Elevators.  Landlord shall provide passenger elevator service during normal business hours to Tenant in common with Landlord and all other tenants.  Landlord shall provide limited passenger service at other times, except in case of an emergency.
C.    Electricity.  All electricity used in the Premises shall be supplied by the electricity company through a separate meter and shall be paid for by Tenant.  Tenant shall pay for the installation of any submeter required on any floor of its Premises.  Tenant shall not install or operate in the Premises any electrically operated equipment or other machinery, other than business machines and equipment normally employed for general office use which do not require high electricity consumption for operation, without obtaining the prior written consent of Landlord.

D.    Water.  Landlord shall furnish hot and cold tap water for drinking and toilet purposes.  Tenant shall pay Landlord for water furnished for any other purpose as Additional Rent at rates fixed by Landlord.  Tenant shall not permit water to be wasted.

E.    Janitorial Service.  Landlord shall furnish janitorial service as generally provided to other tenants in the Building.

F.    Interruption of Services.  If any of the Building equipment or machinery

Ise1REVISED1
052302-1:50PM

8

ceases to function properly for any cause Landlord shall use reasonable diligence to repair the same promptly. Landlord's inability to furnish, to any extent, the Project services set forth in this Section 4, or any cessation thereof resulting from any causes, including without limitation any entry for repairs pursuant to this Lease, and any renovation, redecoration or rehabilitation of any area of the Building shall not render Landlord liable for damages to either person or property or for interruption or loss to Tenant's business, nor be construed as an eviction of Tenant, nor work an abatement of any portion of Rent, nor relieve Tenant from fulfillment of any covenant or agreement hereof. However, in the event that an interruption of the Project services set forth in this Section 4 is within Landlord's reasonable control and such interruption causes the Premises to be untenantable for a period of at least ten (10) consecutive business days, monthly Rent shall thereafter be abated proportionately.

## 5. ALTERATIONS AND REPAIRS.

### A. Landlord's Consent and Conditions.

Tenant shall not make any improvements or alterations to the Premises (the "Work") without in each instance submitting plans and specifications for the Work to Landlord and obtaining Landlord's prior written consent. Tenant shall pay Landlord's standard charge for review of the plans and all other items submitted by Tenant. Landlord will be deemed to be acting reasonably in withholding its consent for any Work which (a) impacts the base structural components or systems of the Building, (b) impacts any other tenant's premises, or (c) is visible from outside the Premises.

Tenant shall reimburse Landlord for actual costs incurred for review of the plans and all other items submitted by Tenant. Tenant shall pay for the cost of all Work. All Work shall become the property of Landlord upon its installation, except for Tenant's trade fixtures and for items which Landlord requires Tenant to remove at Tenant's cost at the termination of the Lease pursuant to Section 5E.

The following requirements shall apply to all Work:

(1) Prior to commencement, Tenant shall furnish to Landlord building permits, certificates of insurance satisfactory to Landlord, and, at Landlord's request, security for payment of all costs.

(2) Tenant shall perform all Work so as to maintain peace and harmony among other contractors serving the Project and shall avoid interference with other work to be performed or services to be rendered in the Project.

(3) The Work shall be performed in a good and workmanlike manner, meeting the standard for construction and quality of materials in the Building, and shall comply with all insurance requirements and all applicable governmental laws,

lse1REVISED1
052302-1:50PM

9

ordinances and regulations ("Governmental Requirements").

(4)     Tenant shall perform all Work so as to minimize or prevent disruption to other tenants, and Tenant shall comply with all reasonable requests of Landlord in response to complaints from other tenants.

(5)     Tenant shall perform all Work in compliance with Landlord's "Policies, Rules and Procedures for Construction Projects" in effect at the time the Work is performed.

(6)     Tenant shall permit Landlord to supervise all Work.  Landlord may charge a supervisory fee not to exceed fifteen percent (15%) of labor, material, and all other costs of the Work.

(7)     Upon completion, Tenant shall furnish Landlord with contractor's affidavits and full and final statutory waivers of liens, as-built plans and specifications, and receipted bills covering all labor and materials, and all other close-out documentation required in Landlord's "Policies, Rules and Procedures for Construction Projects".

B.     Damage to Systems.  If any part of the mechanical, electrical or other systems in the Premises shall be damaged, Tenant shall promptly notify Landlord, and Landlord shall repair such damage.  Landlord may also at any reasonable time make any repairs or alterations which Landlord deems necessary for the safety or protection of the Project, or which Landlord is required to make by any court or pursuant to any Governmental Requirement.  Tenant shall at its expense make all other repairs necessary to keep the Premises, and Tenant's fixtures and personal property, in good order, condition and repair; to the extent Tenant fails to do so, Landlord may make such repairs itself.  The cost of any repairs made by Landlord on account of Tenant's default, or on account of the mis-use or neglect by Tenant or its invitees, contractors or agents anywhere in the Project, shall become Additional Rent payable by Tenant on demand.

C.     No Liens.  Tenant has no authority to cause or permit any lien or encumbrance of any kind to affect Landlord's interest in the Project; any such lien or encumbrance shall attach to Tenant's interest only.  If any mechanic's lien shall be filed or claim of lien made for work or materials furnished to Tenant, then Tenant shall at its expense within ten (10) days thereafter either discharge or contest the lien or claim.  If Tenant contests the lien or claim, then Tenant shall (i) within such ten (10) day period, provide Landlord adequate security for the lien or claim, (ii) contest the lien or claim in good faith by appropriate proceedings that operate to stay its enforcement, and (iii) pay promptly any final adverse judgment entered in any such proceeding.  If Tenant does not comply with these requirements, Landlord may discharge the lien or claim, and the amount paid, as well as attorney's fees and other expenses incurred by Landlord, shall become Additional Rent payable by Tenant on demand.

D.     Ownership of Improvements.  All Work as defined in this Section 5, partitions, hardware, equipment, machinery and all other improvements and all fixtures except trade

lse1REVISED1
052302-1:50PM

10

fixtures, constructed in the Premises by either Landlord or Tenant, (i) shall become Landlord's property upon installation without compensation to Tenant, unless Landlord consents otherwise in writing, and (ii) shall at Landlord's option either (a) be surrendered to Landlord with the Premises at the termination of the Lease or of Tenant's right to possession, or (b) be removed in accordance with Subsection 5E below (unless Landlord at the time it gives its consent to the performance of such construction expressly waives in writing the right to require such removal).

E.    Removal at Termination.   Upon the termination of this Lease or Tenant's right of possession Tenant shall remove from the Project its trade fixtures, furniture, moveable equipment and other personal property, any improvements, except initial improvements outlined in Spaceplan dated May 9, 2002, which Landlord elects shall be removed by Tenant pursuant to Section 5D, and any improvements to any portion of the Project other than the Premises. Tenant shall repair all damage caused by the installation or removal of any of the foregoing items.   If Tenant does not timely remove such property, then Tenant shall be conclusively presumed to have, at Landlord's election (i) conveyed such property to Landlord without compensation or (ii) abandoned such property, and Landlord may dispose of or store any part thereof in any manner at Tenant's sole cost, without waiving Landlord's right to claim from Tenant all expenses arising out of Tenant's failure to remove the property, and without liability to Tenant or any other person.  Landlord shall have no duty to be a bailee of any such personal property.  If Landlord elects abandonment, Tenant shall pay to Landlord, upon demand, any expenses incurred for disposition.

6.    USE OF PREMISES.   Tenant shall use the Premises only for general office purposes.  Tenant shall not allow any use of the Premises which will negatively affect the cost of coverage of Landlord's insurance on the Project.  Tenant shall not allow any inflammable or explosive liquids or materials to be kept on the Premises.  Tenant shall not allow any use of the Premises which would cause the value or utility of any part of the Premises to diminish or would interfere with any other tenant or with the operation of the Project by Landlord.  Tenant shall not permit any nuisance or waste upon the Premises, or allow any offensive noise or odor in or around the Premises.

If any governmental authority shall deem the Premises to be a "place of public accommodation" under the Americans with Disabilities Act or any other comparable law as a result of Tenant's use, Tenant shall either modify its use to cause such authority to rescind its designation or be responsible for any alterations, structural or otherwise, required to be made to the Building or the Premises under such laws.

7.    GOVERNMENTAL REQUIREMENTS AND BUILDING RULES.   Tenant shall comply with all Governmental Requirements applying to its use of the Premises.  Tenant shall also comply with all reasonable rules established for the Project from time to time by Landlord. The present rules and regulations are contained in Appendix B.  Failure by another tenant to comply with the rules or failure by Landlord to enforce them shall not relieve Tenant of its obligation to comply with the rules or make Landlord responsible to Tenant in any way. Landlord shall use reasonable efforts to apply the rules and regulations uniformly with respect to

Tenant and tenants in the Building under leases containing rules and regulations similar to this Lease. In the event of alterations and repairs performed by Tenant, Tenant shall comply with the provisions of Section 5 of this Lease and also Landlord's "Policies, Rules and Procedures for Construction Projects".

8.    **WAIVER OF CLAIMS; INDEMNIFICATION; INSURANCE.**

A.    Waiver of Claims. To the extent permitted by law, Tenant waives any claims it may have against Landlord or its officers, directors, employees or agents for business interruption or damage to property sustained by Tenant as the result of any act or omission of Landlord.

To the extent permitted by law, Landlord waives any claims it may have against Tenant or its officers, directors, employees or agents for loss of rents (other than Rent) or damage to property sustained by Landlord as the result of any act or omission of Tenant.

B.    Indemnification. Tenant shall indemnify, defend and hold harmless Landlord and its officers, directors, employees and agents against any claim by any third party for injury to any person or damage to or loss of any property occurring in the Project and arising from the use of the Premises or from any other act or omission or negligence of Tenant or any of Tenant's employees or agents. Tenant's obligations under this section shall survive the termination of this Lease.

Landlord shall indemnify, defend and hold harmless Tenant and its officers, directors, employees and agents against any claim by any third party for damage to person or Premises or from any other act or omission or negligence of Landlord or any of Landlord's employees or agents. Landlord's obligations under this section shall survive the termination of this Lease.

C.    Tenant's Insurance. Tenant shall maintain insurance as follows, with such other terms, coverages and insurers, as Landlord shall reasonably require from time to time:

(1)    Commercial General Liability Insurance, with (a) Contractual Liability including the indemnification provisions contained in this Lease, (b) a severability of interest endorsement, (c) limits of not less than Two Million Dollars ($2,000,000) combined single limit per occurrence and not less than Two Million Dollars ($2,000,000) in the aggregate for bodily injury, sickness or death, and property damage, and umbrella coverage of not less than Five Million Dollars ($5,000,000).

(2)    Property Insurance against "All Risks" of physical loss covering the replacement cost of all improvements, fixtures and personal property. Tenant waives all rights of subrogation, and Tenant's property insurance shall include a waiver of subrogation in favor of Landlord.

lse1REVISED1
052302-1:50PM

12

(3)     Workers' compensation or similar insurance in form and amounts required by law, and Employer's Liability with not less than the following limits:

| | |
|---|---|
| Each Accident | $500,000 |
| Disease—Policy Limit | $500,000 |
| Disease—Each Employee | $500,000 |

Such insurance shall contain a waiver of subrogation provision in favor of Landlord and its agents.

Tenant's insurance shall be primary and not contributory to that carried by Landlord, its agents, or mortgagee. Landlord, and if any, Landlord's building manager or agent and ground lessor shall be named as additional insureds as respects to insurance required of the Tenant in Section 8C(1). The company or companies writing any insurance which Tenant is required to maintain under this Lease, as well as the form of such insurance, shall at all times be subject to Landlord's approval, and any such company shall be licensed to do business in the state in which the Building is located. Such insurance companies shall have a A.M. Best rating of A VI or better.

Tenant shall cause any contractor of Tenant performing work on the Premises to maintain insurance as follows, with such other terms, coverages and insurers, as Landlord shall reasonably require from time to time:

(1)     Commercial General Liability Insurance, including contractor's liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement, and contractor's protective liability coverage, to afford protection with limits, for each occurrence, of not less than One Million Dollars ($1,000,000) with respect to personal injury, death or property damage.

(2)     Workers' compensation or similar insurance in form and amounts required by law, and Employer's Liability with not less than the following limits:

| | |
|---|---|
| Each Accident | $500,000 |
| Disease—Policy Limit | $500,000 |
| Disease—Each Employee | $500,000 |

Such insurance shall contain a waiver of subrogation provision in favor of Landlord and its agents.

Tenant's contractor's insurance shall be primary and not contributory to that carried by Tenant, Landlord, their agents or mortgagees. Tenant and Landlord, and if any, Landlord's building manager or agent, mortgagee or ground lessor shall be named as additional insured on Tenant's contractor's insurance policies.

lse1REVISED1
052302-1:50PM

D. **Insurance Certificates.** Tenant shall deliver to Landlord certificates evidencing all required insurance no later than five (5) days prior to the Commencement Date and each renewal date. Each certificate will provide for thirty (30) days prior written notice of cancellation to Landlord and Tenant.

E. **Landlord's Insurance.** Landlord shall maintain "All-Risk" property insurance at replacement cost, including loss of rents, on the Building, and Commercial General Liability insurance policies covering the common areas of the Building, each with such terms, coverages and conditions as are normally carried by reasonably prudent owners of properties similar to the Project. With respect to property insurance, Landlord and Tenant mutually waive all rights of subrogation, and the respective "All-Risk" coverage property insurance policies carried by Landlord and Tenant shall contain enforceable waiver of subrogation endorsements.

## 9. FIRE AND OTHER CASUALTY.

A. **Termination.** If a fire or other casualty causes substantial damage to the Building or the Premises, Landlord shall engage a registered architect to certify within one (1) month of the casualty to both Landlord and Tenant the amount of time needed to restore the Building and the Premises to tenantability, using standard working methods. If the time needed exceeds twelve (12) months from the beginning of the restoration, or two (2) months therefrom if the restoration would begin during the last twelve (12) months of the Lease, then in the case of the Premises, either Landlord or Tenant may terminate this Lease, and in the case of the Building, Landlord may terminate this Lease, by notice to the other party within ten (10) days after the notifying party's receipt of the architect's certificate. The termination shall be effective thirty (30) days from the date of the notice and Rent shall be paid by Tenant to that date, with an abatement for any portion of the Premises which has been untenantable after the casualty.

B. **Restoration.** If a casualty causes damage to the Building or the Premises but this Lease is not terminated for any reason, then subject to the rights of any mortgagees or ground lessors, Landlord shall obtain the applicable insurance proceeds and diligently restore the Building and the Premises subject to current Governmental Requirements. Tenant shall replace its damaged improvements, personal property and fixtures. Rent shall be abated on a per diem basis during the restoration for any portion of the Premises which is untenantable, except to the extent that Tenant's negligence caused the casualty.

## 10. EMINENT DOMAIN.
If a part of the Project is taken by eminent domain or deed in lieu thereof which is so substantial that the Premises cannot reasonably be used by Tenant for the operation of its business, then either party may terminate this Lease effective as of the date of the taking. If any substantial portion of the Project is taken without affecting the Premises, then Landlord may terminate this Lease as of the date of such taking. Rent shall abate from the date of the taking in proportion to any part of the Premises taken. The entire award for a taking of any kind shall be paid to Landlord, and Tenant shall have no right to share in the award. All obligations accrued to the date of the taking shall be performed by the party liable to perform said obligations, as set forth herein.

lsa1REVISED1
052302-1:50PM

## 11. RIGHTS RESERVED TO LANDLORD.

Landlord may exercise at any time any of the following rights respecting the operation of the Project without liability to the Tenant of any kind:

A. Name. To change the name or street address of the Building or the suite number(s) of the Premises.

B. Signs. To install and maintain any signs on the exterior and in the interior of the Building, and to approve at its sole discretion, prior to installation, any of Tenant's signs in the Premises visible from the common areas or the exterior of the Building.

C. Window Treatments. To approve, at its discretion, prior to installation, any shades, blinds, ventilators or window treatments of any kind, as well as any lighting within the Premises that may be visible from the exterior of the Building or any interior common area.

D. Keys. To retain and use at any time passkeys to enter the Premises or any door within the Premises. Tenant shall not alter or add any lock or bolt.

E. Access. To have access to inspect the Premises, and to perform its obligations, or make repairs, alterations, additions or improvements, as permitted by this Lease.

F. Preparation for Reoccupancy. To decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy at any time after Tenant abandons the Premises, without relieving Tenant of any obligation to pay Rent.

G. Heavy Articles. To approve the weight, size, placement and time and manner of movement within the Building of any safe, central filing system or other heavy article of Tenant's property. Tenant shall move its property entirely at its own risk.

H. Show Premises. To show the Premises to prospective purchasers, tenants, brokers, lenders, investors, rating agencies or others at any reasonable time, provided that Landlord gives prior notice to Tenant and does not materially interfere with Tenant's use of the Premises.

I. Relocation of Tenant. To relocate the Tenant, upon ninety days' prior written notice, from all or part of the Premises (the "Old Premises") to another area in the Project (the "new premises"), provided that:

    (1)    the size of the new premises is at least equal to the size of the Old Premises;

    (2)    the configuration of the new premises is essentially the same as the Old Premises and allows for the same continuity of work flow;

    (3)    the new premises have an equal number of window offices that offer a

Ise1 REVISED1
052302-1:50PM

view comparable to the Old Premises views;

(4) Landlord pays the cost of moving the Tenant and improving the new premises to the standard of the Old Premises. Cost shall include the normal physical moving costs of the physical move, replacement stationary, preparation and mailing of customer and vendor announcements, change of address fees, recabling of computer and communication systems. The move shall take place over a weekend. Tenant shall cooperate with Landlord in all reasonable ways to facilitate the move, including supervising the movement of files or fragile equipment, designating new locations for furniture, equipment and new telephone and electrical outlets, and determining the color of paint and wallpaper in the new premises.

(5) The Landlord may move the tenant only once during the lease term, and then only to expand the space of an adjoining tenant or to lease a much larger space (at least 5,000 square feet) to a new or existing tenant.

J. Use of Lockbox. To designate a lockbox collection agent for collections of amounts due Landlord. In that case, the date of payment of Rent or other sums shall be the date of the agent's receipt of such payment or the date of actual collection if payment is made in the form of a negotiable instrument thereafter dishonored upon presentment. However, Landlord may reject any payment for all purposes as of the date of receipt or actual collection by mailing to Tenant within 21 days after such receipt or collection a check equal to the amount sent by Tenant.

K. Repairs and Alterations. To make repairs or alterations to the Project and in doing so transport any required material through the Premises, to close entrances, doors, corridors, elevators and other facilities in the Project, to open any ceiling in the Premises, or to temporarily suspend services or use of common areas in the Building. Landlord may perform any such repairs or alterations during ordinary business hours, except that Tenant may require any Work in the Premises to be done after business hours if Tenant pays Landlord for overtime and any other expenses incurred. Landlord may do or permit any work on any nearby building, land, street, alley or way.

L. Landlord's Agents. If Tenant is in default under this Lease, possession of Tenant's funds or negotiation of Tenant's negotiable instrument by any of Landlord's agents shall not waive any breach by Tenant or any remedies of Landlord under this Lease.

M. Building Services. To install, use and maintain through the Premises, pipes, conduits, wires and ducts serving the Building, provided that such installation, use and maintenance does not unreasonably interfere with Tenant's use of the Premises.

N. Other Actions. To take any other action which Landlord deems reasonable in connection with the operation, maintenance or preservation of the Building.

lse1REVISED1
052302-1:50PM

## 12. TENANT'S DEFAULT.

Any of the following shall constitute a default by Tenant:

A.   Rent Default.  Tenant fails to pay any Rent when due;

B.   Assignment/Sublease or Hazardous Substances Default.  Tenant defaults in its obligations under Section 17 Assignment and Sublease or Section 28 Hazardous Substances;

C.   Other Performance Default.  Tenant fails to perform any other obligation to Landlord under this Lease, and, in the case of only the first two (2) such failures during the Term of this Lease, this failure continues for ten (10) days after written notice from Landlord, except that if Tenant begins to cure its failure within the ten (10) day period but cannot reasonably complete its cure within such period, then, so long as Tenant continues to diligently attempt to cure its failure, the ten (10) day period shall be extended to sixty (60) days, or such lesser period as is reasonably necessary to complete the cure;

D.   Credit Default.  One of the following credit defaults occurs:

(1)   Tenant commences any proceeding under any law relating to bankruptcy, insolvency, reorganization or relief of debts, or seeks appointment of a receiver, trustee, custodian or other similar official for the Tenant or for any substantial part of its property, or any such proceeding is commenced against Tenant and either remains undismissed for a period of thirty days or results in the entry of an order for relief against Tenant which is not fully stayed within seven days after entry;

(2)   Tenant becomes insolvent or bankrupt, does not generally pay its debts as they become due, or admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors;

(3)   Any third party obtains a levy or attachment under process of law against Tenant's leasehold interest.

E.   Vacation or Abandonment Default.  Tenant vacates or abandons the Premises.

## 13. LANDLORD REMEDIES.

A.   Termination of Lease or Possession.  If Tenant defaults, Landlord may elect by notice to Tenant either to terminate this Lease or to terminate Tenant's possession of the Premises without terminating this Lease.  In either case, Tenant shall immediately vacate the Premises and deliver possession to Landlord, and Landlord may repossess the Premises and may, at Tenant's sole cost, remove any of Tenant's signs and any of its other property, without relinquishing its right to receive Rent or any other right against Tenant.

lse1REVISED1
052302-1:50PM

B. **Lease Termination Damages.** If Landlord terminates the Lease, Tenant shall pay to Landlord all Rent due on or before the date of termination, plus Landlord's reasonable estimate of the aggregate Rent that would have been payable from the date of termination through the Termination Date, reduced by the rental value of the Premises calculated as of the date of termination for the same period, taking into account anticipated vacancy prior to reletting, reletting expenses and market concessions, discounted to present value at the rate of five percent (5%) per annum. If Landlord shall relet any part of the Premises for any part of such period before such present value amount shall have been paid by Tenant or finally determined by a court, then the amount of Rent payable pursuant to such reletting (taking into account vacancy prior to reletting and any reletting expenses or concessions) shall be deemed to be the reasonable rental value for that portion of the Premises relet during the period of the reletting.

C. **Possession Termination Damages.** If Landlord terminates Tenant's right to possession without terminating the Lease and Landlord takes possession of the Premises itself, Landlord may relet any part of the Premises for such Rent, for such time, and upon such terms as Landlord in its sole discretion shall determine, without any obligation to do so prior to renting other vacant areas in the Building. Any proceeds from reletting the Premises shall first be applied to the expenses of reletting, including redecoration, repair, alteration, advertising, brokerage, legal, and other reasonably necessary expenses. If the reletting proceeds after payment of expenses are insufficient to pay the full amount of Rent under this Lease, Tenant shall pay such deficiency to Landlord monthly upon demand as it becomes due. Any excess proceeds shall be retained by Landlord.

D. **Landlord's Remedies Cumulative.** All of Landlord's remedies under this Lease shall be in addition to all other remedies Landlord may have at law or in equity. Waiver by Landlord of any breach of any obligation by Tenant shall be effective only if it is in writing, and shall not be deemed a waiver of any other breach, or any subsequent breach of the same obligation. Landlord's acceptance of payment by Tenant shall not constitute a waiver of any breach by Tenant, and if the acceptance occurs after Landlord's notice to Tenant, or termination of the Lease or of Tenant's right to possession, the acceptance shall not affect such notice or termination. Acceptance of payment by Landlord after commencement of a legal proceeding or final judgment shall not affect such proceeding or judgment. Landlord may advance such monies and take such other actions for Tenant's account as reasonably may be required to cure or mitigate any default by Tenant. Tenant shall immediately reimburse Landlord for any such advance, and such sums shall bear interest at the default interest rate until paid.

E. **WAIVER OF TRIAL BY JURY.** EACH PARTY WAIVES TRIAL BY JURY IN THE EVENT OF ANY LEGAL PROCEEDING BROUGHT BY THE OTHER IN CONNECTION WITH THIS LEASE. EACH PARTY SHALL BRING ANY ACTION AGAINST THE OTHER IN CONNECTION WITH THIS LEASE IN A FEDERAL OR STATE COURT LOCATED IN ILLINOIS, CONSENTS TO THE JURISDICTION OF SUCH COURTS, AND WAIVES ANY RIGHT TO HAVE ANY PROCEEDING TRANSFERRED FROM SUCH COURTS ON THE

lse1REVISED1
052302-1:50PM

**GROUND OF IMPROPER VENUE OR INCONVENIENT FORUM.**

F. <u>Litigation Costs.</u> Tenant shall pay Landlord's reasonable attorneys' fees and other costs in enforcing this Lease, whether or not suit is filed.

14. <u>SURRENDER.</u> Upon termination of this Lease or Tenant's right to possession, Tenant shall return the Premises to Landlord in good order and condition, ordinary wear and casualty damage excepted. If Landlord requires Tenant to remove any alterations, then Tenant shall remove the alterations in a good and workmanlike manner and restore the Premises to its condition prior to their installation.

15. <u>HOLDOVER.</u> Tenant shall have no right to holdover possession of the Premises after the expiration or termination of this Lease without Landlord's prior written consent, which Landlord may withhold in its sole and absolute discretion. If Tenant retains possession of any part of the Premises after the Term, Tenant shall become a month-to-month tenant for the entire Premises upon all of the terms of this Lease as might be applicable to such month-to-month tenancy, except that Tenant shall pay all of Base Rent, Operating Cost Share Rent and Tax Share Rent at double the rate in effect immediately prior to such holdover, computed on a monthly basis for each full or partial month Tenant remains in possession. Tenant shall also pay Landlord all of Landlord's direct and consequential damages resulting from Tenant's holdover. No acceptance of Rent or other payments by Landlord under these holdover provisions shall operate as a waiver of Landlord's right to regain possession or any other of Landlord's remedies.

16. <u>SUBORDINATION TO GROUND LEASES AND MORTGAGES.</u>

A. <u>Subordination.</u> This Lease shall be subordinate to any present or future ground lease or mortgage respecting the Project, and any amendments to such ground lease or mortgage, at the election of the ground lessor or mortgagee as the case may be, effected by notice to Tenant in the manner provided in this Lease. The subordination shall be effective upon such notice, but at the request of Landlord or ground lessor or mortgagee, Tenant shall within ten (10) days of the request, execute and deliver to the requesting party any reasonable documents provided to evidence the subordination. Any mortgagee has the right, at its option, to subordinate its mortgage to the terms of this Lease, without notice to, nor the consent of, Tenant.

B. <u>Termination of Ground Lease or Foreclosure of Mortgage.</u> If any ground lease is terminated or mortgage foreclosed or deed in lieu of foreclosure given and the ground lessor, mortgagee, or purchaser at a foreclosure sale shall thereby become the owner of the Project, Tenant shall attorn to such ground lessor or mortgagee or purchaser without any deduction or setoff by Tenant, and this Lease shall continue in effect as a direct lease between Tenant and such ground lessor, mortgagee or purchaser. The ground lessor or mortgagee or purchaser shall be liable as Landlord only during the time such ground lessor or mortgagee or purchaser is the owner of the Project. At the request of Landlord, ground lessor or mortgagee, Tenant shall

lse1REVISED1
052302-1:50PM

execute and deliver within ten (10) days of the request any document furnished by the requesting party to evidence Tenant's agreement to atiom.

C.     Security Deposit.  Any ground lessor or mortgagee shall be responsible for the return of any security deposit by Tenant only to the extent the security deposit is received by such ground lessor or mortgagee.

D.     Notice and Right to Cure.  The Project is subject to any ground lease and mortgage identified with name and address of ground lessor or mortgagee in Appendix D to this Lease (as the same may be amended from time to time by written notice to Tenant).  Tenant agrees to send by registered or certified mail to any ground lessor or mortgagee identified either in such Appendix or in any later notice from Landlord to Tenant a copy of any notice of default sent by Tenant to Landlord.  If Landlord fails to cure such default within the required time period under this Lease, but ground lessor or mortgagee begins to cure within ten (10) days after such period and proceeds diligently to complete such cure, then ground lessor or mortgagee shall have such additional time as is necessary to complete such cure, including any time necessary to obtain possession if possession is necessary to cure, and Tenant shall not begin to enforce its remedies so long as the cure is being diligently pursued.

E.     Definitions.  As used in this Section 16, "mortgage" shall include "deed of trust" and/or "trust deed" and "mortgagee" shall include "beneficiary" and/or "trustee", "mortgagee" shall include the mortgagee of any ground lessee, and "ground lessor", "mortgagee", and "purchaser at a foreclosure sale" shall include, in each case, all of its successors and assigns, however remote.

## 17.     ASSIGNMENT AND SUBLEASE.

A.     In General.  Tenant shall not, without the prior consent of Landlord in each case, (i) make or allow any assignment or transfer, by operation of law or otherwise, of any part of Tenant's interest in this Lease, (ii) grant or allow any lien or encumbrance, by operation of law or otherwise, upon any part of Tenant's interest in this Lease, (iii) sublet any part of the Premises, or (iv) permit anyone other than Tenant and its employees to occupy any part of the Premises.  Tenant shall remain primarily liable for all of its obligations under this Lease, notwithstanding any assignment or transfer.  No consent granted by Landlord shall be deemed to be a consent to any subsequent assignment or transfer, lien or encumbrance, sublease or occupancy.  Tenant shall pay all of Landlord's attorneys' fees and other expenses incurred in connection with any consent requested by Tenant or in reviewing any proposed assignment or subletting.  Any assignment or transfer, grant of lien or encumbrance, or sublease or occupancy without Landlord's prior written consent shall be void.  If Tenant shall assign this Lease or sublet the Premises in its entirety any rights of Tenant to renew this Lease, extend the Term or to lease additional space in the Project shall be extinguished thereby and will not be transferred to the assignee or subtenant, all such rights being personal to the Tenant named herein.

B.     Landlord's Consent.  Landlord will not unreasonably withhold its consent to any

lse1REVISED1
052302-1:50PM

proposed assignment or subletting. It shall be reasonable for Landlord to withhold its consent to any assignment or sublease if (i) Tenant is in default under this Lease, (ii) the proposed assignee or sublessee is a tenant in the Project or an affiliate or subtenant of such a tenant or a party that Landlord has identified as a prospective tenant in the Project, (iii) the financial responsibility, nature of business, and character of the proposed assignee or subtenant are not all reasonably satisfactory to Landlord, (iv) in the reasonable judgment of Landlord the purpose for which the assignee or subtenant intends to use the Premises (or a portion thereof) is not in keeping with Landlord's standards for the Building or are in violation of the terms of this Lease or any other leases in the Project, (v) the proposed assignee or subtenant is a government entity, or (vi) the proposed assignment is for less than the entire Premises or for less than the remaining Term of the Lease. The foregoing shall not exclude any other reasonable basis for Landlord to withhold its consent.

      C.     <u>Procedure.</u>  Tenant shall notify Landlord of any proposed assignment or sublease at least thirty (30) days prior to its proposed effective date. The notice shall include the name and address of the proposed assignee or subtenant, its corporate affiliates in the case of a corporation and its partners in a case of a partnership, an execution copy of the proposed assignment or sublease, and sufficient information to permit Landlord to determine the financial responsibility and character of the proposed assignee or subtenant. As a condition to any effective assignment of this Lease, the assignee shall execute and deliver in form satisfactory to Landlord at least fifteen (15) days prior to the effective date of the assignment, an assumption of all of the obligations of Tenant under this Lease. As a condition to any effective sublease, subtenant shall execute and deliver in form satisfactory to Landlord at least fifteen (15) days prior to the effective date of the sublease, an agreement to comply with all of Tenant's obligations under this Lease, and at Landlord's option, an agreement (except for the economic obligations which subtenant will undertake directly to Tenant) to attorn to Landlord under the terms of the sublease in the event this Lease terminates before the sublease expires.

      D.     <u>Change of Management or Ownership.</u>  Any transfer of the direct or indirect power to affect the management or policies of Tenant or direct or indirect change in 50% or more of the ownership interest in Tenant shall constitute an assignment of this Lease.

      E.     <u>Excess Payments.</u>  If Tenant shall assign this Lease or sublet any part of the Premises for consideration in excess of the pro-rata portion of Rent applicable to the space subject to the assignment or sublet, then Tenant shall pay to Landlord as Additional Rent 50% of any such excess immediately upon receipt.

      F.     <u>Recapture.</u>  Landlord may, by giving written notice to Tenant within thirty (30) days after receipt of Tenant's notice of assignment or subletting, terminate this Lease with respect to the space described in Tenant's notice, as of the effective date of the proposed assignment or sublease and all obligations under this Lease as to such space shall expire except as to any obligations that expressly survive any termination of this Lease.

      18.    <u>CONVEYANCE BY LANDLORD.</u>  If Landlord shall at any time transfer its

lse1REVISED1
052302-1:50PM

interest in the Project or this Lease, Landlord shall be released of any obligations occurring after such transfer, except the obligation to return to Tenant any security deposit not delivered to its transferee, and Tenant shall look solely to Landlord's successors for performance of such obligations. This Lease shall not be affected by any such transfer.

19.    ESTOPPEL CERTIFICATE. Each party shall, within ten (10) days of receiving a request from the other party, execute, acknowledge in recordable form, and deliver to the other party or its designee a certificate stating, subject to a specific statement of any applicable exceptions, that the Lease as amended to date is in full force and effect, that the Tenant is paying Rent and other charges on a current basis, and that to the best of the knowledge of the certifying party, the other party has committed no uncured defaults and has no offsets or claims. The certifying party may also be required to state the date of commencement of payment of Rent, the Commencement Date, the Termination Date, the Base Rent, the current Operating Cost Share Rent and Tax Share Rent estimates, the status of any improvements required to be completed by Landlord, the amount of any security deposit, and such other matters as may be reasonably requested. Failure to deliver such statement within the time required shall be conclusive evidence against the non-certifying party that this Lease, with any amendments identified by the requesting party, is in full force and effect, that there are no uncured defaults by the requesting party, that not more than one month's Rent has been paid in advance, that the non-certifying party has not paid any security deposit, and that the non-certifying party has no claims or offsets against the requesting party.

20.    SECURITY DEPOSIT. Tenant shall deposit with Landlord on the date of this Lease, security for the performance of all of its obligations in the amount set forth on the Schedule. If Tenant defaults under this Lease, Landlord may use any part of the Security Deposit to make any defaulted payment, to pay for Landlord's cure of any defaulted obligation, or to compensate Landlord for any loss or damage resulting from any default. To the extent any portion of the deposit is used, Tenant shall within five (5) days after demand from Landlord restore the deposit to its full amount. Landlord may keep the Security Deposit in its general funds and shall not be required to pay interest to Tenant on the deposit amount. If Tenant shall perform all of its obligations under this Lease and return the Premises to Landlord at the end of the Term, Landlord shall return all of the remaining Security Deposit to Tenant within thirty (30) days after the end of the Term. The Security Deposit shall not serve as an advance payment of Rent or a measure of Landlord's damages for any default under this Lease.

If Landlord transfers its interest in the Project or this Lease, Landlord may transfer the Security Deposit to its transferee. Upon such transfer, Landlord shall have no further obligation to return the Security Deposit to Tenant, and Tenant's right to the return of the Security Deposit shall apply solely against Landlord's transferee.

21.    FORCE MAJEURE. Landlord shall not be in default under this Lease to the extent Landlord is unable to perform any of its obligations on account of any strike or labor problem, energy shortage, governmental pre-emption or prescription, national emergency, or any other cause of any kind beyond the reasonable control of Landlord ("Force Majeure").

lse1REVISED1
052302-1:50PM

22.     **TENANT'S     PERSONAL     PROPERTY     AND     FIXTURES.**
INTENTIONALLY DELETED.

23.     **NOTICES.** All notices, consents, approvals and similar communications to be given by one party to the other under this Lease, shall be given in writing, mailed or personally delivered as follows:

A.     Landlord. To Landlord as follows:

CarrAmerica Realty Corporation
2333 Waukegan Road
Suite E-110
Bannockburn, IL 60015
Attn:    Property Manager

with a copy to each of:

CarrAmerica Realty Corporation
1850 K Street, N.W.
Suite 500
Washington, D.C. 20006
Attn:    Lease Administration

and:

CarrAmerica Realty Corporation
1850 K Street, N.W.
Suite 500
Washington, D.C. 20006
Attn:    General Counsel

and:

Mason, Silver, Wenk & Mishkin, L.L.C.
10 South LaSalle Street
Suite 2650
Chicago, IL 60603
Attn:    Keith J. Wenk, Esq.

or to such other person at such other address as Landlord may designate by notice to Tenant.

lse1REVISED1
052302-1:50PM

23

B.    Tenant.  To Tenant as follows:

Swedish Beverages, Inc.
2333 Waukegan Road
Suite S160
Bannockburn, IL 60015
Attn: Tony Filko

or to such other person at such other address as Tenant may designate by notice to Landlord.

Mailed notices shall be sent by United States certified or registered mail, or by a reputable national overnight courier service, postage prepaid.  Mailed notices shall be deemed to have been given on the earlier of actual delivery or three (3) business days after posting in the United States mail in the case of registered or certified mail, and one business day in the case of overnight courier.

24.    QUIET POSSESSION.  So long as Tenant shall perform all of its obligations under this Lease, Tenant shall enjoy peaceful and quiet possession of the Premises against any party claiming through the Landlord.

25.    REAL ESTATE BROKER.  Tenant represents to Landlord that Tenant has not dealt with any real estate broker with respect to this Lease except for any broker(s) listed in the Schedule, and no other broker is in any way entitled to any broker's fee or other payment in connection with this Lease.  Tenant shall indemnify and defend Landlord against any claims by any other broker or third party for any payment of any kind in connection with this Lease.

26.    MISCELLANEOUS.

A.    Successors and Assigns.    Subject to the limits on Tenant's assignment contained in Section 17, the provisions of this Lease shall be binding upon and inure to the benefit of all successors and assigns of Landlord and Tenant.

B.    Date Payments Are Due.    Except for payments to be made by Tenant under this Lease which are due upon demand or are due in advance (such as Base Rent), Tenant shall pay to Landlord any amount for which Landlord renders a statement of account within ten days of Tenant's receipt of Landlord's statement.

C.    Meaning of "Landlord", "Re-Entry, "Including" and "Affiliate".  The term "Landlord" means only the owner of the Project and the lessor's interest in this Lease from time to time.  The words "re-entry" and "re-enter" are not restricted to their technical legal meaning.  The words "including" and similar words shall mean "without limitation." The word "affiliate" shall mean a person or entity controlling, controlled by or under common control with the applicable entity.  "Control" shall mean the power directly or indirectly, by contract or otherwise, to direct the management and policies of the applicable entity.

lse1REVISED1
052302-1:50PM

24

D.  Time of the Essence.  Time is of the essence of each provision of this Lease.

E.  No Option.  This document shall not be effective for any purpose until it has been executed and delivered by both parties; execution and delivery by one party shall not create any option or other right in the other party.

F.  Severability.  The unenforceability of any provision of this Lease shall not affect any other provision.

G.  Governing Law.  This Lease shall be governed in all respects by the laws of the state in which the Project is located, without regard to the principles of conflicts of laws.

H.  Lease Modification.  Tenant agrees to modify this Lease in any way requested by a mortgagee which does not cause increased expense to Tenant or otherwise materially adversely affect Tenant's interests under this Lease.

I.  No Oral Modification.  No modification of this Lease shall be effective unless it is a written modification signed by both parties.

J.  Landlord's Right to Cure.  If Landlord breaches any of its obligations under this Lease, Tenant shall notify Landlord in writing and shall take no action respecting such breach so long as Landlord promptly begins to cure the breach and diligently pursues such cure to its completion.  Landlord may cure any default by Tenant; any expenses incurred shall become Additional Rent due from Tenant on demand by Landlord.

K.  Captions.  The captions used in this Lease shall have no effect on the construction of this Lease.

L.  Authority.  Landlord and Tenant each represents to the other that it has full power and authority to execute and perform this Lease.

M.  Landlord's Enforcement of Remedies.  Landlord may enforce any of its remedies under this Lease either in its own name or through an agent.

N.  Entire Agreement.  This Lease, together with all Appendices, constitutes the entire agreement between the parties.  No representations or agreements of any kind have been made by either party which are not contained in this Lease.

O.  Landlord's Title.  Landlord's title shall always be paramount to the interest of the Tenant, and nothing in this Lease shall empower Tenant to do anything which might in any way impair Landlord's title.

P.  Light and Air Rights.  Landlord does not grant in this Lease any rights to light and

lse1REVISED1
052302-1:50PM

air in connection with Project. Landlord reserves to itself, the Land, the Building below the improved floor of each floor of the Premises, the Building above the ceiling of each floor of the Premises, the exterior of the Premises and the areas on the same floor outside the Premises, along with the areas within the Premises required for the installation and repair of utility lines and other items required to serve other tenants of the Building.

Q. <u>Singular and Plural.</u> Wherever appropriate in this Lease, a singular term shall be construed to mean the plural where necessary, and a plural term the singular. For example, if at any time two parties shall constitute Landlord or Tenant, then the relevant term shall refer to both parties together.

R. <u>No Recording by Tenant.</u> Tenant shall not record in any public records any memorandum or any portion of this Lease.

S. <u>Exclusivity.</u> Landlord does not grant to Tenant in this Lease any exclusive right except the right to occupy its Premises.

T. <u>No Construction Against Drafting Party.</u> The rule of construction that ambiguities are resolved against the drafting party shall not apply to this Lease.

U. <u>Survival.</u> All obligations of Landlord and Tenant under this Lease shall survive the termination of this Lease.

V. <u>Rent Not Based on Income.</u> No rent or other payment in respect of the Premises shall be based in any way upon net income or profits from the Premises. Tenant may not enter into or permit any sublease or license or other agreement in connection with the Premises which provides for a rental or other payment based on net income or profit.

W. <u>Building Manager and Service Providers.</u> Landlord may perform any of its obligations under this Lease through its employees or third parties hired by the Landlord.

X. <u>Late Charge and Interest on Late Payments.</u> Without limiting the provisions of Section 12A, if Tenant fails twice within a twelve (12) month period to pay any installment of Rent or other charge to be paid by Tenant pursuant to this Lease within ten (10) business days after the same becomes due and payable, then Tenant shall pay a late charge equal to five percent (5%) of the amount of such payment. In addition, interest shall be paid by Tenant to Landlord on any late payments of Rent from the date due until paid at the rate provided in Section 2D(2). Such late charge and interest shall constitute Additional Rent due and payable by Tenant to Landlord upon the date of payment of the delinquent payment referenced above.

Y. <u>Tenant's Financial Statements.</u> Upon request from Landlord, Tenant shall provide Landlord with current audited annual and quarterly financial statements (income and balance sheet).

lse1REVISED1
052302-1:50PM

27.  **UNRELATED BUSINESS INCOME.** If Landlord is advised by its counsel at any time that any part of the payments by Tenant to Landlord under this Lease may be characterized as unrelated business income under the United States Internal Revenue Code and its regulations, then Tenant shall enter into any amendment proposed by Landlord to avoid such income, so long as the amendment does not require Tenant to make more payments or accept fewer services from Landlord, than this Lease provides.

28.  **HAZARDOUS SUBSTANCES.** Tenant shall not cause or permit any Hazardous Substances to be brought upon, produced, stored, used, discharged or disposed of in or near the Project unless Landlord has consented to such storage or use in its sole discretion. "Hazardous Substances" include those hazardous substances described in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 et seq., the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq., any other applicable federal, state or local law, and the regulations adopted under these laws. If any lender or governmental agency shall require testing for Hazardous Substances in the Premises, Tenant shall pay for such testing.

29.  **EXCULPATION.** Landlord shall have no personal liability under this Lease; its liability shall be limited to its interest in the Project, and shall not extend to any other property or assets of the Landlord. In no event shall any officer, director, employee, agent, shareholder, partner, member or beneficiary of Landlord be personally liable for any of Landlord's obligations hereunder.

30.  **EXISTING TENANT.** This Lease, and the terms and conditions set forth herein, are subject to Landlord's receipt, on or before May 15, 2002, of an executed Amendment from the exiting tenant of the Premises, Allscripts, Inc., which Amendment shall provide for the surrender of the Premises by Allscripts, Inc. on or before May 15, 2002, and shall otherwise be in a form acceptable to Landlord. In the event Landlord does not receive said Amendment for any reason whatsoever on or before May 15, 2002, Landlord shall, within 5-business days after May 15, 2002, provide notice to Tenant terminating this Lease, in which event this Lease shall be null and void and neither party hereunder shall have any further rights or remedies.

31.  **TEMPORARY SPACE.** Commencing May 13, 2002, Landlord will provide Tenant with temporary space in the Conference Center, rent free at 2333 Waukegan Road, Suite 245, Bannockburn, Illinois. Tenant shall vacate the temporary space on or before the Commencement Date.

[no further text on this page - signature page to follow]

lse1REVISED1
052302-1:50PM

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease.

**LANDLORD:**

**CARRAMERICA REALTY, L.P.,**
a Delaware limited partnership

By:     CarrAmerica Realty GP Holdings, Inc., a Delaware
        corporation, its general partner

By:     _Gerald J. O'Malley_

Print Name: ___ Gerald O'Malley

Print Title: ___ Regional Managing Director

Date: ___ May 24. 2002

**TENANT:**

**SWEDISH BEVERAGES, INC., a** _Illinois corporation_

corporation

By: _A J Filko_

Print Name: _Anthony J. Filko_

Print Title: _COO, CFO_

Date: ___ May 24. 2002

lse1REVISED1
052302-1:50PM

# APPENDIX A

## PLAN OF THE PREMISES





## APPENDIX B

## RULES AND REGULATIONS

1. Tenant shall not place anything, or allow anything to be placed near the glass of any window, door, partition or wall which may, in Landlord's judgment, appear unsightly from outside of the Premises.

2. The Project directory shall be available to Tenant solely to display names and their location in the Project, which display shall be as directed by Landlord.

3. The sidewalks, halls, passages, exits, entrances, elevators and stairways shall not be obstructed by Tenant or used by Tenant for any purposes other than for ingress to and egress from the Premises. Tenant shall lend its full cooperation to keep such areas free from all obstruction and in a clean and sightly condition and shall move all supplies, furniture and equipment as soon as received directly to the Premises and move all such items and waste being taken from the Premises (other than waste customarily removed by employees of the Building) directly to the shipping platform at or about the time arranged for removal therefrom. The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public and Landlord shall, in all cases, retain the right to control and prevent access thereto by all persons whose presence in the judgment of Landlord, reasonably exercised, shall be prejudicial to the safety, character, reputation and interests of the Project. Neither Tenant nor any employee or invitee of Tenant shall go upon the roof of the Project.

4. The toilet rooms, urinals, wash bowls and other apparatuses shall not be used for any purposes other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein, and to the extent caused by Tenant or its employees or invitees, the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by Tenant.

5. Tenant shall not cause any unnecessary janitorial labor or services by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness.

6. Tenant shall not install or operate any refrigerating, heating or air conditioning apparatus, or carry on any mechanical business without the prior written consent of Landlord; use the Premises for housing, lodging or sleeping purposes; or permit preparation or warming of food in the Premises (warming of coffee and individual meals with employees and guests excepted). Tenant shall not occupy or use the Premises or permit the Premises to be occupied or used for any purpose, act or thing which is in violation of any Governmental Requirement or which may be dangerous to persons or property.

7. Tenant shall not bring upon, use or keep in the Premises or the Project any kerosene, gasoline or inflammable or combustible fluid or material, or any other articles deemed

lse1REVISED1
052302-1:50PM

hazardous to persons or property, or use any method of heating or air conditioning other than that supplied by Landlord.

8.     Landlord shall have sole power to direct electricians as to where and how telephone and other wires are to be introduced. No boring or cutting for wires is to be allowed without the consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord.

lse1REVISED1
052302-1:50PM

9. No additional locks shall be placed upon any doors, windows or transoms in or to the Premises. Tenant shall not change existing locks or the mechanism thereof. Upon termination of the lease, Tenant shall deliver to Landlord all keys and passes for offices, rooms, parking lot and toilet rooms which shall have been furnished Tenant.

In the event of the loss of keys so furnished, Tenant shall pay Landlord therefor. Tenant shall not make, or cause to be made, any such keys and shall order all such keys solely from Landlord and shall pay Landlord for any keys in addition to the two sets of keys originally furnished by Landlord for each lock.

10. Tenant shall not install linoleum, tile, carpet or other floor covering so that the same shall be affixed to the floor of the Premises in any manner except as approved by Landlord.

11. No furniture, packages, supplies, equipment or merchandise will be received in the Project or carried up or down in the freight elevator, except between such hours and in such freight elevator as shall be designated by Landlord. Tenant shall not take or permit to be taken in or out of other entrances of the Building, or take or permit on other elevators, any item normally taken in or out through the trucking concourse or service doors or in or on freight elevators.

12. Tenant shall cause all doors to the Premises to be closed and securely locked and shall turn off all utilities, lights and machines before leaving the Project at the end of the day.

13. Without the prior written consent of Landlord, Tenant shall not use the name of the Project or any picture of the Project in connection with, or in promoting or advertising the business of, Tenant, except Tenant may use the address of the Project as the address of its business.

14. Tenant shall cooperate fully with Landlord to assure the most effective operation of the Premises' or the Project's heating and air conditioning, and shall refrain from attempting to adjust any controls, other than room thermostats installed for Tenant's use. Tenant shall keep corridor doors closed.

15. Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage, which may arise from a cause other than Landlord's negligence, which includes keeping doors locked and other means of entry to the Premises closed and secured.

16. Peddlers, solicitors and beggars shall be reported to the office of the Project or as Landlord otherwise requests.

lse1REVISED1
052302-1:50PM

17. Tenant shall not advertise the business, profession or activities of Tenant conducted in the Project in any manner which violates the letter or spirit of any code of ethics adopted by any recognized association or organization pertaining to such business, profession or activities.

18. No bicycle or other vehicle and no animals or pets shall be allowed in the Premises, halls, freight docks, or any other parts of the Building except that blind persons may be accompanied by "seeing eye" dogs. Tenant shall not make or permit any noise, vibration or odor to emanate from the Premises, or do anything therein tending to create, or maintain, a nuisance, or do any act tending to injure the reputation of the Building.

19. Tenant acknowledges that Building security problems may occur which may require the employment of extreme security measures in the day-to-day operation of the Project.

Accordingly:

(a) Landlord may, at any time, or from time to time, or for regularly scheduled time periods, as deemed advisable by Landlord and/or its agents, in their sole discretion, require that persons entering or leaving the Project or the Property identify themselves to watchmen or other employees designated by Landlord, by registration, identification or otherwise.

(b) Tenant agrees that it and its employees will cooperate fully with Project employees in the implementation of any and all security procedures.

(c) Such security measures shall be the sole responsibility of Landlord, and Tenant shall have no liability for any action taken by Landlord in connection therewith, it being understood that Landlord is not required to provide any security procedures and shall have no liability for such security procedures or the lack thereof.

20. Tenant shall not do or permit the manufacture, sale, purchase, use or gift of any fermented, intoxicating or alcoholic beverages without obtaining written consent of Landlord.

21. Tenant shall not disturb the quiet enjoyment of any other tenant.

22. Tenant shall not provide any janitorial services or cleaning without Landlord's written consent and then only subject to supervision of Landlord and at Tenant's sole responsibility and by janitor or cleaning contractor or employees at all times satisfactory to Landlord.

23. Landlord may retain a pass key to the Premises and be allowed admittance thereto at all times to enable its representatives to examine the Premises from time to time and to exhibit the same and Landlord may place and keep on the windows and doors of the Premises at any time signs advertising the Premises for Rent.

lse1REVISED1
052302-1:50PM

24.     No equipment, mechanical ventilators, awnings, special shades or other forms of window covering shall be permitted either inside or outside the windows of the Premises without the prior written consent of Landlord, and then only at the expense and risk of Tenant, and they shall be of such shape, color, material, quality, design and make as may be approved by Landlord.

25.     Tenant shall not during the term of this Lease canvas or solicit other tenants of the Building for any purpose.

26.     Tenant shall not install or operate any phonograph, musical or sound- producing instrument or device, radio receiver or transmitter, TV receiver or transmitter, or similar device in the Building, nor install or operate any antenna, aerial, wires or other equipment inside or outside the Building, nor operate any electrical device from which may emanate electrical waves which may interfere with or impair radio or television broadcasting or reception from or in the Building or elsewhere, without in each instance the prior written approval of Landlord. The use thereof, if permitted, shall be subject to control by Landlord to the end that others shall not be disturbed.

27.     Tenant shall promptly remove all rubbish and waste from the Premises.

28.     Tenant shall not exhibit, sell or offer for sale, Rent or exchange in the Premises or at the Project any article, thing or service, except those ordinarily embraced within the use of the Premises specified in Section 6 of this Lease, without the prior written consent of Landlord.

29.     Tenant shall list all furniture, equipment and similar articles Tenant desires to remove from the Premises or the Building and deliver a copy of such list to Landlord and procure a removal permit from the Office of the Building authorizing Building employees to permit such articles to be removed.

30.     Tenant shall not overload any floors in the Premises or any public corridors or elevators in the Building.

31.     Tenant shall not do any painting in the Premises, or mark, paint, cut or drill into, drive nails or screws into, or in any way deface any part of the Premises or the Building, outside or inside, without the prior written consent of Landlord.

32.     Whenever Landlord's consent, approval or satisfaction is required under these Rules, then unless otherwise stated, any such consent, approval or satisfaction must be obtained in advance, such consent or approval may be granted or withheld in Landlord's sole discretion, and Landlord's satisfaction shall be determined in its sole judgment.

33.     Tenant and its employees shall cooperate in all fire drills conducted by Landlord in the Building.

lse1REVISED1
052302-1:50PM

## APPENDIX C

## TENANT IMPROVEMENT AGREEMENT

1.     INITIAL IMPROVEMENTS. Landlord shall cause to be performed the improvements (the "Initial Improvements") in the Premises in accordance with the space plan prepared by Landlord dated May 9, 2002(the "Plans") on or before May 28, 2002. The Initial Improvements shall be performed at the Landlord's cost.

Landlord, with consultation of Tenant, shall select a contractor to perform the construction of the Initial Improvements. Landlord shall use commercially reasonable efforts to cause the Initial Improvements to be substantially completed, except for minor "Punch List" items, on or before the Commencement Date specified in the Schedule to the Lease, subject to Tenant Delay (as defined in Section 4 hereof) and Force Majeure.

Landlord, or an agent of Landlord, shall provide project management services in connection with the construction of the Initial Improvements and the Change Orders (hereinafter defined). Such project management services shall be performed, at Tenant's cost, for a fee of five percent (5%) of all costs related to the preparation of the Plans and the construction of the Initial Improvements and the Change Orders.

2.     CHANGE ORDERS. If, prior to the Commencement Date, Tenant shall require improvements or changes (individually or collectively, "Change Orders") to the Premises in addition to, revision of, or substitution for the Initial Improvements, Tenant shall deliver to Landlord for its approval plans and specifications for such Change Orders. If Landlord does not approve of the plans for Change Orders, Landlord shall advise Tenant of the revisions required. Tenant shall revise and redeliver the plans and specifications to Landlord within five (5) business days of Landlord's advice or Tenant shall be deemed to have abandoned its request for such Change Orders. Tenant shall pay for all preparations and revisions of plans and specifications, and the construction of all Change Orders.

3.         INTENTIONALLY OMITTED.

lse1REVISED1
052302-1:50PM

4. COMMENCEMENT DATE DELAY. Commencement Date shall be delayed until the Initial Improvements have been substantially completed (the "Completion Date"), except to the extent that the delay shall be caused by any one or more of the following (a "Tenant Delay"):

(a) Tenant's request for Change Orders whether or not any such Change Orders are actually performed; or

(b) Contractor's performance of any Change Orders; or

(c) Tenant's request for materials, finishes or installations requiring unusually long lead times; or

(d) Tenant's delay in reviewing, revising or approving plans and specifications beyond the periods set forth herein; or

(e) Tenant's delay in providing information critical to the normal progression of the project. Tenant shall provide such information as soon as reasonably possible, but in no event longer than one week after receipt of such request for information from the Landlord; or

(f) Tenant's delay in making payments to Landlord for costs of the Change Orders; or

(g) Any other act or omission by Tenant, its agents, contractors or persons employed by any of such persons.

If the Commencement Date is delayed for any reason, then Landlord shall cause Landlord's Architect to certify the date on which the Initial Improvements would have been completed but for such Tenant Delay, or were in fact completed without any Tenant Delay.

5. ACCESS BY TENANT PRIOR TO COMMENCEMENT OF TERM. Landlord at its discretion may permit Tenant and its agents to enter the Premises prior to the Commencement Date to prepare the Premises for Tenant's use and occupancy. Any such permission shall constitute a license only, conditioned upon Tenant's:

(a) working in harmony with Landlord and Landlord's agents, contractors, workmen, mechanics and suppliers and with other tenants and occupants of the Building;

(b) obtaining in advance Landlord's approval of the contractors proposed to be used by Tenant and depositing with Landlord in advance of any work (i) security satisfactory to Landlord for the completion thereof, and (ii) the contractor's affidavit for the proposed work and the waivers of lien from the contractor and all subcontractors and suppliers of material; and

(c) furnishing Landlord with such insurance as Landlord may require against liabilities which may arise out of such entry.

Ise1REVISED1
052302-1:50PM

Landlord shall have the right to withdraw such license for any reason upon twenty-four (24) hours' written notice to Tenant. Landlord shall not be liable in any way for any injury, loss or damage which may occur to any of Tenant's property or installations in the Premises prior to the Commencement Date. Tenant shall protect, defend, indemnify and save harmless Landlord from all liabilities, costs, damages, fees and expenses arising out of the activities of Tenant or its agents, contractors, suppliers or workmen in the Premises or the Building. Any entry and occupation permitted under this Section shall be governed by Section 5 and all other terms of the Lease.

6.    MISCELLANEOUS.

Terms used in this Appendix C shall have the meanings assigned to them in the Lease. The terms of this Appendix C are subject to the terms of the Lease.

lse1REVISED1
052302-1:50PM

**APPENDIX D**

**MORTGAGES CURRENTLY AFFECTING THE PROJECT**

Instrument                                    Name and Address of Holder

None                                          N/A

Ise1REVISED1
052302-1:50PM

## COMMENCEMENT DATE CONFIRMATION

Landlord:          CarrAmerica Realty. L.P., a Delaware limited partnership

Tenant:           Swedish Beverages, Inc., a _____ corporation

This Commencement Date Confirmation is made by Landlord and Tenant pursuant to that certain Lease dated as of _____, 20___ (the "Lease") for certain premises known as Suite _____ in the building commonly known as Bannockburn Lake Office Plaza I (the "Premises"). This Confirmation is made pursuant to Item 9 of the Schedule to the Lease.

1.     **Lease Commencement Date. Termination Date.** Landlord and Tenant hereby agree that the Commencement Date of the Lease is _____, 20___, and the Termination Date of the Lease is _____, _____.

2.     **Acceptance of Premises.** Tenant has inspected the Premises and affirms that the Premises is acceptable in all respects in its current "as is" condition.

3.     **Incorporation.** This Confirmation is incorporated into the Lease, and forms an integral part thereof. This Confirmation shall be construed and interpreted in accordance with the terms of the Lease for all purposes.

TENANT:

Swedish Beverages, Inc., a _____

By:_____

Name:_____

Title:_____

Ise1REVISED1
052302-1:50PM

LANDLORD:

CarrAmerica Realty, L.P., a Delaware limited partnership

By:     CarrAmerica Realty GP Holdings, Inc., a
        Delaware corporation

        By:_____
        Name:_____
        Title:_____

lse1REVISED1
052302-1:50PM

2



Space Plan of Premises

**Tenant Improvements:**

1. Install a new Glass Customed Wood Frame Entry Door—Note: A temporary door will be installed until permanent door is received.
2. All non-wallpapered walls to be painted. Paint color shall be Benjamin Moore—Wedding Veil #2125-70
3. Steam clean all carpeting.
4. Refurbish Interior wood office doors.
5. Remove Shelving in Kitchen (Room 7) and reinstall in Room 5.
6. Install Plywood Board for telephone system in Room 5
7. Remove to 2 base cabinets in Conference area (Room 7) and install next to existing corner kitchen cabinets.
8. Install new countertop over entire corner kitchen area (Room7). Countertop shall be Nevamar-ET-1-1T.
9. Remove and reinstall ceiling projector screen from Room2 to Conference Area in Room 7.
10. Provide clean working blinds for 10 windows.
11. Remove door between two offices (Rooms 1 & 2), remove wallpaper and paint walls, as specified by Swedish Beverages.
12. Relocat door to Room 4.
13. Construct one Office (Room 4) approximately 15' x 12', with door and sidelight. Door to have a 2-way lock. Wall outlet to be replaced with a standard 4 —way outlet.
14. Construct one Storage Room, (Room 5) approximately 10' x 12', with door.
15. Replace baseboard trim in Room #1 with color specified by Swedish Beverages.

**Symbols:**

Duplex Outlet

Quad Outlet

220 Outlet

Approved by: _____

1.    LEASE AGREEMENT                                              2

2.    RENT                                                        2
      A.    Types of Rent                                         2
            (1)    Base Rent..............................................  2
            (2)    Operating Cost Share Rent ........................  2
            (3)    Tax Share Rent .........................................  2
            (4)    Additional Rent ........................................  2
            (5)    Rent.......................................................  3
      B.    Payment of Operating Cost Share Rent and
            Tax Share Rent                                        3
            (1)    Payment of Estimated Operating
                   Cost Share Rent and Tax Share Rent.......  3
            (2)    Correction of Operating Cost Share Rent.  3
            (3)    Correction of Tax Share Rent....................  3
      C.    Definitions                                           3
            (1)    Included Operating Costs ..........................  3
            (2)    Excluded Operating Costs.........................  4
            (3)    Taxes.......................................................  5
            (4)    Lease Year ...............................................  5
            (5)    Fiscal Year...............................................  5
      D.    Computation of Base Rent and Rent Adjustments  5
            (1)    Prorations. ..............................................  5
            (2)    Default Interest. ......................................  6
            (3)    Rent Adjustments. ...................................  6
            (4)    Books and Records. ................................  6
            (5)    Miscellaneous.........................................  6

3.    PREPARATION AND CONDITION OF PREMISES; POSSESSION AND
      SURRENDER OF PREMISES                                       6
      A.    Condition of Premises. ........................................  6
      B.    Tenant's Possession. ..........................................  7
      C.    Maintenance.......................................................  7

4.    PROJECT SERVICES                                            7
      A.    Heating and Air Conditioning..............................  7
      B.    Elevators ............................................................  7
      C.    Electricity ...........................................................  7
      D.    Water..................................................................  7
      E.    Janitorial Service ...............................................  8
      F     Interruption of Services                               8

lse1REVISED1
052302-1:50PM

| 5. | ALTERATIONS AND REPAIRS | 8 |
|---|---|---|
| | A. Landlord's Consent and Conditions. | 8 |
| | B. Damage to Systems. | 9 |
| | C. No Liens. | 9 |
| | D. Ownership of Improvements. | 9 |
| | E. Removal at Termination. | 10 |
| 6. | USE OF PREMISES | 10 |
| 7. | GOVERNMENTAL REQUIREMENTS AND BUILDING RULES. | 10 |
| 8. | WAIVER OF CLAIMS; INDEMNIFICATION; INSURANCE. | 11 |
| | A. Waiver of Claims. | 11 |
| | B. Indemnification. | 11 |
| | C. Tenant's Insurance. | 11 |
| | D. Insurance Certificates. | 12 |
| | E. Landlord's Insurance. | 12 |
| 9. | FIRE AND OTHER CASUALTY | 13 |
| | A. Termination. | 13 |
| | B. Restoration. | 13 |
| 10. | EMINENT DOMAIN. | 13 |
| 11. | RIGHTS RESERVED TO LANDLORD. | 13 |
| | A. Name | 13 |
| | B. Signs. | 13 |
| | C. Window Treatments. | 13 |
| | D. Keys | 14 |
| | E. Access | 14 |
| | F. Preparation for Reoccupancy | 14 |
| | G. Heavy Articles | 14 |
| | H. Show Premises | 14 |
| | I. Relocation of Tenant | 14 |
| | J. Use of Lockbox | 14 |
| | K. Repairs and Alterations | 14 |
| | L. Landlord's Agents | 15 |
| | M. Building Services | 15 |
| | N. Other Actions. | 15 |

N.

lse1REVISED1
052302-1:50PM

12.   TENANT'S DEFAULT.                                                          15
      A.   Rent Default. ......................................................... 15
      B.   Assignment/Sublease or Hazardous Substances Default 15
      C.   Other Performance Default. ............................................ 15
      D.   Credit Default. ...................................................... 15
      E.   Vacation or Abandonment Default. ..................................... 15

13.   LANDLORD REMEDIES                                                          16
      A.   Termination of Lease or Possession. .................................. 16
      B.   Lease Termination Damages. ........................................... 16
      C.   Possession Termination Damages. ...................................... 16
      D.   Landlord's Remedies Cumulative. ...................................... 16
      E.   WAIVER OF TRIAL BY JURY. ............................................. 16
      F.   Litigation Costs. .................................................... 17

14.   SURRENDER.                                                                 17
15.   HOLDOVER.                                                                  17
16.   SUBORDINATION TO GROUND LEASES AND MORTGAGES 17
      A.   Subordination ........................................................ 17
      B.   Termination of Ground Lease or Foreclosure of Mortgage 17
      C.   Security Deposit ..................................................... 18
      D.   Notice and Right to Cure ............................................. 18
      E.   Definitions. ......................................................... 18

17.   ASSIGNMENT AND SUBLEASE.                                                   18
      A.   In General. .......................................................... 18
      B.   Landlord's Consent. .................................................. 18
      C.   Procedure. ........................................................... 19
      D.   Change of Management or Ownership. ................................... 19
      E.   Excess Payments. ..................................................... 19
      F.   Recapture. ........................................................... 19

18.   CONVEYANCE BY LANDLORD                                                     19

19.   ESTOPPEL CERTIFICATE                                                       19

20.   SECURITY DEPOSIT                                                           21

21.   FORCE MAJEURE                                                              20

22.   TENANT'S PERSONAL PROPERTY AND FIXTURES                                    20

lse1REVISED1
052302-1:50PM

30. Existing Tenant       26

31. TEMPORARY SPACE       26

**APPENDIX A** - PLAN OF THE PREMISES
**APPENDIX B** - RULES AND REGULATIONS
**APPENDIX C** - TENANT IMPROVEMENT AGREEMENT
**APPENDIX D** - MORTGAGES CURRENTLY AFFECTING THE PROJECT
**APPENDIX E** - COMMENCEMENT DATE CONFIRMATION
**APPENDIX F** - SPACE PLAN OF PREMISES

lse1REVISED1
052302-1:50PM

 **ST PAUL TRAVELERS**



Debbie Dillon

St. Paul Travelers
Great Lakes Region

(630) 961-8683
(877) 795-9975 (fax)

215 Shuman Boulevard
Naperville, IL 60563

April 25, 2005

## VIA CERTIFIED MAIL

Mr. George Pilja
Foran Glennon Palandech & Ponzi
150 South Wacker Drive, 11th Floor
Chicago, IL 60606

Re: Case Name:     *Richard Wallace v. CarrAmerica Realty Corp., et al.*
    Case No.:     03 L 010011
    Our Policyholder:     Swedish Beverages, Inc.
    Our File No.:     ACX7801
    Policy No.:     I-660-870X561A-TIL-02

Dear Mr. Pilja:

The purpose of this letter is to advise you of our position regarding insurance coverage as it relates to the tender of defense and indemnity of CarrAmerica Realty, L.P., with respect to the above-captioned litigation. Travelers Property Casualty Company of America ("St Paul Travelers") issued a Commercial General Liability Policy to Swedish Beverages, Inc., under policy number I-660-870X561A-TIL-02 with effective dates of 5/17/2002 through 5/17/2003. In considering CarrAmerica Realty's request for coverage, we have reviewed the insurance policy referenced above, the Lease Agreement entered into between Swedish Beverages, Inc., ("Tenant") and CarrAmerica ("Landlord") dated May 24, 2002, along with the Complaint entitled *Richard Wallace v. CarrAmerica Realty Corporation, a/k/a CarrAmerica Realty Services Inc., a/k/a CarrAmerica Realty, L.P., a/k/a CarrAmerica Realty CP Holdings, Inc.,* No. 03 L 010011, filed in the Circuit Court of Cook County Illinois, Law Division ("the lawsuit"). We must inform you that there is no potential for coverage under the referenced policy forfor the claims set forth in the above-entitled Complaint and we will be unable to indemnify or defend CarrAmerica Reality, L.P., in the above-referenced matter. Our position is set forth as follows:

## THE PLAINTIFFS' COMPLAINT/ALLEGATIONS

TheThe lawsuit is brought on behalf of Richard Wallace ("Plaintiff"). Plaintiff alleges in his complaint the incident occurred on March 21, 2003, in the U-shaped driveway of the premises known as Bannockburn Lake Office Plaza One located at 2333 Waukegan Road,

Bannockburn, Illinois. In his complaint, Plaintiff asserts he pulled up to the U-shaped driveway near the front entrance of the above building when he tripped and fell in a large hole near the curb. Plaintiff's action names CarrAmerica Realty, L.P., as the owner and CarrAmerica Realty as the management company for the above premises. Plaintiff's one-count complaint is based on the theory of negligence and cites various allegations against Defendant pertaining to failing to reasonably maintain its premises and failing to warn. Plaintiff's lawsuit seeks damages in excess of $50,000.

Our recitation of these allegations is not meant to imply that we accept them as true or factual, but only to provide a context for this coverage evaluation.

## THE INSURANCE POLICY

The Policy includes general liability coverage in the amount of $1,000,000 per occurrence, $2,000,000 products completed operations; $1,000,000 for personal & advertising injury, a general aggregate limit of $2,000,000. The basis for our coverage position is stated below.

## SECTION 1 – COVERAGES
## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III – Limits of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or performs acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

      *     *     *     *

   b. This insurance applies to "bodily injury" or "property damage" only if:

(1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2)    The "bodily injury" or "property damage" occurs during the policy period; and

c.    Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

## SECTION V – DEFINITIONS

\*\*\*

3.    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\*\*\*

12.    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Please also refer to Endorsement CG 20 11 11 85 entitled **Additional Insured – Managers or Lessors of Premises**, which states:

1.    Designation of Premises (Part Leased to You):

**2333 Waukegan Road
Bannockburn, IL  60015**

2.    Name of Person or Organization (Additional Insured):

**CARRAMERICA REALTY LP**

**2333 Waukegan Road, Suite 240
Bannockburn, IL  60015**

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1.    Any occurrence which takes place after you cease to be a tenant in that premises.

2.    Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule.

The above endorsement names CarrAmerica Reality, L.P., as an additional insured. Thus, St. Paul Travelers also no duty to defend or indemnify the other entities listed in the complaint. In addition, CarrAmerica Reality, L.P., is an additional insured only as to the ownership, maintenance or use of that part of the premises leased to Swedish Beverages, Inc. The complaint alleges that the Plaintiff tripped and fell in the U-shaped driveway of the Bannockburn Lake Office Plaza I. Since the incident took place in a common area and not in Swedish Beverage's demised premises, there would be no coverage for CarrAmerica Realty, L.P., under the above endorsement. St. Paul Travelers has no duty to defend or indemnify CarrAmerica Reality, L.P., in this lawsuit.

Your letter also refers to an indemnification provision in the Lease. Even if Swedish Beverages has a duty to indemnify CarrAmerica Realty, L.P., this would not make CarrAmerica Realty, L.P., an insured under the St. Paul Travelers policy nor does St. Paul Travelers have any coverage obligations to CarrAmerica as a result. In addition, it appears that Swedish Beverages has no duty to indemnify CarrAmerica because the alleged injury did not arise out of Swedish Beverage's use of the Premises but out of CarrAmerica's operation of the common area.

For the reasons set forth herein, the St. Paul Travelers will not be defending or indemnifying CarrAmerica Realty LP in the above-referenced matter. This coverage determination is based on facts and issues presently available, and the St. Paul Travelers fully reserves and retains all rights which it has under the terms of the Policy and under the law. The above evaluation of coverage is not intended to be exhaustive, and there may be other terms and conditions, and coverage defenses that might be applicable. If CarrAmerica Realty, LP has additional information that it believes would impact the coverage position taken herein, please forward it to the undersigned immediately for review. The St. Paul Travelers reserves the right to assert any additional Policy terms or conditions as coverage defenses might be applicable now or in the future. Furthermore, the St. Paul Travelers' actions in investigating, evaluating and/or monitoring this matter should neither be construed as a waiver, estoppel or other relinquishment of its rights to limit or deny coverage, nor as an admission of any obligation under the Policy identified herein.

If you have any questions or wish to discuss the coverage position taken herein, please do not hesitate to contact the undersigned at your convenience. If any amended complaint is filed, please forward immediately to St. Paul Travelers for review.

Sincerely,
Travelers Property Casualty Company of America

Debbie Dillon



# COMMERCIAL INSURANCE

**A Custom Insurance Policy Prepared for:**

SWEDISH BEVERAGES, INC.
2333 WAUKEGAN RD.
SUITE S-160
BANNOCKBURN IL 60015

Presented by: T J ADAMS GROUP LLC

 Travelers Property Casualty
A Member of Travelers Group

MANUFACTURERS - MEATS, FATS, OILS, BFV
COMMON POLICY DECLARATIONS
ISSUE DATE: 05/30/02

POLICY NUMBER: I-660-870X561A-TIL-02

1. **NAMED INSURED AND MAILING ADDRESS:**
   SWEDISH BEVERAGES, INC.
   2333 WAUKEGAN RD.
   SUITE S-160
   BANNOCKBURN, IL 60015

2. **POLICY PERIOD:** From 05/17/02 to 05/17/03 12:01 A.M. Standard Time at your mailing address.

3. **LOCATIONS**
   Premises    Bldg.
   Loc. No.    No.   Occupancy            Address

   SEE IL TO 03

4. **COVERAGE PARTS FORMING PART OF THIS POLICY AND INSURING COMPANIES:**
   COMMERCIAL PROPERTY COV PART DECLARATIONS        CP TO 01 02 94 TIL
   COMMERCIAL GENERAL LIABILITY COV PART DECLARATIONS   CG TO 01 03 94 TIL

5. **NUMBERS OF FORMS AND ENDORSEMENTS**
   **FORMING A PART OF THIS POLICY:**   SEE IL T8 01 10 93

6. **SUPPLEMENTAL POLICIES:** Each of the following is a separate policy containing its complete provisions:
   Policy                        Policy No.              Insuring Company

   DIRECT BILL

7. **PREMIUM SUMMARY:**
   Provisional Premium   $ 13,308
   Due at Inception      $
   Due at Each

NAME AND ADDRESS OF AGENT OR BROKER    COUNTERSIGNED BY:
J ADAMS GROUP LLC (SV782)

BUTTERFIELD ROAD
SUITE
LOMBARD, IL 60149                      Authorized Representative

                                       DATE

IL TO 02 11 89        PAGE 1 OF 1                          NY SRV CTR



**POLICY NUMBER:**   I-660-870X561A-TIL-02

**EFFECTIVE DATE:**   05-17-02

**ISSUE DATE:**   05-30-02

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

| | |
|---|---|
| IL T0 02 11 89 | COMMON POLICY DECLARATIONS |
| IL T8 01 10 93 | FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS |
| IL T0 01 12 94 | COMMON POLICY CONDITIONS |
| IL T0 03 04 96 | LOCATION SCHEDULE |

**COMMERCIAL PROPERTY**

| | |
|---|---|
| CP T0 01 02 94 | COMMERCIAL PROPERTY DECLARATIONS |
| CP T0 00 08 92 | TABLE OF CONTENTS |
| CP 00 90 07 88 | COMMERCIAL PROPERTY CONDITIONS |
| CP T1 00 06 95 | BUILDING & PERSONAL PROPERTY COV FORM |
| CP T1 04 06 95 | BUSINESS INCOME COV FORM W/EE |
| CP T1 08 06 95 | CAUSES OF LOSS-SPECIAL FORM |
| CP T3 01 10 91 | AMENDATORY PROVISIONS-SEASONAL |
| CP T3 54 06 95 | SELECT PROPERTY EXTRA |

**COMMERCIAL GENERAL LIABILITY**

| | |
|---|---|
| CG T0 01 03 94 | COMM'L GENERAL LIABILITY DEC |
| CG T0 07 09 87 | DECLARATIONS PREMIUM SCHEDULE |
| CG T0 08 07 86 | KEY TO DECLARATIONS PREMIUM SCHEDULE |
| CG T0 34 10 93 | TABLE OF CONTENTS |
| CG 00 01 10 93 | COMMERCIAL GENERAL LIABILITY COV FORM |
| CG 00 57 09 99 | AMENDMENT OF INSURING AGRMNT-KNOWN INJ |
| CG D0 37 01 99 | OTHER INSURANCE-ADDITIONAL INSUREDS |
| CG D0 86 03 95 | HIRED AND NONOWNED AUTO EXCESS LIAB |
| CG D1 94 11 97 | CHGS IN COMMERCIAL GENERAL LIAB COV FORM |
| CG D2 34 02 01 | WEB XTEND - LIABILITY |
| CG 21 47 10 93 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG D0 76 06 93 | EXCLUSION-LEAD |
| CG D1 42 01 99 | EXCLUSION-DISCRIMINATION |
| CG T4 78 02 90 | EXCLUSION-ASBESTOS |
| CG F2 11 01 01 | ILLINOIS CHANGES - INSURED CONTRACT |
| CG T3 33 12 88 | LIMIT WHEN TWO OR MORE POLICIES APPLY |
| CG 02 00 04 87 | IL CHANGES -CANCELLATION AND NONRENEWAL |

**INTERLINE ENDORSEMENTS**

| | |
|---|---|
| IL 00 21 04 98 | NUCLEAR ENERGY LIABILITY EXCLUSION |
| IL 01 18 03 99 | ILLINOIS CHANGES |
| IL 02 84 05 90 | IL CHANGES-CANCELLATION AND NONRENEWAL |
| IL T9 01 07 86 | ILLINOIS INSURANCE IN THE TIL |

# COMMON POLICY CONDITIONS



All Coverage Parts included in this policy are subject to the following conditions:

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy or any Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least:
   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. If the policy is cancelled, that date will become the end of the policy period. If a Coverage Part is cancelled, that date will become the end of the policy period as respects that Coverage Part only.

5. If this policy or any Coverage Part is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us as part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:
1. Make inspections and surveys at any time;
2. Give you reports on the conditions we find; and
3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:
1. Are safe or healthful; or
2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## E. PREMIUMS

1. The first Named Insured shown in the Declarations:
   a. Is responsible for the payment of all premiums; and
   b. Will be the payee for any return premiums we pay.

2. We compute all premiums for this policy in accordance with our rules, rates, rating plans, premiums and minimum premiums. The premium shown in the Declarations was computed based on rates and rules in effect at the time the policy was issued. On each renewal continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have rights and duties but only with respect to that property.

Includes copyrighted material of Insurance Services Office, with its permission.  Copyright, Insurance Services Office, 1989

This policy consists of the Common Policy Declarations and the Coverage Parts and endorsements listed in that declarations form.

In return for payment of the premium, The Travelers agrees with the Named Insured to provide the insurance afforded by a Coverage Part forming part of this policy. That insurance will be provided by the company indicated as insuring company in the Common Policy Declarations by the abbreviation of its name opposite that Coverage Part.

The companies listed below (each a stock company) have executed this policy, but it is valid only if countersigned on the Common Policy Declarations by our authorized representative.

The Travelers Indemnity Company (IND)
The Phoenix Insurance Company (PHX)
The Charter Oak Fire Insurance Company (COF)
The Travelers Indemnity Company of Illinois (TIL)
* The Travelers Indemnity Company of Connecticut (TCT)
The Travelers Indemnity Company of America (TIA)

*Formerly known as the Travelers Indemnity Company of Rhode Island (TRI)

Secretary

President

The Travelers Insurance Company (INS)

Secretary

President

IL T0 01 12 94
(Rev. 2-95)

 

**LOCATION SCHEDULE**

**POLICY NUMBER: I-660-870X561A-TIL-02**

This Schedule of Locations and Buildings applies to the Common Policy Declarations for the period

05-17-02 to 05-17-03 .

| Loc. No. | Bldg. No. | Address | Occupancy |
|---|---|---|---|
| 1 | 1 | 2333 WAUKEGAN RD.<br>SUITE S-160<br>BANNOCKBURN, IL 60015 | OFFICE |
| 2 | 2 | 10601 SEYMOUR AVENUE<br>FRANKLIN PARK, IL 60131 | WAREHOUSE DISTRIBUTION |

**IL T0 03 04 96**

One Tower Square, Hartford, Connecticut 06183    

## COMMERCIAL PROPERTY
## COVERAGE PART DECLARATIONS

**POLICY NUMBER:** I-660-870X561A-TIL-02
**ISSUE DATE:**

**DECLARATIONS PERIOD:** From 05-17-02 to  05-17-03  12:01 A.M. Standard Time at your mailing address shown in the Common Policy Declarations.

The Commercial Property Coverage Part consists of these Declarations, the Commercial Property Conditions Form, the Coverage Forms and Causes of Loss Forms shown below.

1. **COVERAGE, LIMITS OF INSURANCE AND DEDUCTIBLE:**   Insurance applies only at a premises and for a coverage, optional coverage or coverage option for which a Limit of Insurance or an "X" is shown below.

---

**Premises Loc. No. 0001      Bldg. No. 001      Deductible: 1,000   PER OCCURRENCE**

| Coverage/Coverage Form | Limit of Insurance | Causes of Loss | Coinsurance |
|---|---|---|---|
| YOUR BUSINESS PERSONAL PROPERTY | $ 20,000 | SPECIAL | 100% |

☐ Agreed Value   ☒ Replacement Cost Applies   ☐ Inflation Guard:   Percentage

**Business Income/Extra Expense – Optional Coverages or Coverage Options**

☐ Agreed Value
☐ Extended Period of Indemnity:      Days
☐ Maximum Period of Indemnity:  120 Days
☐ Monthly Limit of Indemnity:
☐ Extra Expense: Restoration Period and Monthly Percentage Limits on Loss Payment –
  Three Months at 40-80-100%.   Exceptions:

☐ Ordinary Payroll is Excluded
☐ Ordinary Payroll Limited:      Days

---

**Premises Loc. No. 0001      Bldg. No. 001      Deductible: 72 HOURS**

| Coverage/Coverage Form | Limit of Insurance | Causes of Loss | Coinsurance |
|---|---|---|---|
| BUSINESS INCOME WITH EXTRA EXPENSE | $ 50,000 | SPECIAL | 50% |

☐ Agreed Value   ☐ Replacement Cost Applies   ☐ Inflation Guard:   Percentage

**Business Income/Extra Expense – Optional Coverages or Coverage Options**

☐ Agreed Value
☒ Extended Period of Indemnity: 30   Days
☐ Maximum Period of Indemnity:  120 Days
☐ Monthly Limit of Indemnity:
☐ Extra Expense: Restoration Period and Monthly Percentage Limits on Loss Payment --
  Three Months at 40-80-100%.   Exceptions:

☐ Ordinary Payroll is Excluded
☒ Ordinary Payroll Limited: 90   Days

---

NUMBERS OF FORMS, SCHEDULES AND ENDORSEMENTS FORMING PART OF THIS COVERAGE PART ARE ATTACHED AS A SEPARATE LISTING.

**CP T0 01 02 94**

PRODUCER: **T J ADAMS GROUP LLC**          SV782     OFFICE: **ELMIRA NY SRV CTR 700**

 One Tower Square, Hartford, Connecticut 06183  

## COMMERCIAL PROPERTY
## COVERAGE PART DECLARATIONS

**POLICY NUMBER:** I-660-870X561A-TIL-02
**ISSUE DATE:**

---

**Premises Loc. No. 0002**     **Bldg. No. 002**     **Deductible:** 1,000     PER OCCURRENCE

| | **Coverage/Coverage Form** | **Limit of Insurance** | **Causes of Loss** | **Coinsurance** |
|---|---|---|---|---|
| STOCK | | $400,000 | SPECIAL | 100% |

☐ Agreed Value     ☒ Replacement Cost Applies     ☐ Inflation Guard:     Percentage

**Business Income/Extra Expense — Optional Coverages or Coverage Options**

☐ Agreed Value                                        ☐ Ordinary Payroll is Excluded
☐ Extended Period of Indemnity:     Days              ☐ Ordinary Payroll Limited:     Days
☐ Maximum Period of Indemnity:  120 Days
☐ Monthly Limit of Indemnity:
☐ Extra Expense: Restoration Period and Monthly Percentage Limits on Loss Payment —
   Three Months at 40-80-100%.     Exceptions:

---

**Premises Loc. No.**     **Bldg. No.**     **Deductible:**

| | **Coverage/Coverage Form** | **Limit of Insurance** | **Causes of Loss** | **Coinsurance** |
|---|---|---|---|---|
| | | $ | | |

☐ Agreed Value     ☐ Replacement Cost Applies     ☐ Inflation Guard:     Percentage

**Business Income/Extra Expense — Optional Coverages or Coverage Options**

☐ Agreed Value                                        ☐ Ordinary Payroll is Excluded
☐ Extended Period of Indemnity:     Days              ☐ Ordinary Payroll Limited:     Days
☐ Maximum Period of Indemnity:  120 Days
☐ Monthly Limit of Indemnity:
☐ Extra Expense: Restoration Period and Monthly Percentage Limits on Loss Payment —
   Three Months at 40-80-100%.     Exceptions:

---

**Premises Loc. No.**     **Bldg. No.**     **Deductible:**

| | **Coverage/Coverage Form** | **Limit of Insurance** | **Causes of Loss** | **Coinsurance** |
|---|---|---|---|---|
| | | $ | | |

☐ Agreed Value     ☐ Replacement Cost Applies     ☐ Inflation Guard:     Percentage

**Business Income/Extra Expense — Optional Coverages or Coverage Options**

☐ Agreed Value                                        ☐ Ordinary Payroll is Excluded
☐ Extended Period of Indemnity:     Days              ☐ Ordinary Payroll Limited:     Days
☐ Maximum Period of Indemnity:  120 Days
☐ Monthly Limit of Indemnity:
☐ Extra Expense: Restoration Period and Monthly Percentage Limits on Loss Payment —
   Three Months at 40-80-100%.     Exceptions:

---

**CP T0 01 02 94**
Order # CP T9 93 02 94
PRODUCER: T J ADAMS GROUP LLC          SV782     OFFICE: ELMIRA NY SRV CTR 700



TABLE OF CONTENTS

# COMMERCIAL PROPERTY COVERAGE PART

The following indicates the contents of the principal Forms which may be attached to your policy. It contains no reference to the Declarations or Endorsements which also may be attached.

Page No. Varies
By Form

COMMERCIAL PROPERTY CONDITIONS
  A.  Concealment, Misrepresentation or Fraud
  B.  Control of Property
  C.  Insurance Under Two or More Coverages
  D.  Legal Action Against Us
  E.  Liberalization
  F.  No Benefit to Bailee
  G.  Other Insurance
  H.  Policy Period, Coverage Territory
  I.  Transfer of Rights of Recovery Against Others to Us

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
  A.  Coverage
  B.  Exclusions and Limitations
  C.  Limits of Insurance
  D.  Deductible
  E.  Loss Conditions
  F.  Additional Conditions
  G.  Optional Coverages
  H.  Definitions

CAUSES OF LOSS–BASIC FORM
  A.  Covered Causes of Loss
  B.  Exclusions
  C.  Limitations
  D.  Definitions

CAUSES OF LOSS–BROAD FORM
  A.  Covered Causes of Loss
  B.  Exclusions
  C.  Limitations
  D.  Additional Coverage–Collapse
  E.  Definitions

CAUSES OF LOSS–SPECIAL FORM
  A.  Covered Causes of Loss
  B.  Exclusions
  C.  Limitations
  D.  Additional Coverage–Collapse
  E.  Additional Coverage Extensions
  F.  Definitions

GLASS COVERAGE FORM
  A.  Coverage
  B.  Exclusions
  C.  Limits of Insurance
  D.  Deductible
  E.  Loss Conditions
  F.  Large Plate Option

BUSINESS INCOME COVERAGE FORM
  A.  Coverage
  B.  Exclusions
  C.  Limits of Insurance
  D.  Loss Conditions
  E.  Additional Condition
  F.  Optional Coverages
  G.  Definitions

BUILDERS' RISK COVERAGE FORM
  A.  Coverage
  B.  Exclusions
  C.  Limits of Insurance
  D.  Deductible
  E.  Loss Conditions
  F.  Additional Conditions
  G.  Definition

CONDOMINIUM ASSOCIATION COVERAGE FORM
  A.  Coverage
  B.  Exclusions and Limitations
  C.  Limits of Insurance
  D.  Deductible
  E.  Loss Conditions
  F.  Additional Conditions
  G.  Optional Coverages
  H.  Definition

CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
  A.  Coverage
  B.  Exclusions and Limitations
  C.  Limits of Insurance
  D.  Deductible
  E.  Loss Conditions
  F.  Additional Condition
  G.  Optional Coverages
  H.  Definitions



# TABLE OF CONTENTS (Cont'd)

Page No. Varies
By Form

## EXTRA EXPENSE COVERAGE FORM
- A. Coverage
- B. Exclusions
- C. Limits of Insurance
- D. Loss Conditions
- E. Definitions

## LEGAL LIABILITY COVERAGE FORM
- A. Coverage
- B. Exclusions
- C. Limits of Insurance
- D. Loss Conditions
- E. Additional Conditions
- F. Definition

## MORTGAGE HOLDER'S ERRORS AND OMISSIONS COVERAGE FORM
- A. Coverage
- B. Exclusions
- C. Limits of Insurance
- D. Additional Coverage–Collapse
- E. Condition Applicable to Coverage A–Mortgage Holder's Interest
- F. Conditions Applicable to Coverage B–Property Owned or Held in Trust
- G. Conditions Applicable to Coverage C–Mortgagee Holders Liability and Coverage D–Real Estate Tax Liability
- H. Conditions Applicable to All Coverages
- I. Definitions

## LEASEHOLD INTEREST COVERAGE FORM
- A. Coverage
- B. Exclusions
- C. Limits of Insurance
- D. Loss Conditions
- E. Additional Condition
- F. Definitions

## TOBACCO SALES WAREHOUSES COVERAGE FORM
- A. Coverage
- B. Exclusions
- C. Limits of Insurance
- D. Deductible
- E. Loss Conditions
- F. Additional Conditions
- G. Definitions

**CP T0 00 08 92**



# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and
2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:
   a. During the policy period shown in the Declarations; and
   b. Within the coverage territory.

2. The coverage territory is:
   a. The United States of America (including its territories and possessions);
   b. Puerto Rico; and
   c. Canada.

## I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But

you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

a. Someone insured by this insurance;

b. A business firm:

(1) Owned or controlled by you; or

(2) That owns or controls you; or

c. Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc. 1983, 1987



# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout the policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing the insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION H – DEFINITIONS.

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property and Costs Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the designated building or structure at the premises described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery and

(b) Equipment;

(4) Personal property owned by you that is used to maintain or service the building or structure or its grounds, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings;

(d) Lobby and hallway furnishings owned by you;

(e) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering (not used for restaurant operations); and

(f) Lawn maintenance or snow removal equipment.

(5) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the building or structure;

(b) Materials, equipment, supplies and temporary structures, on or within 500 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 500 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property–Separation of Coverage endorsement:

(1) Furniture and fixtures;

(2) Machinery and equipment;

(3) "Stock";

(4) All other personal property owned by you and used in your business;

(5) Labor, materials or services furnished or arranged by you on personal property of others;

(6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy or lease, but do not own; and

(b) You acquired or made at your expense but are not permitted to remove;

(7) Leased personal property for which you have a contractual responsibility to insure, unless coverage is other-

wise provided for under Personal Property of Others.

**c. Personal Property of Others** that is:

(1) In your care, custody or control; and

(2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 500 feet of the described premises.

However, our payment for loss of or damage to Personal Property of Others will only be for the account of the owner of the property.

## 2. Property and Costs Not Covered

Unless the following property is added by endorsement to this Coverage Part, Covered Property does not include:

**a.** Accounts, bills, currency, deeds , food stamps or other evidences of debt, money, notes, credit card slips or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Roadways, walks, patios or other paved surfaces, except as provided in the Coverage Extensions;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, back filling or filling (except those costs made necessary due to repair of building insured under this policy from a covered cause of loss), reclaiming or restoring land or water;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

(1) The lowest basement floor; or

(2) The surface of the ground, if there is no basement;

This provision does not apply to foundations of buildings or structures while under construction.

**h.** Water or land whether in its natural state or otherwise (including land on which the property is located), growing crops, standing timber or lawns (including fairways, greens and tees);

**i.** Aircraft or watercraft (other than watercraft owned by you while out of water at the described premises) and personal property while airborne or waterborne;

**j.** Bridges, bulkheads, pilings, piers, wharves, docks, dikes or dams;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Underground pipes, flues, drains, tunnels, tanks, mines or mining property;

**m.** The cost to research, replace or restore the information on valuable papers and records, including those which exist on electronic or magnetic media, except as provided in the Coverage Extensions;

**n.** Vehicles or self-propelled machines that:

(1) Are licensed for use on public roads; or

(2) Are operated principally away from the described premises;

but Covered Property does include:

(1) Vehicles or self-propelled machines, other than automobiles, you manufacture, process, warehouse or hold for sale; or

(2) Automobiles you manufacture, process or warehouse;

**o.** The following property while outside of buildings:

(1) Grain, hay, straw or other crops; or

(2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than "stock" of trees shrubs or plants), and retaining walls that are not part of a building described in the Declarations all except as provided in the Coverage Extensions.

## 3. Covered Causes of Loss

See applicable Causes of Loss Form as shown in the Declarations.

## 4. Additional Coverages

### a. Debris Removal

(1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

This Additional Coverage does not apply to:

(a) Costs to extract "pollutants" from land or water; or

(b) Costs to remove, restore or replace polluted land or water.

(2) Payment for Debris Removal is included within the applicable Limit of Insurance shown in the Declarations. The most we will pay under this Additional Coverage is 25% of:

(a) The amount we pay for the direct physical loss of or damage to Covered Property; plus

(b) The deductible in this policy applicable to that loss or damage.

When the debris removal expense exceeds the above 25% limitation or the sum of loss of or damage to Covered Property and the expense for removal of its debris exceed the applicable Limit of Insurance we will pay an additional amount for debris removal expense up to $25,000 in any one occurrence.

### b. Pollutant Cleanup and Removal

We will pay your expense to extract "pollutants" from land or water at the described premises location, if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss which occurs:

(1) On the described premises;

(2) To Covered Property; and

(3) During the policy period.

The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage is $25,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy beginning with the effective date of this policy. This amount is in addition to the Limits of Insurance.

### c. Preservation of Property

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

(1) While it is being moved or while temporarily stored at another location; and

(2) Only if the loss or damage occurs within 90 days after the property is first moved.

Coverage ceases when the policy is amended to provide insurance at the new location.

### d. Fire Department Service Charge

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $5,000 for your liability for fire department service charges:

(1) Assumed by contract or agreement prior to loss; or

(2) Required by local ordinance.

No Deductible applies to this Additional Coverage. The amount payable under this Additional Coverage is in addition to the Limits of Insurance.

### e. Reward Coverage

We will reimburse you for reward(s) you have incurred leading to:

(1) The successful return of undamaged stolen articles to a law enforcement agency; or

**(2)** The arrest and conviction of any person(s) who have damaged or stolen any of your covered property.

We will pay 25% of the covered loss (prior to the application of any applicable deductible and recovery of undamaged stolen articles) up to a maximum of $5,000 for the payments of rewards you make. This amount is in addition to the Limits of Insurance. These reward payments must be documented. No deductible applies to this Additional Coverage.

**5. Coverage Extensions**

If a Coinsurance percentage of 80% or more or a value reporting period symbol is shown in the Declarations, you may extend the insurance provided by this Coverage Form as follows:

**a. Newly Acquired or Constructed Property**

**(1)** You may extend the insurance that applies to Building to apply to:

**(a)** Your new buildings or additions to existing buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises.

The most we will pay for loss or damage under this Extension is $500,000 at each building.

**(2)** You may extend the insurance for which a limit of insurance is stated in the Declarations that applies to Your Business Personal Property or to Personal Property of Others to apply to that type of property at a building you acquire, at a location described in the Declarations and at any location you acquire by purchase or lease.

The most we will pay for loss or damage to Your Business Personal Property and Personal Property of Others under this Extension is $250,000 in total at each location.

**(3)** Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 90 days expire after you acquire or begin to construct the property;

**(c)** You report values to us; or

**(d)** The property is more specifically insured.

We will charge you additional premium for values reported from the date construction begins or you acquire the property.

**b. Personal Effects and Property of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to the following types of property only while on the described premises to:

**(1)** Personal effects owned by you, your officers, your partners or your employees.

**(2)** Personal property, other than personal effects, owned by;

**(a)** Your employees, for not more than $2,500 for any one employee; or

**(b)** Others, and in your care, custody or control.

The most we will pay for loss or damage under this Extension is $10,000 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers and Records (Other Than Accounts Receivable)**

You may extend the insurance that applies to Your Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged valuable papers and records (other than accounts receivable) including those which exist on electronic or magnetic media for which duplicates do not exist. The most we will pay under this Extension is $5,000 at each described premises.

**d. Property Off-Premises**

You may extend the insurance provided by this Coverage Form to apply to Your Business Personal Property, other than "stock," that is temporarily at your home or at a location you do not own, lease or

operate. This Extension does not apply to:

(1) Property in or on a vehicle;

(2) Property at any fair or exhibition; or

(3) Property in the care, custody or control of your salespersons.

The most we will pay for loss or damage under this Extension is $10,000.

### e. Temporary Relocation of Property

If Personal Property for which a limit of insurance is shown in the Declarations is removed from the described premises and stored temporarily at a location you own, lease or operate while the described premises is being renovated or remodeled, we will pay for loss or damage to that stored property:

(1) Caused by or resulting from a Covered Cause of Loss;

(2) Up to $50,000 in any one occurrence; and

(3) During the storage period of up to 90 consecutive days but not beyond the expiration date of this policy;

unless the stored property is more specifically insured.

### f. Outdoor Property

You may extend the insurance provided by this Coverage Form to apply to your outdoor property on the described premises, as follows:

(1) Fences, retaining walls not part of a building, lawns (including fairways, greens, and tees), trees, shrubs and plants, (other than "stock" of trees, shrubs, or plants), walks, roadways, patios, or other paved surfaces for loss or damage by the following Causes of Loss:

(a) Fire;

(b) Lightning;

(c) Explosion;

(d) Riot or Civil Commotion;

(e) Aircraft;

(f) Falling Objects;

(g) Sinkhole Collapse; or

(h) Volcanic Action.

(2) Radio and television antennas (including satellite dishes) and signs (other than signs attached to buildings) for loss or damage by the Causes of Loss listed above and:

(a) Windstorm;

(b) Hail; or

(c) Vehicles.

The most we will pay under this Extension is $5,000 in any one occurrence, but not more than $500 for any one tree, shrub or plant nor $2,500 for any one sign or antenna.

### g. Claim Data

You may extend the insurance provided by this Coverage Form to apply to the expense you incur in preparing claim data when we require it. This includes the cost of taking inventories, making appraisals and preparing other documentation to show the extent of loss. The most we will pay for preparation of claim data under this Extension is $1,000. We will not pay for any expenses incurred, directed, or billed by or payable to insurance adjusters or their associates or subsidiaries or any costs as provided in the Loss Condition – Appraisal.

### h. Extra Expense

You may extend the insurance provided by this Coverage Form to apply to the necessary and reasonable extra expense you incur to continue as nearly as possible your normal business operation following loss or damage to Covered Property by a Covered Cause of Loss. The most we will pay under this Extension is $1,000 in total in any one occurrence for all extra expense wherever incurred.

The Additional Condition, Coinsurance, does not apply to these Extensions.

## B. EXCLUSIONS AND LIMITATIONS

See applicable Causes of Loss Form as shown in the Declarations.

## C. LIMITS OF INSURANCE

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss of or damage to outdoor signs attached to buildings is $2,500 per sign in any one occurrence.

Except as provided below the limits applicable to the Coverage Extensions are in addition to the Limits of Insurance.

Payments under the following coverages will not increase the applicable Limit of Insurance:

1. Preservation of Property; and

2. Temporary Relocation of Property.

## D. DEDUCTIBLE

We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance, after any deduction required by the Coinsurance Additional Condition or the Agreed Value Optional Coverage.

If more than one deductible applies to the same loss or damage the most we will deduct is the largest applicable deductible.

## E. LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Abandonment

There can be no abandonment of any property to us.

### 2. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 3. Duties In the Event of Loss or Damage

a. You must see that the following are done in the event of loss of or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

   **a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

      (1) Pay the value of lost or damaged property;

      (2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

      (3) Take all or any part of the property at an agreed or appraised value; or

      (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

   **b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

   **c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

   **d.** We will not pay you more than your financial interest in the Covered Property.

   **e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owner's property. We will not pay the owners more than their financial interest in the Covered Property.

   **f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

   **g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

      (1) We have reached agreement with you on the amount of loss; or

      (2) An appraisal award has been made.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property.

   **a.** We will pay:

      (1) Recovery expense; and

      (2) Costs to repair the recovered property;

   **b.** But the amount we pay will not exceed:

      (1) The total of **a.(1)** and **a.(2)** above;

      (2) The value of the recovered property; or

      (3) The Limit of Insurance;

     whichever is less.

**6. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

   **a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d., e., f., g.** and **h.** below.

   **b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $5,000 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value even when attached to the building:

      (1) Awnings or floor coverings;

      (2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

      (3) Outdoor equipment or furniture.

   **c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

   **d.** Glass at the cost of replacement with safety glazing material if required by law.

   **e.** Tenant's Improvements and Betterments at:

      (1) Actual cash value of the lost or damaged property if you make repairs promptly.

      (2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

         (a) Multiply the original cost by the number of days from the loss or

damage to the expiration of the lease; and

(b) Divide the amount determined in (a) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(3) Nothing if others pay for repairs or replacement.

f. Valuable Papers and Records, including those which exist on electronic or magnetic media (other than prepackaged software programs), at the cost of:

(1) Blank material for reproducing the records; and

(2) Labor to transcribe or copy the records when there is a duplicate.

g. Works of art, antiques or rare articles at the least of:

(1) Market value at the time and place of loss;

(2) Cost of reasonably restoring that property; or

(3) Replacing that property with substantially the same property.

h. Personal Property of Others at the amount you are liable not to exceed Actual Cash Value.

## F. ADDITIONAL CONDITIONS

The following conditions apply In addition to the Common Policy Conditions and the Commercial Property Conditions.

This Additional Condition does not apply to Personal Property of Others when a specific limit of insurance is shown for that coverage in the Declarations.

### 1. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies when the loss or damage In any one occurrence is $5,000 or more.

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declara-

tions is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in step (1);

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in step (2); and

(4) Subtract the deductible from the figure determined in step (3).

We will pay the amount determined in step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1** (Underinsurance):

| When: | The value of the property is | $250,000 |
|---|---|---|
| | The Coinsurance percentage for it is | 80% |
| | The Limit of Insurance for it is: | $120,000 |
| | The Deductible is: | $500 |
| | The amount of loss is: | $40,000 |
| Step (1): | $250,000 x 80% = | $200,000 |

| Step (2): | $120,000/$200,000 = | .60 |
|---|---|---|
| Step (3): | $40,000 x .60 = | $24,000 |
| Step (4): | $24,000 - $500 = | $23,500 |

We will pay no more than $23,500. The remaining $16,500 is not covered.

**Example No. 2** (Adequate Insurance):

When:

| The value of the property is | $250,000 |
|---|---|
| The Coinsurance percentage for it is: | 80% |
| The Limit of Insurance for it is: | $200,000 |

The Deductible is: $500

The amount of loss is: $40,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%).Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,500 ($40,000 amount of loss minus the deductible of $500).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example No. 3:** (Underinsurance)

When:

The value of the property is:

| | |
|---|---|
| Bldg. at Location No. 1: | $75,000 |
| Bldg. at Location No. 2: | $100,000 |
| Personal Property at Location No. 2 | $75,000 |
| Total Value: | $250,000 |
| The Coinsurance percentage for it is: | 90% |
| The Limit of Insurance for Buildings and Personal-Property at Locations No. 1 and 2 is: | $180,000 |
| The Deductible is: | $1,000 |
| The amount of loss is: Bldg. at Location No. 2: | $30,000 |
| Personal Property at Location No. 2: | $20,000 |
| Total amount of loss | $50,000 |

Step (1): $250,000 x 90% = $225,000

(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2): $180,000/$225,00 .80

Step (3): $50,000 x.80 = $40,000

Step (4): $40,000 - $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

## 2. Mortgageholders

**a.** The term, mortgageholder, includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

(1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

(2) Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so; and

(3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

(1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

(1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

9. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

## G. OPTIONAL COVERAGES

If shown in the Declarations, the following Optional Coverages apply separately to each item.

### 1. Agreed Value

a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies.

b. If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

c. The terms of this Optional Coverage apply only to loss or damage that occurs:

(1) On or after the effective date of this Optional Coverage; and

(2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

### 2. Inflation Guard

a. The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

(1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

Example:

If:

The applicable Limit of Insurance is:      $100,000

The annual percentage increase is      8%

The number of days since the beginning of the policy year (or last policy change) is: 146

The amount of insurance is:

$100,000 X .08 X 146/365 = $3,200

### 3. Replacement Cost

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

b. If applicable to Personal Property of Others at the amount you are liable not to exceed replacement cost.

c. This Optional Coverage does not apply to:

(1) Obsolete property which is not in use;

(2) Residential personal property or personal effects;

(3) Awnings or floor coverings;

(4) Outdoor equipment or furniture;

(5) Works of art, antiques or rare articles; or

(6) "Stock," unless the Including "Stock" option is shown in the Declarations.

d. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides, if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

This restriction does not apply to losses less than $5,000 in any one occurrence.

e. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2), or (3), subject to f. below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace, on the same premises, the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

## H. DEFINITIONS

1. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste and any unhealthful or hazardous building materials (including but not limited to asbestos and lead products or materials containing lead.). Waste includes materials to be recycled, reconditioned or reclaimed.

2. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.



# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION G—DEFINITIONS.

## A. COVERAGE

Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

(i) Business Income including "Rental Value."

(ii) Business Income other than "Rental Value."

(iii) "Rental Value."

If option (i) above is selected, the term Business Income will include "Rental Value." If option (iii) above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to property in the open or property in a vehicle, the described premises includes the area within 500 feet of the building at which the described premises is located.

With respect to the requirements set forth in the preceding paragraph, if you are a tenant, your premises is the portion of the building which you rent, lease or occupy, including:

1. All routes within the building to gain access to the described premises;

2. All areas within the buildings on the same parcel of land which provides essential services to conduct your "operations"; and

3. Your personal property in the open (or in a vehicle) within 500 feet of the building.

1. **Business Income**

   a. Business Income means the:

      (1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

      (2) Continuing normal operating expenses incurred, including payroll except when the following is indicated in the Declarations:

         (a) "Ordinary payroll" is excluded; or

         (b) "Ordinary payroll" is limited to a specified number of days. The number of days may be used in two separate periods during the "period of restoration."

   b. When "ordinary payroll" is excluded or limited:

      (1) In determining the operating expenses for the policy year for Coinsurance purposes, payroll expenses will not include "ordinary payroll expenses," except for "ordinary payroll expenses" incurred during the number of days shown in the Schedule, or in the Declarations. If the "ordinary payroll expenses" for the policy year vary during the year, the period of greatest "ordinary payroll expenses" will be used.

      (2) "Ordinary payroll expenses" means payroll expenses for all your employees except:

         (a) Officers;

         (b) Executives;

         (c) Department managers;

         (d) Employees under contract; and

**(e)** Additional Exemptions, shown in the Schedule or in the Declarations as:

  **(i)** Job Classifications; or

  **(ii)** Employees.

**(3)** "Ordinary payroll expenses" include:

  **(a)** Payroll;

  **(b)** Employee benefits, if directly related to payroll;

  **(c)** FICA payments;

  **(d)** Union dues; and

  **(e)** Worker's compensation premiums.

## 2. Covered Causes Of Loss.

See applicable Causes of Loss Form as shown in the Declarations.

## 3. Additional Coverages

### a. Extra Expense.

Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

**(1)** We will pay reasonable and necessary Extra Expense to avoid or minimize the suspension of business and to continue "operations":

  **(a)** At the described premises; or

  **(b)** At replacement premises or at temporary locations, including:

    **(i)** Relocation expenses; and

    **(ii)** Costs to equip and operate the replacement premises or temporary locations.

**(2)** We will pay reasonable and necessary Extra Expense to minimize the suspension of business if you cannot continue "operations."

**(3)** We will pay reasonable and necessary Extra Expense to:

  **(a)** Expedite the repair or replacement of property; or

  **(b)** Research, replace or restore the lost information on damaged valuable papers and records (other than accounts receivable);

to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

### b. Civil Authority.

We will pay for the actual loss of Business Income you sustain and reasonable and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from a Covered Cause of Loss.

The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

The coverage for Extra Expense will begin immediately after the time of that action and will end twenty four consecutive days after the time of that action.

### c. Alterations and New Buildings.

We will pay for the actual loss of Business Income you sustain due to direct physical loss or damage at the described premises caused by or resulting from a Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 500 feet of the described premises and:

  **(a)** Used in the construction, alterations or additions; or

  **(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations," the "period of restoration" will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

### d. Extended Business Income.

**(1)** Business Income Other Than "Rental Value."

If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(b)** Ends on the earlier of:

   **(i)** The date you could restore your "operations," with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

   **(ii)** unless otherwise stated in the Declarations, 30 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from a Covered Cause of Loss.

**(2)** "Rental Value"

If the necessary suspension of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

**(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

**(b)** Ends on the earlier of :

   **(i)** The date you could restore tenant occupancy with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

   **(ii)** 30 consecutive days after the date determined in **(2) (a)** above.

However, Extended Business Income does not apply to loss of "Rental-Value" incurred as a result of unfavorable business conditions caused by the impact of a Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from a Covered Cause of Loss.

### 4. Coverage Extensions

The Additional Condition, Coinsurance, does not apply to these Extensions.

You may extend the insurance provided by this Coverage Part as follows:

#### a. Newly Acquired Locations

**(1)** You may extend your Business Income Coverage to apply to property at any location you newly acquire by purchase or lease other than locations at fairs or exhibitions.

**(2) (a)** The most we will pay for loss under this Extension is $250,000 at each newly acquired location.

   **(b)** If a fraction is shown in the Declarations the most we will pay for loss in each period of 30 consecutive days is the fraction shown in the Declaration times $250,000.

**(3)** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

   **(a)** This policy expires;

(b) 90 days expire after you acquire or begin to construct the property;

(c) You report the location to us; or

(d) You obtain property insurance at your new location.

We will charge you additional premium for values reported from the date you acquire the location.

**b. Claim Data Expense**

You may extend the insurance provided by this Coverage Form to apply to the reasonable expenses you incur in the preparing of claim data when we require it. This includes the cost of preparing income statements and other documentation to show the extent of Business Income loss. The most we will pay under this Extension is $1,000 in any one occurrence. We will not pay for any expenses incurred, directed or billed by or payable to insurance adjusters or their associates or subsidiaries or any costs as provided in the LOSS CONDITION – Appraisal.

**B. EXCLUSIONS AND LIMITATIONS**

See applicable Causes of Loss Form as shown in the Declarations.

**C. LIMITS OF INSURANCE**

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations. The limits applicable to the Coverage Extensions are in addition to the Limit of Insurance. Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

1. Alterations and New Buildings;

2. Civil Authority;

3. Extended Business Income; or

4. Extra Expense.

**D. LOSS CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2. Duties in the Event of Loss**

a. You must see that the following are done in the event of loss:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the direct physical loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property



for inspection, testing and analysis, and permit us to make copies from your books and records.

(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(7) Cooperate with us in the investigation and settlement of the claim.

(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Limitation — Electronic Media And Records**

We will not pay for any loss of Business Income, Extended Business Income and Extra Expense caused by direct physical loss of or damage to Electronic Media and Records after the longer of:

a. 60 consecutive days from the date of direct physical loss or damage; or

b. The period, beginning with the date of direct physical loss or damage, necessary to repair, rebuild or replace, with reasonable speed and similar quality, other property at the described premises which suffered loss or damage in the same occurrence.

Electronic Media and Records are:

(1) Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

(2) Data stored on such media; or

(3) Programming records used for electronic data processing or electronically controlled equipment.

**Example No. 1:**

A Covered Cause of Loss damages a computer on June 1. It takes until Sep-

tember 1 to replace the computer, and until October 1 to restore the data that was lost when the damage occurred. We will only pay for the Business Income loss sustained during the period June 1 — September 1. Loss during the period September 2 — October 1 is not covered.

**Example No. 2:**

A Covered Cause of Loss results in the loss of data processing programming records on August 1. The records are replaced on October 15. We will only pay for the Business Income loss sustained during the period August 1 — September 29 (60 consecutive days). Loss during the period September 30 — October 15 is not covered.

**4. Loss Determination**

a. The amount of Business Income loss will be determined based on:

(1) The Net Income of the business before the direct physical loss or damage occurred;

(2) The likely Net Income of the business if no physical loss or damage occurred, but not including any likely increase in Net Income attributable to an increase in the volume of business as a result of favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, to the extent insured, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4) Other relevant sources of information, including:

(a) Your financial records and accounting procedures;

(b) Bills, invoices and other vouchers; and

(c) Deeds, liens or contracts.

b. The amount of Extra Expense will be determined based on:

(1) All reasonable and necessary expenses that exceed the normal operating

expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

(a) The salvage value that remains of any property bought for temporary use during the "period of restoration," once "operations" are resumed; and

(b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) All reasonable and necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**c. Resumption of Operations**

We will reduce the amount of your:

(1) Business Income loss to the extent you can resume your "operations," in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

(2) Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations," or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**5. Loss payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if:

**a.** You have complied with all of the terms of this Coverage Part; and

**b.** We have reached agreement with you on the amount of loss or an appraisal award has been made.

**E. ADDITIONAL CONDITION**

**Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any loss if the Limit of Insurance for Business Income is less than:

**a.** The Coinsurance percentage shown for Business Income in the Declarations; times

**b.** The sum of:

(1) The Net Income (Net Profit or Loss before income taxes), and

(2) All operating expenses, except as follows,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

**1.** Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

**2.** Divide the Limit of Insurance for the described premises by the figure determined in step 1; and

**3.** Multiply the total amount of loss by the figure determined in step 2.

We will pay the amount determined in step 3. or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

**1.** Prepaid freight - outgoing;

**2.** Returns and allowances;

**3.** Discounts;

**4.** Bad debts;

**5.** Collection expenses;

**6.** Cost of raw stock and factory supplies consumed (including transportation charges);



7. Cost of merchandise sold (including transportation charges);

8. Cost of other supplies consumed (including transportation charges);

9. Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

10. Power, heat and refrigeration expenses that do not continue under contract (if form CP 15 11 is attached);

11. The amount of payroll expense excluded (when ordinary payroll is excluded or limited as stated in the Declarations); and

12. Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion — not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example No. 1 (Underinsurance):**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been:     $400,000

The Coinsurance percentage is:     50%

The Limit of Insurance is:     $150,000

The amount of loss is:     $ 80,000

Step 1: $400,000 X 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step 2: $150,000/$200,000 = .75

Step 3: $ 80,000 X .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example No. 2 (Adequate Insurance):**

When: The Net Income and operating expenses for the 2 months following the inception, or last previous anniversary date, of this policy at the described premises would have been:     $400,000

The Coinsurance percentage is:     50%

The Limit of Insurance is:     $200,000

The amount of loss is:     $ 80,000

Step 1: $400,000 X 50% = $200,000 (the minimum amount of insurance to meet your coinsurance requirements)

Step 2: $200,000/$200,000 = 1.00

Step 3: $80,000 X 1.00 = $80,000

We will cover the $80,000 loss. No penalty applies.

### F. OPTIONAL COVERAGES

If shown in the Declarations, the following Optional Coverages apply separately to each item.

1. **Maximum Period of Indemnity**

   a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

   b. The most we will pay for loss of Business Income, Extended Business Income and Extra Expense is the lesser of:

      (1) The amount of loss sustained during the 120 days immediately following the beginning of the "period of restoration"; or

      (2) The Limit of Insurance shown in the Declarations.

2. **Monthly Limit of Indemnity**

   a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

   b. The most we will pay for loss of Business Income and Extended Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

      (1) The Limit of Insurance, multiplied by

      (2) The fraction shown in the Declarations for this Optional Coverage.

**Example:**

When: The Limit of Insurance is:     $120,000

The fraction shown in the Declarations for this Optional Coverage is:     1/4

The most we will pay for loss in each period of 30 consecutive days is: $120,000 X 1/4 = $30,000

If, in this example, the actual amount of loss is:

| | |
|---|---|
| Days 1-30 | $40,000 |
| Days 31-60 | $20,000 |
| Days 61-90 | $30,000 |
| | $90,000 |

We will pay:

| | |
|---|---|
| Days 1-30 | $30,000 |
| Days 31-60 | $20,000 |
| Days 61-90 | $30,000 |
| | $80,000 |

The remaining $10,000 is not covered.

### 3. Business Income Agreed Value

a. To activate this Optional Coverage:

(1) A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations."

(a) During the 12 months prior to the date of the Work Sheet; and

(b) Estimated for the 12 months immediately following the inception of this Optional Coverage.

(2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown on the Business Income Report/Work Sheet on file with us. The Agreed Value should be at least equal to:

(a) The Coinsurance percentage shown in the Declarations; multiplied by

(b) The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

b. The Additional Condition, Coinsurance, is suspended until:

(1) 12 months after the effective date of this Optional Coverage; or

(2) The expiration date of this policy;

whichever occurs first.

c. We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

(1) Within 12 months of the effective date of this Optional Coverage; or

(2) When you request a change in your Business Income Limit of Insurance.

d. If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

(1) The Business Income Limit of Insurance; divided by

(2) The Agreed Value.

### Example:

| | |
|---|---|
| When: The Limit of Insurance is | $100,000 |
| The Agreed Value is | $200,000 |
| The amount of loss is | $ 80,000 |

Step (a): $100,000 / $200,000 = .50

Step (b): .50 X $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

## G. DEFINITIONS

1. "Finished Stock" means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

2. "Operations" means:

a. Your business activities occurring at the described premises; and

b. The tenantability of the described premises, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

3. "Period of Restoration" means the period of time that:

CP T1 04 06 95

a. Begins:

(1) 72 hours after the time of direct physical loss or damage for Business Income coverage; or

(2) Immediately after the time of direct physical loss or damage for Extra Expense coverage;

caused by or resulting from any Covered Cause of loss at the described premises; and

b. Ends on the earlier of:

(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

(1) Regulates the construction, use or repair, or requires the tearing down of any property; or

(2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

The expiration date of this policy will not cut short the "period of restoration."

4. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste and any unhealthful or hazardous building materials (Including but are not limited to asbestos and lead products or materials containing lead.). Waste includes materials to be recycled, reconditioned or reclaimed.

5. "Rental Value" means the:

a. Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you; and

b. Amount of all charges which are the legal obligations of the tenants(s) and which would otherwise be your obligations; and

c. Fair rental value of any portion of the described premises which is occupied by you.


# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to SECTION F – DEFINITIONS.

## A. COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

1. Excluded in Section **B.**, Exclusions; or

2. Limited in Section **C.**, Limitations;

that follow.

## B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   ### a. Ordinance or Law

   The enforcement of any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance or Law, applies whether the loss results from:

   (1) An ordinance or law that is enforced even if the property has not been damaged; or

   (2) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   ### b. Earth Movement

   (1) Any earth movement (other than sinkhole collapse) whether man made or natural, including but not limited to earthquake, mine subsidence, landslide, or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (2) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

   Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   (a) Airborne volcanic blast or airborne shock waves;

   (b) Ash, dust or particulate matter; or

   (c) Lava flow.

   All volcanic eruptions that occur within any 168 hour period will constitute a single occurrence.

   Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   ### c. Governmental Action

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

   ### d. Nuclear Hazard

   Nuclear reaction or radiation, or radioactive contamination, however caused.

   But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

   ### e. Utility Services

   The failure or fluctuation of power or other utility service supplied to the described

premises, however caused, if the failure or fluctuation occurs away from the described premises.

But if the failure or fluctuation of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion does not apply to Business Income coverage or Extra Expense coverage. Instead, the Special Exclusion in paragraph **B.4.a.(1)** applies to these coverages.

**f.  War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g.  Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) (a) Water or sewage that backs up or overflows from a sewer, drain or sump.

(b) Except for septic tank and cess pool systems this exclusion does not apply when the cause of water or sewage overflow occurs due to a blockage which originates on the described premises.

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if Water as described in **g.(1)** through **g.(4)** above results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h.  Neglect**

Neglect of an insured to use reasonable means to save and preserve property from further damage at and after the time of loss.

2.  We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical current, including electric arcing, that disturbs electrical devices, equipment, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.** (1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision;

(7) The following causes of loss to personal property:

(a) Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature;

**(c)** Marring or scratching;

**(d)** Changes in flavor, color, texture or finish; and

**(e)** Contamination.

But if an excluded cause of loss that is listed in **2.d. (1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of liquids that occurs over a period of 14 days or more.

**g.** Water, other liquids, or powders that leak or flow from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act by you, any of your partners, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, sand, dust, ice or sleet to personal property in the open.

**k.** Collapse, except as provided in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss."

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the resulting loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in **B.1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

## 4. Special Exclusions

The following provisions apply to the specified Coverage Forms when they are part of this policy.

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Extra Expense Coverage Form or Valued Business Income Coverage Form.**

We will not pay for:

**(1)** Any loss caused directly or indirectly by the failure of power or other utility service supplied to the described premises, however caused, if the failure occurs outside of a building.

But if the failure of power or other utility service results in loss or damage by a "Specified Cause of Loss," we will pay for the loss or damage resulting from that "Specified Cause of Loss."

**(2)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock."

This exclusion does not apply to Extra Expense.

**(3)** Any loss caused by or resulting from direct physical loss of or damage to the following property while outside of buildings:

**(a)** Grain, hay, straw or other growing crops;

**(b)** Fairways, greens and tees including surrounding trees, shrubs or plants; and

**(c)** Radio or television antennas, (including satellite dishes) and their lead-in wiring, masts or towers, except as provided in the Additional Coverage Extension—Radio Antennas.

**(4)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

**(5)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration."

**(6)** Any other consequential loss.

## b. Leasehold Interest Coverage Form

**(1)** Exclusion **B.1.a.,** Ordinance or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your canceling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

## c. Legal Liability Coverage Form

**(1)** The following Exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.,** Ordinance or Law;

**(b)** Paragraph **B.1.c.,** Governmental Action;

**(c)** Paragraph **B.1.d.,** Nuclear Hazard;

**(d)** Paragraph **B.1.e.,** Utility Services; and

(e) Paragraph **B.1.f.** War and Military Action.

(2) The following additional exclusions apply to insurance under this Coverage Form:

(a) **Contractual Liability**

We will not defend any claim or "suit," or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

(I) Your assumption of liability was executed prior to the accident; and

(II) The building is Covered Property under this Coverage Form.

(b) **Nuclear Hazard**

We will not defend any claim or "suit," or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

## C. LIMITATIONS

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

   a. Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   b. Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

   c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   d. Building materials and supplies not attached as part of the building or structure caused by or resulting from theft.

      However this limitation does not apply to:

      (1) Building materials and supplies held for sale by you, unless they are insured under the Builder's Risk Coverage Form; or

      (2) Business Income coverage or Extra Expense coverage.

   e. Property that is missing, where the only evidence of loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

   f. Gutters and downspouts caused by or resulting from weight of snow, ice or sleet.

   g. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

2. We will not pay more than $1,000 in any one occurrence for loss of or damage to glass that is part of a building or structure regardless of the number of panes, plates or similar units of glass. Subject to this $1,000 aggregate, we will not pay more than $250 for any one pane, plate, multiple plate insulating unit, radiant or solar heating panel, jalousie, louver or shutter.

However, this limitation does not apply to:

a. Loss or damage by the "specified causes of loss," except vandalism; or

b. Business Income Coverage or Extra Expense Coverage.

3. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

a. Valuable papers and records, such as books of account, manuscripts, abstracts, drawings, card index systems, film, tape, disc, drum, cell or other data processing, recording or storage media, and other records.

b. Animals, and then only if they are killed or their destruction is made necessary.

c. Fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

(1) Glass that is part of a building or structure;

(2) Containers of property held for sale; or

(3) Photographic or scientific instrument lenses.

d. Builders' machinery, tools, and equipment owned by you or entrusted to you provided that such property is Covered Property. However, this limitation does not apply:

(1) If the property is located on or within 500 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

(2) To Business Income Coverage or to Extra Expense Coverage.

4. The special limit shown for each category, a. through d., is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

a. $5,000 for furs, fur garments and garments trimmed with fur.

b. $5,000 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

c. $25,000 for patterns, dies, molds and forms.

d. $1,000 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

5. If the building where loss or damage occurs has been "vacant" for more than 60 consecutive days before that loss or damage occurrs

a. We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(1) Vandalism;

(2) Sprinkler leakage, unless you have protected the system against freezing;

(3) Building glass breakage;

(4) Water damage;

(5) Theft; or

(6) Attempted theft.

b. With respect to Covered Causes of Loss other than those listed in **5.a.(1)** through **5. a.(6)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

## D. ADDITIONAL COVERAGE — COLLAPSE

The term Covered Cause of Loss includes the Additional Coverage — Collapse as described and limited in **D.1**, through **D.5.** below.

1. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage form, if the collapse is caused by one or more of the following:

a. The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

b. Hidden decay;

c. Hidden insect or vermin damage;

**d.** Weight of people or personal property;

**e.** Weight of rain that collects on a roof;

**f.** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurrs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in **D.1.a.** through **D.1.e.**, we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling, or renovation, contributes to the collapse.

**2.** If the direct physical loss or damage does not involve collapse of a building or any part of a building, we will pay for loss or damage to Covered Property caused by the collapse of personal property only if:

**a.** The personal property which collapses is inside a building insured under this Coverage Form; and

**b.** The collapse was caused by a cause of loss listed in **D.1.a.** through **D.1.f.** above.

**3.** With respect to the following property:

**a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

**b.** Awnings, gutters and downspouts;

**c.** Yard fixtures;

**d.** Outdoor swimming pools;

**e.** Fences;

**f.** Piers; pilings, wharves, docks, dikes or dams;

**g.** Beach or diving platforms or appurtenances;

**h.** Retaining walls; and

**i.** Walks, roadways and other paved surfaces;

if the collapse is caused by a cause of loss listed in **D.1.b.** through **D.1.f.**, we will pay for loss or damage to that property only if:

**a.** Such loss or damage is a direct result of the collapse of a building insured under this Coverage Form; and

**b.** The property is Covered Property under this Coverage Form.

**4.** Collapse does not include settling, cracking, shrinkage, bulging or expansion.

**5.** This Additional Coverage – Collaspe, will not increase the Limits of Insurance provided in this Coverage Part.

**E. ADDITIONAL COVERAGE EXTENSIONS**

**1. Property In Transit.**

This Extension applies only to Your Business Personal Property to which this form applies.

**a.** You may extend the insurance provided by this Coverage Part to apply to Your Business Personal Property In transit more than 500 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

This Extension does not apply to property in the care, custody or control of your salespersons or to tools, equipment, supplies and materials all used for service or repair in your business and usually kept in a motor vehicle.

**b.** Loss or damage must be caused by or result from one of the following causes of loss:

**(1)** Fire, lightning, explosion, windstorm or hail, riot or civil commotion, vandalism, flood or earthquake.

**(2)** Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed.

**(3)** Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

**c.** The most we will pay for loss or damage in any one occurrence under this Extension is $2,500.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

**2. Water Damage, Other Liquids, Powder or Molten Material Damage.**

If loss or damage caused by or resulting from covered water or other liquid, powder or mol-

ten material occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

a. Results in discharge of any substance from an automatic fire protection system; or

b. Is directly caused by freezing.

However, this limitation does not apply to Business Income coverage or to Extra Expense coverage.

**3. Building Damage By Theft.**

You may extend coverage for loss or damage by theft which applies to your Business Personal Property to that part of the building you occupy and which contains your insured personal property, and to property within the building used for maintenance or service of the building, if you are liable for such damage. We shall not be liable under this Extension of Coverage for damage by fire or explosion, or to glass (other than glass building blocks) or to any lettering, ornamentation or burglar alarm tape on glass.

**4. Radio Antennas**

This Additional Coverage Extension applies only to coverage as provided under the BUSINESS INCOME COVERAGE FORM(S).

a. Coverage is provided by this Coverage Part to apply to loss of Business Income you sustain due to the necessary suspension of your "operations" resulting from direct physical loss or damage to radio antennas, including their lead-in wiring, masts, or towers used exclusively for communications between your locations and your employees away from your locations.

b. We will not pay for loss under this Extension if the "period of restoration" for radio antennas is less than 72 hours.

c. The most we will pay for loss under this Extension is $10,000. This Coverage Extension is additonal insurance.

**F. DEFINITIONS**

1. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste and any unhealthful or hazardous building materials. (Including but are not limited to asbestos and lead products or materials containing lead.) Waste includes materials to be recycled, reconditioned or reclaimed.

2. "Specified Causes of Loss" means the following: Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow ice or sleet; water damage.

a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

(1) The cost of filling sinkholes; or

(2) Sinking or collapse of land into manmade underground cavities.

b. Falling objects does not include loss or damage to:

(1) Personal property in the open; or

(2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

3. A building is "vacant":

a. When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, Building means the unit or suite rented or leased to the tenant. Such building is vacant when it



does not contain enough business personal property to conduct customary operations.

**b.** When this policy is issued to the owner of a building, building means the entire building.

Such building is vacant when 70% or more of its total square footage:

**(1)** Is not rented; or

**(2)** Is not used to conduct customary operations.

**c.** Buildings under construction or renovation are not considered vacant.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDATORY PROVISIONS – SEASONAL AUTOMATIC INCREASE

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

The following provision applies only when stated in the COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS and only to the premises so indicated:

**Seasonal Automatic Increase** – The Limit of Insurance for Your Business Personal Property at a designated premises location and building as stated in the Commercial Property Coverage Part Declarations shall be increased by 25% for seasonal variations, subject to maximum increase of $100,000 for all premises locations and buildings subject to this provision and insured under this policy. This increase shall not apply:

A. Unless the stated Limit of Insurance equals 100% of your average monthly values at the designated premises location and building for the 12 months immediately preceding the date of loss, or in the event you have been in business less than twelve months, for such shorter period of time; or

B. If "Your Business Personal Property" Limit of Insurance is a "Blanket" limit as indicated on the Commercial Property Coverage Part Declarations or is subject to the Value Reporting Form.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SELECT PROPERTY EXTRA

This endorsement modifies insurance under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM
CAUSES OF LOSS - SPECIAL FORM

**A.** The BUILDING AND PERSONAL PROPERTY COVERAGE FORM is revised as follows:

**1.** BROADENED BUILDING COVERAGE is added as follows:

Paragraph **A.1.a.(2)** of the COVERAGE-Covered Property-Building provision is replaced by the following:

**(2)** You may extend the insurance that applies to described Buildings at each location to apply to:

**(a)** Enclosed buildings not described in the Declarations and the business personal property within them;

**(b)** Structures including outdoor fixtures, including but not limited to:

**i.** Outdoor swimming pools not part of a building and related pool equipment;

**ii.** Outdoor fences and signs (including outdoor signs attached to buildings);

**iii.** Retaining walls that are not part of a building;

**iv.** Radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers; and

**v.** Unenclosed buildings;

but not including bridges, bulkheads, pilings, piers, wharves, docks, dikes or dams. The most we will pay for loss or damage is $25,000 in total in any one occurrence, but not more than $10,000 in total in any one occurrence for outdoor fences and signs (including outdoor signs attached to buildings);

**2.** Property and Costs Not Covered is revised as follows:

**a.** Item **g.** as respects foundations is deleted.

**b.** Item **o.(2)** is deleted and is replaced by the following:

**(2)** Radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers and retaining walls that are not part of a building described in the Declarations, except as provided in this endorsement; and

**(3)** Trees, shrubs or plants (other than "stock" of trees, shrubs or plants), except as provided in the Outdoor Property Coverage Extension.

**3.** The following Additional Coverage is added:

**Fire Protective Equipment Discharge**

If fire protective equipment discharges accidentally or to control a Covered Cause of Loss, we will pay your cost to:

**(1)** refill or recharge the system with the extinguishing agents that were discharged; and

**(2)** replace or repair faulty valves or controls which caused the discharge.

The most we will pay under this Additional Coverage is $5,000 in any one occurrence.

**4.** The Outdoor Property - COVERAGE EXTENSION is deleted and replaced with the following:

**f. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor property on the described premises as follows:

Lawns (including fairways, greens and tees) trees, shrubs and plants (other than

"stock" of trees, shrubs or plants), walks, roadways, patios, or other paved surfaces for loss or damage by the following Causes of Loss:

(1) Fire;

(2) Lightning;

(3) Explosion;

(4) Riot or Civil Commotion;

(5) Aircraft;

(6) Falling Objects;

(7) Sinkhole Collapse; or

(8) Volcanic Action.

The most we will pay under this Extension is $5,000 in total in any one occurrence, but not more than $500 for any one tree, shrub or plant.

5. The second paragraph of item **C. LIMITS OF INSURANCE** dealing with outdoor signs attached to buildings is deleted.

6. The COVERAGE EXTENSIONS are revised as follows:

a. Valuable Papers and Records (Other Than Accounts Receivable) is deleted and is replaced with the following:

**Valuable Papers and Records (Other Than Accounts Receivable and Coverage provided by the Electronic Data Precessing "Software" and Data Coverage – Coverage Extension)**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged valuable papers and records (other than accounts receivable and coverage provided by the Electronic Data Processing "Software" and Data Cov-erage-Coverage Extension) including those which exist electronic or magnetic media for which duplicates do not exist. The most we will pay under this Extension is $15,000 in any one occurrence.

(2) The following Exclusions of the Causes of Loss - Special Form do not apply to this Coverage Extension: **B.1.b.**(Earth Movement), and **B.1.g.** (Water), **B.2.a.**(Electrical dis-

turbance) and **B.2.d.(6)** (Mechanical breakdown).

b. Property Off-Premises is deleted and is replaced with the following:

**Property Off-Premises**

You may extend the insurance provided by this Coverage Form to apply to personal property owned by you (other than "money" and "securities") or personal property owned by others for which you are liable (except when carried by you under a contract or agreement as a bailee for hire) while such personal property is:

(1) At a location not owned, leased or operated by you;

(2) Sold under an installation contract and your insurable interest continues until the installation is accepted by the customer; or

(3) (a) In transit ; or

(b) Shipped at the risk of a consignee or other party and in the event that by reason of loss or damage caused by or resulting from a covered cause of loss insured against in this Coverage Part you cannot collect because of the consignee's or other party's refusal or inability to pay.

The most we will pay for loss or damage under this Extension is $15,000 in total in any one occurrence.

7. The limit applicable to the Claim Data Coverage Extension is increased from $1,000 to $5,000.

8. The following COVERAGE EXTENSIONS are added:

a. **Accounts Receivable (Other Than Coverage Provided By The Electronic Data Processing "Software" And Data Coverage - Coverage Extension)**

You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to your accounts receivable records including those on electronic data processing media (Other Than Coverage Provided by The Electronic Data Processing "Soft-

ware" and Data Coverage Coverage Extension).

(1) We will pay:

(a) Amounts due from your customers that you are unable to collect because of loss or damage to your accounts receivable records;

(b) Interest charges on any loan required to offset amounts you are unable to collect because of loss or damage to your accounts receivable records, pending our payments of these amounts;

(c) Collection expenses in excess of your normal collection expenses that are made necessary by the loss; and

(d) Other reasonable expenses that you incur to reestablish your accounts receivable.

(2) We will not pay for loss or damage under this Coverage Extension caused by or resulting from:

(a) Bookkeeping, accounting or billing errors or omissions; or

(b) Programming errors or faulty machine instructions.

(3) We will not pay for loss or damage that requires:

(a) An audit of records;

(b) An inventory computation; or

(c) A profit or loss computation;

to prove its factual existence.

(4) Loss or damage must be caused by or result from a Covered Cause of Loss except:

Exclusions **B.1.b.**(Earth Movement) and **B.1.g.** (Water) of the Causes of Loss Special Form do not apply to this Coverage Extension.

The most we will pay under this Extension is $15,000 in any one occurrence.

**b. "Money" and "Securities"**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to "money" and "securities" owned by you. The most

we will pay under this Coverage Extension is:

(a) $10,000 at each described premises;

(b) $10,000 within a bank or savings institution;

(c) $5,000 while in the custody of a "messenger" en route to or from the described premises, a bank or savings institution; or

(d) $5,000 within the living quarters of a "messenger" in **(c)** above.

(2) Exclusions **B.1.b.**(Earth Movement) and **B.1.g.** (Water) and Limitation **C.1.e** (Property that is missing) of the Causes of Loss Special Form do not apply to this Coverage Extension.

(3) The following Definitions are added as respects this Coverage Extension:

(a) "Messenger" means you, any of your partners or any employee while having care and custody of property away from the described premises.

(b) "Money" means:

I. Currency, coins, and bank notes in current use and having a face value; and

ii. Travelers checks, register checks and money orders held for sale to the public.

(c) "Securities" means negotiable and non-negotiable instruments or contracts representing either money or other property and includes:

I. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

ii. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money" or Lottery tickets held for sale.

**c. Electronic Data Processing "Software" and Data Coverage (Other than reproduction of data or software as provided in Accounts Receivable · Coverage Extension and as provided by the Valuable Papers · Additional Coverage).**

(1) We will pay your necessary and reasonable "Extra Expenses" to continue your normal business operations following loss or damage to your electronic data processing "software" from a Covered Cause of Loss (Other than reproduction of data or software as provided in Accounts Receivable - Coverage Extension and as provided by the Valuable Papers - Additional Coverage). We will also pay for your actual lost "Business Income" you sustain due to the necessary suspension of your operations during the "period of restoration." The suspension must be caused by direct physical loss of or damage to your electronic data processing "software" at the premises which are described in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

The most we will pay under this Coverage Extension is $15,000 in total in any one occurrence.

(2) The following DEFINITIONS are added as respects this Coverage Extension:

(a) "Business Income" means the:

(i) Net income (net profit or loss before income taxes) that would have been earned had no loss or damage occurred; and

(ii) Continuing normal operating expenses incurred, including payroll.

(b) "Extra Expense" means necessary and reasonable expenses you incur to avoid or minimize the suspension of business that you would not have incurred if there had been no direct physical loss or damage caused by resulting from a Covered Cause of Loss.

(c) "Period of Restoration" means the period of time that:

(i) Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

(ii) Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

(i) Regulates the construction, use or repair, or requires the tearing down of any property; or

(ii) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

The expiration date of this policy will not cut short the "period of restoration."

(d) "Software" means data processing media made up of all forms of converted machine readable data, programs and instruction materials used in your business operations, including the materials on which the data is recorded such as tapes, disks, or cards including property of others that you hold in any capacity or for which you are responsible.

(4) The following is added to Property and Costs Not Covered as respects this Coverage Extension:

(a) Accounts, bills, evidences of debt, valuable papers, records,



abstracts, deeds, manuscripts and other documents unless they are in the form of "software" and then only in that form.

**(b)** "Software" which cannot be replaced with other of the same kind or quality.

**(5)** The following is added to Valuation as respects this Coverage Extension:

"Software" will be valued at the cost to reproduce the "software." But if it is not reproduced or replaced, we will only pay the blank value of the "software."

**(6)** Exclusions **B.2.a.** Electrical disturbance and **B.2.d.(6)** Mechanical breakdown of the Causes of Loss Special Form do not apply to this Coverage Extension.

**B.** The CAUSES OF LOSS - SPECIAL FORM is revised as follows:

**1.** Item **C.2.** of the LIMITATIONS, which provides a limit of $250 for any one plate, $1,000 in any one occurrence for loss or damage to glass that is part of a building is deleted.

**2.** Item **E.1.** of the ADDITIONAL COVERAGE EXTENSIONS - Property In Transit is deleted.

**3.** Item **C.3.a.** of the Limitations is deleted and replaced with the following:

**C.3.a.** Valuable papers and records, such as books of account, manuscript, abstracts, drawings, card index systems, film, tape, disc, drum, cell or other data processing, recording or storage media, and other records, except as provided in the Coverage Extensions of this endorsement.

**4.** The following ADDITIONAL COVERAGE EXTENSION is added:

**Water Damage Extension**

With respect to covered property, we will pay for loss or damage caused by or resulting from:

**a.** Water that backs up or overflows from a sewer, drain or sump; or

**b.** Water under the ground surface pressing on or flowing or seeping through:

**(1)** Foundations, walls, floors or paved surfaces;

**(2)** Basements, whether paved or not; or

**(3)** Doors, windows or other openings.

**c.** EXCLUSION **g. (3)** is deleted.

**d.** EXCLUSION **g. (4)** is deleted.

**e.** Item **C.1.c.** of the LIMITATIONS is revised to include:

**(3)** The loss or damage is caused by or results from water that backs up or overflows from a sewer, drain or sump; or

**(4)** The loss or damage is caused by or results from water under the ground surface pressing on, or flowing through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

**f.** Item **2.c.** of the DEFINITIONS as respects "Specified Causes of Loss" - Water Damage is deleted and replaced with the following:

**c.** Water damage means:

**(1)** Accidental discharge of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam;

**(2)** Water that backs up or overflows from a sewer, drain or sump; or

**(3)** Water under the ground surface pressing on, or flowing through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

**g.** The most we will pay for loss or damage under this Additional Coverage Extension is 10% of the limit(s) of insurance shown for Building(s) separately at each affected described premises shown in

the Declarations and 10% of the limit(s) of insurance shown for Personal Property separately at each affected described premises shown in the Declarations, but not more than $100,000 in total in any one policy year. Loss of Business Income or Extra Expense does not apply to this Additional Coverage Extension.

C. When the Business Income Coverage Forms are attached to this policy:

1. The Additional Coverage - Extended Business Income 30 consecutive days is revised to 90 consecutive days.

2. The limit applicable to the Claim Data Expense Coverage Extension is increased from $1,000 to $5,000.



**COMMERCIAL GENERAL LIABILITY**          **POLICY NO.:**  I-660-870X561A-TIL-02
**COVERAGE PART DECLARATIONS**            **ISSUE DATE:**  05-30-02

**DECLARATIONS PERIOD:**  From 05-17-02 to 05-17-03  12:01 A.M. Standard Time at your mailing
address shown in the Common Policy Declarations.

The Commercial General Liability Coverage Part consists of these Declarations and the Coverage Form shown
below.

**1.  COVERAGE AND LIMITS OF INSURANCE:**

| COMMERCIAL GENERAL LIABILITY COVERAGE FORM | LIMITS OF INSURANCE |
|---|---|
| General Aggregate Limit (Other than Products-Completed Operations) | $    2,000,000 |
| Products-Completed Operations Aggregate Limit | $    2,000,000 |
| Personal & Advertising Injury Limit | $    1,000,000 |
| Each Occurrence Limit | $    1,000,000 |
| Fire Damage Limit (any one fire) | $       50,000 |
| Medical Expense Limit (any one person) | $        5,000 |

**2.  AUDIT PERIOD:**  ANNUAL

**3.  FORM OF BUSINESS:**  CORPORATION

**4.  NUMBERS OF FORMS, SCHEDULES AND ENDORSEMENTS FORMING PART OF THIS COVERAGE
     PART ARE ATTACHED AS A SEPARATE LISTING.**

# COMMERCIAL GENERAL LIABILITY COVERAGE
# IS SUBJECT TO A GENERAL AGGREGATE LIMIT

**DECLARATIONS PREMIUM SCHEDULE**          **POLICY NUMBER:** I-660-870X561A-TIL-02

This Schedule applies to the Declarations for the period of   05-17-02   to   05-17-03

It shows all of your known rating classes as of the effective date.  Any exceptions will be so noted.  This includes all locations you own, rent or occupy.

| OPN NO. | LOC/ BLDG NO. | CLASS DESCRIPT/ CODE NO. | SUBLINE | PREMIUM BASE/ EXPOSURE | RATES | ADVANCE PREMIUM |
|---|---|---|---|---|---|---|
| MINIMUM PREMIUMS | | | | | | |
| | | PREM/OPS | $232 | | | |
| | | PROD/C-OPS | $537 | | | |
| | | LOB | $250 | | | |
| | 1/ 1 | BUILDINGS OR PREMISES - OFFICE - OTHER THAN NOT-FOR-PROFIT - NOC INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 001 | | 61226 | PREM/OPS | A    2,308 | 175.477 | 405 |
| | 2/ 2 | FRUIT OR VEGETABLE JUICE MFG. - NO BOTTLING OF CARBONATED BEVERAGES | | | | |
| 002 | | 53565 | PREM/OPS | S  4,000,000 | .396 | 1,584 |
| 003 | | | PROD/C-OPS | S  4,000,000 | 1.684 | 6,736 |
| | 2/ 2 | ADDITIONAL INTEREST-VENDORS-BROAD | | | | |
| 004 | | 49950 | PROD/C-OPS | 4,000,000 | .150% | 1,010 |
| | | HIRED AND NONOWNED AUTO EXCESS LIABILITY | | | | |
| 005 | | 39097 | PREM/OPS | | | 200 |
| | | COVERAGE PART TOTAL | | | | 9,935 |

*This class is subject to the prem/ops transition program.

☐ If an "X" is entered in this box, these Declarations are completed on the Premium Schedule Extension CG T0 12.

CG T0 07 09 87                                          PAGE    1   (END)

# KEY TO DECLARATIONS PREMIUM SCHEDULE

**ABBREVIATIONS:**

— CLASS DESCRIP — means CLASS DESCRIPTION

— LOC/BLDG NO. — means LOCATION/BUILDING NUMBER

— OPN NO. — means OPERATION NUMBER

— PREM/OPS — means PREMISES/OPERATIONS

— PROD/C-OPS — means PRODUCTS/COMPLETED OPERATIONS

**PREMIUM BASE:**

| Key Letter | Premium Base | How Rates Apply |
|---|---|---|
| a | Area | per 1,000 square feet |
| c | Total Cost | per $1,000 of total cost |
| m | Admissions | per 1,000 admissions |
| p | Payroll | per $1,000 of payroll |
| s | Gross Sales | per $1,000 of gross sales |
| t | (see note * below) | (see note * below) |
| u | Units | per unit |

*Premium base t is used for a number of rarely used premium bases.
The specific base and how rates apply are shown with the Class Description
on the DECLARATIONS-PREMIUM SCHEDULE.

TABLE OF CONTENTS

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM
## (CG 00 01 10 93)

SECTION I--COVERAGES

Beginning on Page

| | | |
|---|---|---|
| Coverage A-- Bodily Injury and Property Damage Liability | Insuring Agreement | 1 |
| | Exclusions | 1 |
| Coverage B-- Personal and Advertising Injury Liability | Insuring Agreement | 4 |
| | Exclusions | 4 |
| Coverage C-- Medical Payments | Insuring Agreement | 4 |
| | Exclusions | 5 |
| Supplementary Payments | | 5 |

SECTION II--WHO IS AN INSURED ....................................................................... 5

SECTION III--LIMITS OF INSURANCE ..................................................................... 6

SECTION IV--COMMERCIAL GENERAL LIABILITY CONDITIONS ........................................ 7

Bankruptcy ............................................................................................... 7
Duties in the Event of Occurrence, Claim or Suit ..................................................... 7
Legal Action Against Us ................................................................................. 7
Other Insurance ......................................................................................... 8
Premium Audit ........................................................................................... 8
Representations .......................................................................................... 8
Separation of Insureds .................................................................................. 8
Transfer of Rights of Recovery Against Others To Us .................................................. 9
When We Do Not Renew .................................................................................. 9

SECTION V--DEFINITIONS ................................................................................... 9



# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us'" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I – COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement.**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

    (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

    (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

    b. This insurance applies to "bodily injury" and "property damage" only if:

    (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

    (2) The "bodily injury" or "property damage" occurs during the policy period.

    c. Damages because of "'bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

2. **Exclusions.**

    This insurance does not apply to:

    a. Expected or Intended Injury

    "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

    b. Contractual Liability

    "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    (1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

    (2) That the insured would have in the absence of the contract or agreement.

    c. Liquor Liability

    "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

    (1) Causing or contributing to the intoxication of any person;

    (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

    This exclusion applies only if you are in the business of manufacturing distributing, selling, serving or furnishing alcoholic beverages.

**d.** Workers Compensation and Similar Laws

Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

**e.** Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

   **(a)** Employment by the insured; or

   **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of (1) above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

**f.** Pollution

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

   **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

   **(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

   **(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

   **(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

      **(i)** if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

      **(ii)** if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**(2)** Any loss, cost or expense arising out of any:

   **(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

   **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**g.** Aircraft, Auto or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

   **(a)** Less than 26 feet long; and

Copyright, Insurance Services Office, Inc., 1992   **CG 00 01 10 93**



**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of "mobile equipment".

**h.** Mobile Equipment

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i.** War

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j.** Damage to Property

"Property damage" to:

**(1)** Property you own, rent, or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k.** Damage to Your Product

"Property damage" to "your product" arising out of it or any part of it.

**l.** Damage to Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.** Damage to Impaired Property or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.** Recall of Products, Work or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (SECTION III).

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

   b. This insurance applies to:

      (1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

      (2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

      but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions.**

   This insurance does not apply to:

   a. "Personal injury" or "advertising injury":

      (1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

      (2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

      (3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

      (4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

   b. "Advertising injury" arising out of:

      (1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

      (2) The failure of goods, products or services to conform with advertised quality or performance;

      (3) The wrong description of the price of goods, products or services; or

      (4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

## COVERAGE C. MEDICAL PAYMENTS

1. **Insuring Agreement.**

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      provided that:

      (1) The accident takes place in the "coverage territory" and during the policy period;

      (2) The expenses are incurred and reported to us within one year of the date of the accident; and

      (3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the

Copyright, Insurance Services Office, Inc., 1992

CG 00 01 10 93



applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions.**

We will not pay expenses for "bodily injury":

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an "employee" of any insured, if benefits for the "'bodily injury" are payable or must be provided under a workers compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard."

g. Excluded under Coverage A.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

### SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

We will pay with respect to any claim or "suit" we defend:

1. All expenses we incur.

2. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

3. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work.

5. All costs taxed against the insured in the "suit."

6. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

### SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. An organization other than a partnership or joint venture, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

a. Your "employees," other than your "executive officers," but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, no "employee" is an insured for:

(1) "Bodily injury" or "personal injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), or to a co-"employee" while in the course of his or her employment or while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or



(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by,

(b) Rented to in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees" or, if you are a partnership or joint venture, by any partner or member.

**b.** Any person (other than your "employee"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**4.** Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits."

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage C;

**b.** Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage B.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

**4.** Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

**5.** Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage A; and

**b.** Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence."

     Copyright, Insurance Services Office, Inc., 1992     CG 00 01 10 93

6. Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy.**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit.**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   (1) How, when and where the "occurrence" or offense took place;

   (2) The names and addresses of any injured persons and witnesses; and

   (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received; and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us.**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance.**

   If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

   a. **Primary Insurance**

      This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

Copyright, Insurance Services Office, Inc., 1992

 

## b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

## c. Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## 5. Premium Audit.

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

## 6. Representations.

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

## 7. Separation Of Insureds.

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

## 8. Transfer Of Rights Of Recovery Against Others To Us.

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

## 9. When We Do Not Renew.

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

Copyright, Insurance Services Office, Inc., 1992

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

1. "Advertising injury" means injury arising out of one or more of the following offenses:

   a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   b. Oral or written publication of material that violates a person's right of privacy;

   c. Misappropriation of advertising ideas or style of doing business; or

   d. Infringement of copyright, title or slogan.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

   c. All parts of the world if:

      (1) The injury or damage arises out of:

         (a) Goods or products made or sold by you in the territory described in a. above; or

         (b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

      (2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

8. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

Copyright, Insurance Services Office, Inc., 1992

**(a)** Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection or engineering services.

**9.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

**10.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

**11.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance but not construction or surfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**12.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**13.** "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

**e.** Oral or written publication of material that violates a person's right of privacy.

 Copyright, Insurance Services Office, Inc., 1992 CG 00 01 10 93

14. **a.** "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    (1) Products that are still in your physical possession; or

    (2) Work that has not yet been completed or abandoned.

  **b.** "Your work" will be deemed completed at the earliest of the following times:

    (1) When all of the work called for in your contract has been completed.

    (2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

    (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  **c.** This hazard does not include "bodily injury" or "property damage" arising out of:

    (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

    (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

    (3) Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations.

15. "Property damage" means:

  **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

16. "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

  **a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

  **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

17. "Your product" means:

  **a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    (1) You;

    (2) Others trading under your name; or

    (3) A person or organization whose business or assets you have acquired; and

  **b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

  "Your product" includes:

  **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

  **b.** The providing of or failure to provide warnings or instructions.

  "Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

18. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

19. "Your work" means:

  **a.** Work or operations performed by you or on your behalf; and

  **b.** Materials, parts or equipment furnished in connection with such work or operations.

  "Your work" includes:

  **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

  **b.** The providing of or failure to provide warnings or instructions.

 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURING AGREEMENT— KNOWN INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART (OCCURRENCE VERSION)

Paragraph 1. **Insuring Agreement** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   **(1)** The amount we will pay for damages is limited as described in Section III – Limit Of Insurance; and

   **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

   **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

   **(3)** Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive no-

tice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OTHER INSURANCE – ADDITIONAL INSUREDS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### PROVISIONS

Paragraph 4.b. of CONDITIONS (SECTION IV) is amended as follows:

**b.** Excess Insurance

This insurance is excess over any of the other insurance; whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage for "your work";

(2) That is Fire Insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(3) If the loss arises out of the maintenance or use of aircraft, "autos", or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I); or

(4) That is valid and collectible insurance available to you if you are added as an additional insured under any other policy.

When this insurance is excess, we will have no duty under Coverage A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.



POLICY NUMBER: I-660-870X561A-TIL-02

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# HIRED AND NONOWNED AUTO EXCESS LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

### SCHEDULE

| COVERAGE | ADDITIONAL PREMIUM |
|---|---|
| Hired and Nonowned Auto Liability | $ 200 |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement).

### PROVISIONS

**A.** If a premium charge is shown in the Schedule, the insurance provided under COVERAGE A (Section I) applies to "bodily injury" and "property damage" arising out of the maintenance or use of a "hired auto" or "nonowned auto."

**B.** With respect to the insurance provided by this endorsement:

1. The exclusions, under COVERAGE A (Section I), other than exclusions a, b, d, e, f and i and the Nuclear Energy Liability Exclusion (Broad Form) are deleted and replaced by the following:

    **a.** "Property damage" to:

    **(1)** Property owned or being transported by, or rented or loaned to the insured; or

    **(2)** Property in the care, custody or control of the insured.

    **b.** "Bodily injury" to any fellow employee of the "insured" arising out of and in the course of the fellow employee's employment.

2. WHO IS AN INSURED (Section II) is replaced by the following:

    Each of the following is an insured under this insurance to the extent set forth below:

    **a.** You;

    **b.** Anyone else including any partner or executive officer of yours while using with your permission a "hired auto" or a "nonowned auto" except

    **(1)** The owner or lessee (of whom you are a sublessee) of a "hired auto" or the owner or lessee of a "nonowned auto" or any agent or employee of any such owner or lessee;

    **(2)** Any partner or executive officer with respect to any "auto" owned by such partner or officer or a member of his or her household;

    **(3)** Any person while employed in or otherwise engaged in duties in connection with an "auto business," other than "auto business" you operate;

    **(4)** Anyone other than your employees, partners, a lessee or borrower or any of their employees, while moving property to or from a "hired auto" or a "nonowned auto"; or

    **c.** Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under a. or b. above.

3. **ADDITIONAL DEFINITIONS**

    **a.** "Auto Business" means the business or occupation of selling, repairing, servicing, storing or parking "autos."

    **b.** "Hired auto" means any "auto" you lease, hire, or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your employees or partners or members of their households.

 Copyright, The Travelers Indemnity Company, 1995

Includes Material Copyrighted by Insurance Services Office, Inc.

 

c. "Nonowned auto" means any "autos" you do not own, lease, hire rent or borrow that are used in connection with your business. This includes "autos" owned by your employees or partners or members of their households but only while used in your business or your personal affairs.

## 4. AMENDED DEFINITIONS

Definition 6. "insured contract" of the DEFINITIONS section is amended by the addition of the following to the paragraph (An "insured contract" does not include that part of any contract or agreement):

d. That pertains to the loan, lease or rental of an "auto" to you or any of your employees, if the "auto" is loaned, leased or rented with a driver; or

e. That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

C. The insurance provided by this endorsement is excess over any of the other insurance, whether primary, excess, contingent or on any other basis, that applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" or "nonowned auto."

 Copyright, The Travelers Indemnity Company, 1995 Includes Material Copyrighted by Insurance Services Office, Inc. **CG D0 86 03 95**


**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES IN COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

PROVISIONS

A. Paragraph **1.a.** of COVERAGE A. – BODILY IN-JURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) is deleted and replaced by the following:

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

B. Paragraph **2.b.** of COVERAGE A. – BODILY IN-JURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) is deleted and replaced by the following:

2. **Exclusions**

   This insurance does not apply to:

b. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

   (1) That the insured would have in the absence of the contract or agreement; or

   (2) Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

      (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

      (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

C. Paragraph **1.a.** of COVERAGE B. – PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages) is deleted and replaced by the following:

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance



applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

**D.** The following is added to Paragraph 2. Exclusions of COVERAGE B. – PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages):

(This insurance does not apply to:)

1. "Personal injury" or "advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

2. Any loss, cost or expense arising out of any:

    a. Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

    b. Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**E.** SUPPLEMENTARY PAYMENTS – COVERAGES A AND B (Section I – Coverages) is amended as follows:

1. The first sentence is deleted and replaced by the following:

    We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

2. Paragraph 4. is deleted and replaced by the following:

    4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

3. The following is added:

    If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

    a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

    b. This insurance applies to such liability assumed by the insured;

    c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

    d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

    e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and we agree that we can assign the same counsel to defend the insured and the indemnitee; and

    f. The indemnitee:

        (1) Agrees in writing to:

            (a) Cooperate with us in the investigation, settlement or defense of the "suit";

 Copyright, Travelers Indemnity Company, 1997 **CG D1 94 11 97**

 

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of paragraph **2.b.(2)** of COVERAGE A -- BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I -- Coverages), such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in paragraph f. above, are no longer met.

**F.** WHO IS AN INSURED (Section II) is amended as follows in order to specifically include Limited Liability Companies:

**1.** Paragraphs **1.** and **2.a.** are deleted and replaced by the following:

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to

the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

**a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

**(1)** "Bodily injury" or "personal injury";

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

**(b)** To the spouse , child, parent, brother or sister of that co-"employee" as a conse-



quence of paragraph **(1)(a)** above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **(1)(a)** or **(b)** above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property;

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

2. The first sentence of paragraph **4.** is deleted and replaced by the following:

Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

3. The final paragraph is deleted and replaced by the following:

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**G.** Condition **2.** Duties In The Event Of Occurrence, Offense, Claim or Suit (Section IV – Commercial General Liability Conditions) is amended as follows:

1. Paragraph **c.(3)** is deleted and replaced by the following:

c. You and any other involved insured must:

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

2. Paragraph **d.** is deleted and replaced by the following:

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**H.** Condition **4.** Other Insurance (Section IV – Commercial General Liability Conditions) is amended as follows:

The first two paragraphs of paragraph **b.** are deleted and replaced by the following:

b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I – Coverages).

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**I.** DEFINITIONS (Section V) is amended as follows:

1. Definition **8.** "insured contract" is amended as follows:

a. Subpart **f.(2)(a)** is deleted and replaced by the following:

(a) Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

Copyright, Travelers Indemnity Company, 1997      CG D1 94 11 97



**b.** Subpart **f.(3)** is deleted and replaced by the following:

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failing to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**2.** Definition **14.** "products-completed operations hazard" is amended as follows:

Paragraph **c.(1)** is deleted and replaced by the following:

**c.** This hazard does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**3.** Definition **16.** "suit" is deleted and replaced by the following:

"Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WEB XTEND—LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### PROVISIONS

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY (SECTION I – COVERAGES)** is deleted in its entirety and replaced by the following:

### COVERAGE B. PERSONAL INJURY, ADVERTISING INJURY AND WEB SITE INJURY LIABILITY

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury", "advertising injury" or "web site injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury", "advertising injury", or "web site injury" to which this insurance does not apply. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION – III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

   b. This insurance applies to:

      (1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

      (2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services; or

      (3) "Web site injury" caused by an offense committed in the course of the visual or audio presentation of material on "your web site" or in the numerical expression of computer code used to enable "your web site";

   but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions.**

   This insurance does not apply to:

   a. "Personal injury", "advertising injury" or "web site injury":

      (1) Arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity;

      (2) Arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period;

      (3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

      (4) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

   b. Any loss, cost or expense arising out of any:

      (1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

      (2) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of, pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**c.** "Personal injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability:

   **(1)** Assumed in a contract or agreement that is an "insured contract", provided the "personal injury" arises out of an offense committed subsequent to the execution of the contract or agreement; or

   **(2)** That the insured would have in the absence of the contract or agreement.

**d.** "Advertising injury" arising out of:

   **(1)** Breach of contract;

   **(2)** The failure of goods, products or services to conform with advertised quality or performance;

   **(3)** The wrong description of the price of goods, products or services;

   **(4)** An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting; or

   **(5)** For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**e.** "Web site injury":

   **(1)** arising out of:

      **(a)** Breach of contract;

      **(b)** The failure of goods, products or services to conform with advertised quality or performance;

      **(c)** The wrong description of the price of goods, products or services;

      **(d)** Dishonest, fraudulent, criminal or malicious acts, errors or omissions committed by any insured, or by anyone for whom the insured is legally responsible, whether acting alone or with others;

      **(e)** An offense committed by any insured whose business is providing access to intellectual property of others via "your web site".

      **(f)** The hosting of an electronic chatroom or bulletin board.

   **(2)** expected or intended by any insured.

## SECTION II – WHO IS AN INSURED

The introductory sentence of paragraph 2. a. (1) Section II – Who Is An Insured is deleted and replaced by the following:

**2. a. (1)** "Bodily injury", "personal injury" or "web site injury":

Section II – Who Is An Insured, paragraph 4. c., is deleted and replaced by the following:

**4. c.** Coverage B does not apply to "personal injury", "advertising injury" or "web site injury" arising out of an offense committed before you acquired or formed the organization.

## SECTION III – LIMITS OF INSURANCE

**SECTION III – Limits Of Insurance, paragraph 4,** is deleted and replaced by the following:

**4.** Subject to 2. above, the Personal, Advertising and Web Site Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury", "advertising injury" and all "web site injury" sustained by any one person or organization.

## SECTION V – DEFINITIONS

## ADVERTISING INJURY

The definition of **"Advertising injury" (SECTION V – DEFINITIONS)** is deleted in its entirety and replaced by the following:

**1.** "Advertising injury" means injury, arising out of one or more of the following offenses:

   **a.** Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   **b.** Oral, written or electronic publication of material that violates a person's right of privacy;

   **c.** Infringement of copyright, title or slogan.

## COVERAGE TERRITORY

The definition of **"Coverage Territory", (SECTION V – DEFINITIONS)** is deleted in its entirety and replaced by the following:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

 Copyright, The Travelers Indemnity Company, 2001

 

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

**c.** All parts of the world if:

   (1) The injury or damage arises out of:

      **(a)** Goods or products made or sold by you in the territory described in a. above;

      **(b)** The activities of a person whose home is in the territory described in a. above, but who is away for a short time on your business; or

      **(c)** "Personal injury", "advertising injury", and "web site injury" offenses that take place through the Internet or similar electronic means of communication; and

   (2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

### INSURED CONTRACT

Subparagraph f. of the definition of **"Insured Contract"** (SECTION V – DEFINITIONS) is deleted and replaced by the following:

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal injury" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

### PERSONAL INJURY

The definition of **"Personal injury"** (SECTION V – DEFINITIONS) is deleted in its entirety and replaced by the following:

"Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occu-

pies by or on behalf of its owner, landlord or lessor;

**d.** Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

**e.** Oral, written or electronic publication of material that violates a person's right of privacy.

### SUIT

The definition of **"Suit"** (SECTION V – DEFINITIONS) is deleted in its entirety and replaced by the following:

"Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury", "advertising injury" or "web site injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

The following definitions are added to **SECTION V – DEFINITIONS**

### WEB SITE INJURY

**"Web site injury"**, means injury, other than "personal injury" or "advertising injury", arising out of one or more of the following offenses:

**a.** Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**b.** Oral, written or electronic publication of material that violates a person's right of privacy;

**c.** Oral, written or electronic publication of material that violates a person's right of publicity; or

**d.** Infringement of copyright, title or slogan.

### YOUR WEB SITE

**"Your web site"** means all computer files and data which may be accessed via the Internet using a Universal Resource Locator that includes any domain name owned by or assigned to you.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT — RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to paragraph 2., Exclusions of COVERAGE A—BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):

This insurance does not apply to:

**1.** "Bodily injury" to:

  **a.** A person arising out of any:

    **(1)** Refusal to employ that person;

    **(2)** Termination of that person's employment; or

    **(3)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  **b.** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above is directed.

This exclusion applies

**a.** whether the insured may be held liable as an employer or in any other capacity; and

**b.** to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to paragraph 2., Exclusions of COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages):

This insurance does not apply to:

**1.** "Personal injury" to:

  **a.** A person arising out of any:

    **(1)** Refusal to employ that person;

    **(2)** Termination of that person's employment; or

    **(3)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person; or

  **b.** The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above is directed.

This exclusion applies:

**a.** Whether the insured may be liable as an employer or in any other capacity; and

**b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – LEAD

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
CATASTROPHE UMBRELLA POLICY

**PROVISIONS**

This insurance does not apply to any injury, damage, loss, cost, payment or expense, including, but not limited to, defense and investigation, of any kind arising out of, resulting from, caused by or contributed to by the actual or alleged presence or actual, alleged or threatened dispersal, release, ingestion, inhalation or absorption of lead, lead compounds or lead which is or was contained or incorporated into any material or substance. This exclusion applies, but is not limited to:

1. Any supervision, instructions, recommendations, warnings or advice given in connection with the above;

2. Any obligation to share damages, losses, costs, payments or expenses with or repay someone else who must make payment because of such injury or damage, loss, cost, payment or expense; or

3. Any request, order or requirement to abate, mitigate, remediate, contain, remove or dispose of lead, lead compounds or materials or substances containing lead.

CG D0 76 06 93



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION—DISCRIMINATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## PROVISIONS

1. **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY –** is amended by adding the following additional exclusion:

   (This Insurance does not apply to:)

   "Bodily injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.

2. **COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY –** is amended by adding the following additional exclusion:

   (This insurance does not apply to:)

   "Personal injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION — ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
CATASTROPHE UMBRELLA POLICY

This insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the actual or alleged presence or actual, alleged or threatened dispersal of asbestos, asbestos fibers or products containing asbestos, provided that the injury or damage is caused or contributed to by the hazardous properties of asbestos. This includes:

a. Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

b. Any obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

Copyright, The Travelers Indemnity Company.



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ILLINOIS CHANGES – INSURED CONTRACT

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL GENERAL LIABILITY – CONTRACTORS COVERAGE PART

The following is added to COMMERCIAL GENERAL LIABILITY DEFINITIONS (Section V):

Definition 8., "Insured contract" is amended to add the following:

"Insured contract" does not include your liability to a third party by reason of a Claim or suit against you by that third party for contribution under the Illinois Joint Tortfeasor Contribution Act for damages claimed against such third party as a result of injury to your employee if you have that liability because you have waived, in a contract, your right to limit such liability to the amount of the workers compensation benefits paid for that injured employee under the Illinois Workers Compensation Act.



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LIMITATION WHEN TWO OR MORE POLICIES APPLY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### PROVISIONS

1. Injury, damage or loss might be covered by this policy and also by other policies issued to you by us or any affiliate. When these other policies contain a provision similar to this one, the amount we will pay is limited. The maximum that we will pay under all such policies combined is the highest limit that applies in any one of these policies.

2. This does not apply to any personal liability policy or to any policy with a policy number containing the letters CUP, EX, PRS, SPS, XS or IXL.

 
**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES-CANCELLATION AND NONRENEWAL

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** CANCELLATION (Common Policy Conditions) is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. **a.** We may cancel this policy by mailing to you written notice stating the reason for cancellation.

   **b.** If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   **c.** If we cancel for a reason other than nonpayment of premium, we will mail the notice at least;

      **(1)** 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      **(2)** 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** Any insured has violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification of the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

**B.** The following is added and supercedes any provision to the contrary:

**NONRENEWAL**

1. If we decide not to renew this policy, we will mail written notice stating the reason for nonrenewal no less than 60 days before the expiration date to:

   **a.** You; and

   **b.** The broker, if known to us, or the agent of record.

2. Even if we do not comply with these terms, this policy will terminate:

   **a.** On the expiration date, if:

      **(1)** You fail to perform any of your obligations in connection with the payment of the premium for the policy, or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit; or

      **(2)** We have indicated our willingness to renew this policy to you or your representative; or

      **(3)** You have notified us or our agent that you do not want to renew this policy.

   **b.** On the effective date of any other insurance replacing this policy.

**C.** Mailing of Notices

We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (Broad Form)

This endorsement modifies Insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF
    TRANSPORTATION
UNDERGROUND STORAGE TANK POLICY

1. The Insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plu-tonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 Copyright, Insurance Services Office, Inc., 1997

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES

This endorsement modifies insurance provided under the following:

> COMMERCIAL PROPERTY COVERAGE PART
> FARM COVERAGE PART
> STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to Standard Property Policy **CP 00 99** the terms Coverage Part and Coverage Form in this endorsement are replaced by the term Policy.

**B.** The following is added to the **Legal Action Against Us** Condition:

The 2 year period for legal action against us is extended by the number of days between the date the proof of loss is filed with us and the date we deny the claim in whole or in part.

**C.** If this policy covers:

  **1.** The following in **a.** and **b.,** then Paragraphs **2.** and **3.** apply:

  **a.** Real property used principally for residential purposes up to and including a four family dwelling; or

  **b.** Household or personal property that is usual or incidental to the occupancy of any premises used for residential purposes.

  **2.** The second paragraph of the **Appraisal** Condition is deleted and replaced by the following:

  **a.** Each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally, except as provided in **b.** below.

  **b.** We will pay your appraiser's fee and the umpire's appraisal fee, if the following conditions exist:

   **(1)** You demanded the appraisal ; and

   **(2)** The full amount of loss, as set by your appraiser, is agreed to by our appraiser or by the umpire.

  **3.** The **Concealment, Misrepresentation Or Fraud** Condition is replaced by the following:

  **CONCEALMENT, MISREPRESENTATION OR FRAUD**

  **a.** This Coverage Part or Coverage Form is void if you or any insured ("insured") commit fraud or conceal or misrepresent a fact in the process leading to the issuance of this insurance, and such fraud, concealment or misrepresentation is stated in the policy or endorsement or in written application for this policy and:

   **(1)** Was made with actual intent to deceive; or

   **(2)** Materially affected either our decision to provide this insurance or the hazard we assumed.

  However, this condition will not serve as a reason to void this Coverage Part or Coverage Form after the Coverage Part or Coverage Form has been in effect for one year or one policy term, whichever is less.

  **b.** This Coverage Part or Coverage Form is void if you or any other insured ("insured"), at any time subsequent to the issuance of this insurance, commit fraud or intentionally conceal or misrepresent a material fact relating to:

   **(1)** This Coverage Part or Coverage Form:

   **(2)** The Covered Property:

   **(3)** Your interest in the Covered Property: or

   **(4)** A claim under this Coverage Part or Coverage Form.

  **c.** Notwithstanding the limitations stated in **3.a.** above, we may cancel the Coverage Part or Coverage Form in accordance with the terms of the Cancellation Condition.

**D.** For the Commercial Property Coverage Part and the Standard Property Policy, the following exclusion and related provisions are added to Para-

graph **B.2.** Exclusions in the Causes of Loss Forms and to any Coverage Form or policy to which a Causes of Loss Form is not attached:

1. We will not pay for loss or damage arising out of any act committed:

   **a.** By or at the direction of any insured; and

   **b.** With the intent to cause a loss.

2. However, this exclusion will not apply to deny payment to an innocent co-insured who did not cooperate in or contribute to the creation of the loss if:

   **a.** The loss arose out of a pattern of criminal domestic violence; and

   **b.** The perpetrator of the loss is criminally prosecuted for the act causing the loss.

3. If we pay a claim pursuant to Paragraph **D.2.**, our payment to the insured is limited to that insured's insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

**E.** The **Intenational Loss Exclusion** in the Causes of Loss Form – Farm Property, Mobile Agricultural Machinery And Equipment Coverage Form and Livestock Coverage Form is replaced by the following:

1. We will not pay loss ("loss") or damage arising out of any act committed:

   **a.** By or at the direction of any "insured"; and

   **b.** With the intent to cause a loss ("loss").

2. This exclusion, however, will not apply to deny payment to an innocent co-"insured" who did not cooperate in or contribute to the creation of the loss ("loss") if:

   **a.** The loss ("loss") arose out of a pattern of criminal domestic violence; and

   **b.** The perpetrator of the loss ("loss") is criminally prosecuted for the act causing the loss.

3. If we pay a claim pursuant to Paragraph **E.2.**, our payment to the "insured" is limited to that "insured's insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

 Copyright, Insurance Services Office, Inc., 1999 **IL 01 18 03 99**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

**A.** The CANCELLATION Common Policy Condition is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. If this policy has been in effect for 60 days or less, except as provided in paragraphs 9. and 10. below, we may cancel this policy by mailing written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. If this policy has been in effect for more than 60 days, except as provided in paragraphs 9. and 10. below, we may cancel this policy only for one or more of the following reasons:

   a. Nonpayment of premium;

   b. The policy was obtained through a material misrepresentation;

   c. You have violated any of the terms and conditions of the policy;

   d. The risk originally accepted has measurably increased;

   e. Certification to the Director of Insurance of the loss of reinsurance by the insurer which provided coverage to us for all or a substantial part of the underlying risk insured; or

   f. A determination by the Director that the continuation of the policy could place us

in violation of the insurance laws of this State.

If we cancel this policy based on one or more of the above reasons except for non-payment of premium, we will mail written notice at least 60 days before the effective date of cancellation. When cancellation is for nonpayment of premium, we will mail written notice at least 10 days before the effective date of cancellation.

4. We will mail our notice to you, any mortgagee or lienholder known to us and to the agent or broker, at the last addresses known to us.

5. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

7. Proof of mailing will be sufficient proof of notice.

8. Our notice of cancellation will state the reason for cancellation.

9. **REAL PROPERTY OTHER THAN RESIDENTIAL PROPERTIES OCCUPIED BY 4 FAMILIES OR LESS:**

   The following applies only if this policy covers real property other than residential property occupied by 4 families or less:

   If any one or more of the following conditions exists at any building that is Covered Proper-

ty in this policy, we may cancel this policy by mailing to you written notice of cancellation at least 10 days before the effective date of cancellation.

a. After a fire loss, permanent repairs to the building have not started within 60 days of satisfactory adjustment of loss, unless the delay is due to a labor dispute or weather conditions.

b. The building has been unoccupied 60 or more consecutive days. This does not apply to:

(1) Seasonal unoccupancy; or

(2) Buildings under repair, construction or reconstruction, if properly secured against unauthorized entry.

c. The building has:

(1) An outstanding order to vacate;

(2) An outstanding demolition order; or

(3) Been declared unsafe in accordance with the law.

d. Heat, water, sewer service or public lighting have not been connected to the building for 30 consecutive days or more.

## 10. RESIDENTIAL PROPERTIES OCCUPIED BY 4 FAMILIES OR LESS:

The following applies if this policy covers residential properties occupied by 4 families or less:

If this policy has been in effect for 60 days or if this is a renewal policy, we may only cancel this policy for one or more of the following reasons:

a. Nonpayment of premium;

b. The policy was obtained by misrepresentation or fraud; or

c. Any act that measurably increases the risk originally accepted.

The provisions of paragraphs 9. and 10. above do not apply to coverage under the Glass Coverage Form.

11. For insurance provided under the COMMERCIAL PROPERTY COVERAGE PART, the following applies:

## GRAIN IN PUBLIC GRAIN WAREHOUSES

(Not applicable to grain owned by the Commodity Credit Corporation)

The following applies only with respect to grain in public grain warehouses:

The first Named Insured or we may cancel this policy at any time by mailing to:

a. The other; and

b. The Director of the Illinois Department of Agriculture (at its Springfield Office);

60 days' written notice of cancellation.

B. The following is added:

## NONRENEWAL

1. If we decide not to renew this policy, we will mail written notice stating the reason for non-renewal to your last mailing address known to us at least 60 days before the expiration date of the policy. A copy of the notice will also be sent to:

a. The broker, if known to us, or the agent of record; and

b. The last known mortgagee or lienholder named in the policy at the last mailing address known to us.

This paragraph does not apply if we have manifested our willingness to renew directly to you.

2. The following provision applies only if this policy covers residential properties occupied by 4 families or less:

If this policy has been issued to you and in effect with us for 5 or more years, we may not fail to renew this policy unless:

a. The policy was obtained by misrepresentation or fraud;

b. The risk originally accepted has measurably increased; or

c. You received 60 days' notice of our intent not to renew as provided in 1. above.

The provisions of paragraph B.2. above do not apply to coverage under the Glass Coverage Form.

Copyright, Insurance Services Office, Inc., 1990
Copyright, ISO Commercial Risk Services, Inc., 1990
**IL 02 84 05 90**





THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ILLINOIS INSURANCE IN THE TRAVELERS INDEMNITY COMPANY OF ILLINOIS

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
BUSINESS AUTO COVERAGE PART
BUSINESSOWNERS COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

## PROVISIONS

The obligations expressed in the policy as obligations of the company indicated as insuring company in the Common Policy Declarations subject to the exclusions, conditions and other terms thereof, are the obligations of The Travelers Indemnity Company of Illinois to the extent that such obligations are with respect to risks located in Illinois and that the policy to such extent as a contract between the insured and The Travelers Indemnity Company of Illinois and no other.

One Tower Square, Hartford, Connecticut 06183



Trav___sPropertyCasualty
A Member of Travelers Group

CHANGE ENDORSEMENT

Named Insured:
SWEDISH BEVERAGES, INC.

Policy Number: I-660-870X561A-TIL-02
Policy Effective Date: 05/17/02
Issue Date: 06/24/02
Additional Premium $ 49

Effective from 05/23/02 at the time of day the policy becomes effective.

THIS INSURANCE IS AMENDED AS FOLLOWS:

ADD AS ADDITIONAL INSURED TREE OF LIFE NORTHEAST UNDER ENDORSEMENT
CG 20 15 FOR LOC 1 / BLDG 1:  2333 WAUKEGAN RD., BANNOCKBURN, IL 60015

NAME AND ADDRESS OF AGENT OR BROKER:            COUNTERSIGNED BY:
     T J ADAMS GROUP LLC (SV782)
     333 E BUTTERFIELD ROAD
     SUITE 500                                  _____
     LOMBARD, IL 60148                          Authorized Representative
                                                DATE: _____
IL T0 07 09 87     PAGE  1 OF  1                OFFICE: ELMIRA NY SRV CTR

**Travelers**Property Casualty
A Member of Travelers Group

POLICY NUMBER: I-660-870X561A-TIL-02

EFFECTIVE DATE: 05-17-02

ISSUE DATE: 06-24-02

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

IL T0 07 09 87    CHANGE ENDORSEMENT
IL T8 01 10 93    FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

COMMERCIAL GENERAL LIABILITY

CG 20 15 11 88    ADDITIONAL INSURED-VENDORS


**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED — VENDORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

Policy Number:

Name of Person or Organization (Vendor):
**TREE OF LIFE NORTHEAST**

**2501 71ST STREET**

**NORTH BERGAN          NJ 07047**

Your Products:  **FRUIT/VEGETABLE JUICE MFG.**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization (referred to below as vendor) shown in the Schedule, but only with respect to "bodily injury" or "property damage" arising out of "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

1. The insurance afforded the vendor does not apply to:
    a. "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

    b. Any express warranty unauthorized by you;

    c. Any physical or chemical change in the product made intentionally by the vendor.

    d. Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instruc-

tions from the manufacturer, and then repackaged in the original container;

    e. Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business in connection with the distribution or sale of the products;

    f. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

    g. Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor.

2. This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

TravelersPropertyCasualty
A Member of TravelersGroup

THE TRAVELERS
DBS - 700 870X561A 660    020517
P.O. BOX 26385
RICHMOND, VA  23260-6385



**Notice of Cancellation**

SWEDISH BEVERAGES, INC.
2333 WAUKEGAN RD.
BANNOCKBURN        IL        60015

**YOUR INSURANCE POLICY IS SUBJECT TO CANCELLATION.    PLEASE
SEE REVERSE SIDE FOR NOTICE OF CANCELLATION.**



**Travelers**Property Casualty
*A Member of Travelers Group*

**Commercial Package**

## NOTICE OF CANCELLATION
## FOR NON-PAYMENT OF PREMIUM

**POLICY NO.** 870X561A 660 0
**Issue Date** 08/12/02
**Page 2 of 3**

Insurer  THE TRAVELERS INDEMNITY
COMPANY

Agent  T J ADAMS GROUP LLC

**Named Insured
and Mailing Address**
SWEDISH BEVERAGES, INC.
2333 WAUKEGAN RD.
BANNOCKBURN   IL   60015

**Please contact your agent
if you have any questions.**
PHONE: (888) 661-3938

## EFFECTIVE DATE OF CANCELLATION: SEPTEMBER 01, 2002

We are pleased to have you as a customer and would like to continue to provide your
insurance.  Unfortunately, we have not received the premium payment due on this policy.
Therefore, your policy shown on this notice is cancelled on the effective date of
cancellation shown above, and at the time the policy became effective. We will refund any
premium due you. We regret having to take this action, and will be pleased to reinstate
this coverage if we receive your payment on or before the effective date of cancellation.
In that event, we will send you a notice of reinstatement continuing your coverage.

| Premium Information | | |
|---|---|---|
| POLICY NUMBER  870X561A 660   0 | POLICY PERIOD 05/17/02 To 05/17/03 | |
| Previous balance          $10,695.40 | Pay Either Amount | MINIMUM DUE    $2,673.84 |
| | | TOTAL DUE    $10,695.40 |
| | By | DUE DATE  SEPTEMBER 01, 2002 |

If you wish to reinstate your policy, you must pay the MINIMUM DUE by the effective date
of cancellation.  The MINIMUM DUE shown above includes:

    $1,336.92 that was due on 08/01/02;
    $1,336.92 that is  due on 09/01/02.

A late charge has been assessed on your account because we have not received your previous
minimum due. This account level charge is listed on another notice that is being issued
and mailed to you today.

*Please detach the return stub and mail with your payment in the enclosed envelope to:*
THE TRAVELERS, CL REMITTANCE CENTER, HARTFORD, CT 06183-1008.
...........................................................................................
648844J   2002224  5147  700 08V782

**Payment Coupon**  *Make checks payable to:* THE TRAVELERS - COMMERCIAL LINES

T J ADAMS GROUP LLC
SWEDISH BEVERAGES, INC.

Include Account Number on the check.

3304PA073       870X561A 660   0

| | |
|---|---|
| Change of Address? Place an "X" here. Print changes on reverse side. | **TOTAL BALANCE** $10,695.40 |
| | **MINIMUM DUE** $2,673.84 |

**PAYMENT MUST BE RECEIVED BY**
SEPTEMBER 01, 2002

THE TRAVELERS
CL REMITTANCE CENTER
HARTFORD, CT 06183-1008

*C*

AMOUNT ENCLOSED

9933333034160130373340393939392900026738400106954063

 TravelersPropertyCasualty
A Member of TravelersGroup


The account number shown above consists of your CL policy number and policy form. For the complete policy number refer to your policy paper.

This bill is rendered by The Travelers affiliated company indicated on the policy noted above.

*********************************** QUESTIONS? ***************************************

If you have any questions about this statement, please contact your Agent, Travelers Billing Customer Service or the Travelers on-line Telephone Inquiry Service. To reach Travelers Billing Customer Service or the Telephone Inquiry dial 1-800-252-2268 and follow the instructions.
Your 9 character billing account number is: --- 3304PA073.

Date of this Notice      08/19/02

SWEDISH BEVERAGES, INC.
2333 WAUKEGAN RD.
BANNOCKBURN     IL     60015

Please contact your agent
with any questions, future
policy changes and all
address changes.

T J ADAMS GROUP LLC
(888) 661-3938

# REINSTATEMENT NOTICE

We are pleased to tell you that your policy has been reinstated.  Thank you for your payment.

| POLICYHOLDER | POLICY IDENTIFICATION NUMBER |
|---|---|
| SWEDISH BEVERAGES, INC. | 870X561A 660 |
| **TYPE OF INSURANCE** | **POLICY PERIOD** |
| Commercial Package | 05/17/02 To 05/17/03 |

Receipt of funds dishonored upon presentment is not a valid means of reinstatement.  Reinstatement will only occur when all conditions have been met.  If these conditions have not been met the reinstatement will be null and void.

We understand that circumstances will occasionally cause a payment to arrive late, but please be aware that if future payments don't reach us on time, WE MAY REQUIRE FULL PAYMENT OF THE OUTSTANDING BALANCE ON YOUR POLICY.  Please contact your Travelers representative if you have any questions concerning this notice.  Thank you for your business.

648826R     2002231     5152     700 0SV782

One Tower Square, Hartford, Connecticut 06183



CHANGE EFFECTIVE DATE: 02-28-03
CHANGE ENDORSEMENT NUMBER: 0002

Travelers Property Casualty
A Member of Travelers Group

## CHANGE ENDORSEMENT

Named Insured:
SWEDISH BEVERAGES, INC.

Policy Number: I-660-870X561A-TIL-02
Policy Effective Date: 05/17/02
Issue Date: 03/03/03
Premium $ NIL

Effective from 02/28/03 at the time of day the policy becomes effective.

THIS INSURANCE IS AMENDED AS FOLLOWS:

ADD AS ADDITIONAL INSURED CARRAMERICA REALTY LP AS PROVIDED UNDER
ENDORSEMENT CG 20 11 FOR LOC 1/BLDG 1 2333 WAUKEGAN ROAD,
BANNOCKBURN, IL  60015

NAME AND ADDRESS OF AGENT OR BROKER:
   T J ADAMS GROUP LLC (SV782)
   333 E BUTTERFIELD ROAD
   SUITE 500
   LOMBARD, IL 60148

IL T0 07 09 87    PAGE 1 OF 1

COUNTERSIGNED BY:

_____
Authorized Representative
DATE: _____

OFFICE: ELMIRA NY SRV CTR



POLICY NUMBER: I-660-870X561A-TIL-02

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED — MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

1. Designation of Premises (Part Leased to You):

   2333 WAUKEGAN ROAD
   BANNOCKBURN            IL 60015

2. Name of Person or Organization (Additional Insured):

   CARRAMERICA REALTY LP

   2333 WAUKEGAN ROAD, STE 240

   BANNOCKBURN            IL 60015

3. Additional Premium: $        4

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to be a tenant in that premises.

2. Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule.

       Copyright, Insurance Services Office, Inc., 1984

One Tower Square, Hartford, Connecticut 06183

Trav●Property Casualty
A Member of Travelers Group

CHANGE ENDORSEMENT

Named Insured:
SWEDISH BEVERAGES, INC.

Policy Number: I-660-870X561A-TIL-02
Policy Effective Date: 05/17/02
Issue Date: 03/25/03
Return Premium $ 285

Effective from 02/28/03 at the time of day the policy becomes effective.

THIS INSURANCE IS AMENDED AS FOLLOWS:

THE FOLLOWING LOCATION IS ADDED:

LOCATION 03, BUILDING 03:
631 W PARK AVE.  AURORA, IL 60506

OCCUPANCY- WAREHOUSE

LIMITS AT LOCATION 03:  BUSINESS PERSONAL PROPERTY   $  400,000
                        GENERAL LIABILITY AGGREGATE  $2,000,000
                        GENERAL LIABILITY EACH OCC   $1,000,000

LOCATION 02, BUILDING 02: 10601 SEYMOUR AVENUE   FRANKLIN PARK, IL 60131
THE LOCATION DELETED FOR ALL COVERAGES

ADD'L INS-MANAGERS OR LESSORS OF PRM, CG 20 11, 11-85,
IS AMENDED AS FOLLOWS:

ADDITIONAL INSURED-VENDORS, CG 20 15, 11-88,
IS AMENDED AS FOLLOWS:

NAME AND ADDRESS OF AGENT OR BROKER:          COUNTERSIGNED BY:
  T J ADAMS GROUP LLC (SV782)
  333 E BUTTERFIELD ROAD                      _____
  SUITE 500                                   Authorized Representative
  LOMBARD, IL 60148                           DATE: _____

IL T0 07 09 87    PAGE  1 OF  1               OFFICE: ELMIRA NY SRV CTR


**POLICY NUMBER:** I-660-870X561A-TIL-02

**EFFECTIVE DATE:** 05-17-02

**ISSUE DATE:** 03-03-03

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

IL TO 07 09 87   CHANGE ENDORSEMENT
IL T8 01 10 93   FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

COMMERCIAL GENERAL LIABILITY

CG 20 11 11 85   ADD'L INS-MANAGERS OR LESSORS OF PRM